**Roy Lee ENGBERG, Appellant (Petitioner),**

v.

**Joseph B. MEYER, Attorney General of the State of Wyoming, and Duane Shillinger, Warden of the Wyoming State Penitentiary, Appellees (Respondents).**

No. 87–15.

Supreme Court of Wyoming.

Oct. 17, 1991.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, and Martin J. McClain, Deputy State Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., and John W. Renneisen, Deputy Atty. Gen., for appellees.

Before BROWN, C.J.,* Ret., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

THOMAS, Justice, writing for the Court on the issues affecting guilt or innocence, and CARDINE, Justice, writing for the Court on the issues affecting the imposition of the capital sentence.

MACY, J., filed an opinion dissenting in part and concurring in part.

URBIGKIT, J., filed an opinion dissenting in part and concurring in part.

THOMAS, J., filed an opinion dissenting with respect to the reversal of the capital sentence, in which BROWN, C.J., Ret., joined.

In this appeal from the denial of post-conviction relief in a capital murder case, the issues divide, as does the pertinent statute, between those matters that affect the determination of guilt or innocence and those that impact the imposition of the capital sentence. Because of a division of the court with respect to the disposition of this case, with three justices agreeing that Roy Lee Engberg (Engberg) was lawfully convicted of first degree murder but one of those justices agreeing with the other two that the capital sentence should be set aside, the majority opinion of the court with respect to those issues affecting guilt

* Chief Justice at time of oral argument.

or innocence has been assigned to Justice Thomas and the majority opinion of the court with respect to the issues affecting the imposition of the capital sentence has been assigned to Justice Cardine.

THOMAS, Justice (on the question of guilt or innocence of first degree murder).

The first function of the court in this appeal is to apply our rule of procedural waiver. Next, questions that could not be presented on direct appeal or for which cause exists to avoid procedural waiver must be examined for error of constitutional magnitude. With respect to the conviction of the crime of first degree murder, these questions include: failure of the prosecution to advise Engberg of a hypnotic session with a key witness; a claim of ineffective assistance of counsel on direct appeal (this issue requires that we afford incidental attention to two other contentions); a claim of cumulative error that was prejudicial to Engberg's right to a fair trial; a charge of conflict of interest because a member of the attorney general's legal staff had served as counsel for Engberg on his direct appeal; and a claim that this court has structured an unfair and constitutionally infirm process for seeking post-conviction relief. All but five of the claims asserted by Engberg as fatally affecting his conviction fall under the rule of procedural waiver. With respect to the others, we conclude that none serve as a ground for setting aside the conviction of first degree murder. We affirm the dismissal by the trial court of Engberg's petition for post-conviction relief insofar only as that dismissal relates to the propriety of his conviction.

Engberg was convicted, after a trial by jury, of the crimes of felony murder in violation of § 6–4–101(a), W.S.1977, and armed robbery in violation of § 6–4–402, W.S.1977. Following these findings of guilty, the jury received evidence with respect to whether capital punishment should be imposed and, in accordance with § 6–2–102, W.S.1977 (June 1983 Repl.), found five statutory aggravating circumstances and no statutory mitigating circumstances, but did determine, as a non-statutory mitigating circumstance, the fact that the crimes may have been induced by economic and family conditions. The jury then recommended capital punishment, which was imposed by the court pursuant to § 6–2–102(f), W.S.1977 (June 1983 Repl.). A sentence of twenty-five to thirty years was imposed for the aggravated robbery. Engberg appealed the judgment and sentence for these crimes, and this court affirmed. A more detailed statement of the facts underlying Engberg's conviction can be found in *Engberg v. State*, 686 P.2d 541 (Wyo.1984), *cert. denied* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984).

After this court affirmed his convictions and denied his petition for rehearing, counsel was appointed for Engberg to assist him in presenting a petition for post-conviction relief. Engberg asserted twenty issues to the district court in support of his petition for rehearing. The State of Wyoming moved to dismiss the petition pursuant to Rule 12(b)(6), W.R.C.P. Following oral argument, the trial court entered a memorandum of findings of fact and conclusions of law explaining its decision to grant the State's motion. An order was entered in the district court dismissing Engberg's petition for post-conviction relief. This appeal is taken from that order.

For the sake of completeness, all of the issues asserted by Engberg are set forth in Appendix I to this opinion. Our examination of those issues convinces the court that all but six of them could, or should, have been raised on direct appeal, and no good cause is shown in this appeal for the failure to include them in the direct appeal. We have said:

"* * * This court has taken a disciplined approach to post-conviction relief, pointing out that it is not a substitute for the right of review upon appeal from a conviction nor is it to be treated as an appeal. Questions which may be raised by a motion for post-conviction relief are limited to those of constitutional magnitude which manifest a miscarriage of justice. Those issues which could have been presented on appeal are not open to

challenge by a motion for post-conviction relief because they are foreclosed by the doctrine of res judicata." *Cutbirth v. State*, 751 P.2d 1257, 1261 (Wyo.1988) (citations omitted).

This is a rule of procedural waiver very like that applied in the federal courts.

" * * * [A] convicted person is foreclosed from raising in a post-conviction proceeding any claim of error which he could or should have presented on appeal unless he demonstrates good cause for not presenting the issue on appeal and actual prejudice arising from the failure to present it. This adoption of a rule parallel to the rule applied in the federal courts will facilitate in a material way the task of the federal courts in examining issues raised in federal post-conviction proceedings in which review is sought of a conviction in the State of Wyoming." *Cutbirth*, 751 P.2d at 1262.

This rule of procedural waiver is applicable to, and forecloses from direct consideration, the first issue and the third through the fifteenth issues set forth in the appendix.

The remaining issues as articulated by Engberg are:

"2. Whether the State's failure to disclose its use of hypnosis as means of enhancing Kay Otto's memory violated its ethical obligations and denied appellant his right to due process of law, his right of confrontation, and his right to effective assistance of counsel.

\*　\*　\*　\*　\*　\*

"16. Whether appellant's right to be free from cruel and unusual punishment and to due process was violated by the jury's finding as aggravating circumstances that the murder was committed for pecuniary gain and while the defendant was engaged in the commission of a robbery when the robbery had already been used to elevate the crime to capital murder.

"17. Whether the cumulative nature of the error is such that, regardless of the harmlessness of any one error, together they prejudiced appellant's rights to due process, fundamental fairness, and a reliable determination that the death penalty should be imposed.

"18. Whether appellant was afforded effective assistance of counsel during his appeal to the Wyoming Supreme Court.

"19. Whether it was improper for the office of the Attorney General to represent the State in post-conviction proceedings to urge that an Assistant Attorney General's proper representation was a procedural bar to the issues raised in appellant's petition for post-conviction relief.

"20. Whether this Court's discussion and holding in prior cases with regard to petitions for post-conviction relief ignore the plain and obvious statutory language and establish a procedure which is violative of fundamental fairness due process and equal procedure and whether it has established a confusing and unworkable process wherein courts simply dismiss petitions for post-conviction relief to get rid of them."

The State of Wyoming styles these issues as arguments and, responding first to "Issue 20," states them as follows:

"I. Was there error in the procedures followed in the lower court on Engberg's petition for post-conviction relief?

\*　\*　\*　\*　\*　\*

"VIII. Was Engberg deprived of a fair trial, due process or confrontation by the failure of the State to disclose Kay Otto's contact with a hypnotist?

\*　\*　\*　\*　\*　\*

"XIII. Was the jury properly instructed as to statutory aggravating circumstances; was Engberg denied due process or subjected to cruel and unusual punishment?

"XIV. Did Engberg receive effective assistance of counsel on appeal?

"XV. Does the cumulative nature of any errors in this case warrant relief?

"XVI. Is the Attorney General's entire staff disqualified from post-conviction proceedings because one of Engberg's four attorneys on direct appeal has since become an Assistant Attorney General?"

■ Engberg urges with respect to these issues that error was committed during or after his direct appeal or that he has demonstrated good cause for not presenting the issues at that time. We agree that Issues 18, 19 and 20 quoted above could not have been raised on direct appeal. We conclude that good cause has been demonstrated to avoid the rule of procedural waiver with respect to Issues 2 and 16. As to the former, the prosecutor did not disclose the hypnotic session to Engberg, and it was not discovered until after his direct appeal. With respect to Issue 16, it is premised upon recent federal decisions which would require a conclusion that Engberg's sentence was imposed in violation of the Constitution of the United States of America, if we should accept the principles found in those cases. The change in the law demonstrates sufficient cause to avoid our rule of procedural waiver. Finally, the claim of cumulative error will be considered, but only with respect to those issues properly before the court in this appeal.

We first address Engberg's claims relating to the hypnosis of a key witness, Kay Otto, the victim's sister, who was with the victim when he was shot and killed by Engberg. We are satisfied that good cause has been demonstrated for not presenting this issue on appeal, and error must be found for violation of the standards set forth in our precedents. Even though some of our state standards were articulated subsequent to Engberg's conviction, he would have been entitled to invoke them because his case had not been decided finally at the time those rules were promulgated. We conclude, however, that this error does not require that post-conviction relief be granted because Engberg has not demonstrated substantial prejudice.

The record now discloses that a hypnotic session was conducted in an effort to enhance Kay Otto's recollection of the events at the time her brother was killed. This information was not disclosed to Engberg or his counsel prior to the return of the jury's verdict and, in fact, was not discovered until the preparation of Engberg's petition for post-conviction relief. When the question was raised, the district court permitted interrogatories to be filed and, in response, the State admitted the hypnotic session. By the affidavits of Kay Otto and the police officer who conducted the hypnotic session, the State suggests that the hypnosis was unsuccessful. Engberg contends that an evidentiary hearing must be conducted in order to resolve that question. We are satisfied that no hearing is required because, under our case law, any attempt to hypnotize a witness must be disclosed.

■ The State relies upon language from *Haselhuhn v. State*, 727 P.2d 280, 284 (Wyo.1986), *cert. denied* 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987), in which the court stated:

"* * * [T]he State must advise the defendant of the fact that a witness has been previously hypnotized and make available to the defendant on request all statements and proceedings relating to the hypnosis."

*See also Gee v. State*, 662 P.2d 103 (Wyo. 1983); *Chapman v. State*, 638 P.2d 1280 (Wyo.1982). The State insists that this language reaches only situations in which the witness actually was hypnotized. In *Chapman*, however, we articulated the proposition that the fact or degree of hypnosis is difficult to evaluate. We are satisfied that a defendant need not depend upon the conclusion of the State with respect to that fact. We never have suggested that the requirement of disclosure is dependent upon the success of the effort at hypnosis. *See Haselhuhn; Pote v. State*, 695 P.2d 617 (Wyo.1985); *Chapman*.

■ We also are satisfied that Engberg was entitled to claim the benefit of this disclosure requirement. He was convicted on December 20, 1982. Our decision in *Gee* was announced on April 28, 1983. While we suggested in that decision that the rule articulated was implicit in *Chapman*, which did antedate Engberg's conviction, we do not rely upon the proposition that the State was on notice by virtue of *Chapman*. Engberg was entitled to the benefit of the rule announced in *Gee* because it must be applied retroactively.

In *Ostwald v. State*, 538 P.2d 1298 (Wyo. 1975), we adopted the principles set forth in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), in order to determine whether a defendant should receive the benefit of retroactive application of a decision by this court.[1] We applied those principles, as they should be applied in this case, when we said in *Flores v. State*, 572 P.2d 746, 747 (Wyo.1977):

> "Where the purpose served by the ruling would be to 'substantially improve the accuracy of the fact finding process at trial' a retroactive application of such decision is mandated, *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 1046, 28 L.Ed.2d 434 (1971) * * *."

Essentially, this is the rule advanced in *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977); *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). In such an instance, neither good faith reliance on the old law nor the impact on the administration of justice are sufficient to require only prospective application. *Williams*. The product of our decisions concerning hypnosis is that the rule does enhance the fact finding process because of its utility in testing the credibility of the witness.

Furthermore, retroactive application is not foreclosed on grounds that Engberg's case was "finally decided." *E.g., Flores*, 572 P.2d 746; *Ostwald*, 538 P.2d 1298. Our rule with respect to "finally decided" cases relates to the availability of appeal after the judgment of conviction has been rendered. When appeal has been exhausted, we hold the case to have been "finally decided." *Flores; Ostwald. See also Clenin v. State*, 573 P.2d 844 (Wyo.1978), *confirmed on reh'g sub nom. Summers v.*

*State*, 731 P.2d 558 (Wyo.1989) (rule enunciated in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), applied retroactively to cases on direct appeal). Because Engberg's appeal had not been decided at the time we decided *Gee*, 662 P.2d 103, Engberg should receive the benefit of the rule announced in *Gee*.

Even in light of these principles, our examination of the record persuades us beyond a reasonable doubt that this error was not prejudicial. There is no reasonable probability that the jury's verdict would have been different had the use of hypnosis with respect to Kay Otto been disclosed. This is not an instance in which she was the only witness who identified Engberg; several other witnesses testified that he was the murderer. In addition, the record contains an abundance of circumstantial evidence linking Engberg to the robbery and the murder. On the day of the murder, he inexplicably departed from Casper where the murder occurred; he had acquired money on that day, but the source of those funds is unexplained; he paid his overdue rent and rent for a week in advance even though he abandoned the rented premises that same day; he used aliases to conceal his identity; he was deceptive with respect to the purpose for which he purchased a used car in Rawlins after the car driven from Casper failed; material evidence was found along the road between Rawlins and Salt Lake City, Utah; at various times, Engberg, or his wife, had pawned a .38 caliber revolver; a round of ammunition which would fit that revolver was discovered in the pocket of a vest in the abandoned mobile home; additional rounds were located in Engberg's motel room when he was arrested; and, in the automobile purchased in Rawlins, an orange-toned, multicolored ski cap and a brown lightweight jacket similar to those worn by the killer were found. *See Engberg*, 686 P.2d 541. Under these circumstances, the loss of the oppor-

1. In *Ostwald v. State*, 538 P.2d 1298 (Wyo.1975), we quoted from *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), the following:

" * * * The criteria guiding resolution of the question implicates (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

tunity to impeach Kay Otto with respect to the use of hypnosis could not lead to any different result.

■ We also address Engberg's argument that the failure to disclose the use of hypnosis constituted a violation of his right to due process as announced in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* requires the state to disclose "evidence that is both favorable to the accused and 'material either to guilt or punishment.'" *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *Brady.* Impeachment evidence, like exculpatory evidence, is within the *Brady* rule and must be disclosed if material. *Bagley; Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We have stated previously that evidence of hypnosis is valuable for impeachment purposes:

"* * * [T]he credibility of a witness could be seriously impaired by hypnosis under certain circumstances inasmuch as:

"'The issue relative to the admissibility of testimony of witnesses who were previously hypnotized is whether the product of the hypnosis was to refresh or develop the witness' own recollection or to teach the witness and add additional facts to the recollection beyond that which has been mentally stored in the memory, consciously or unconsciously. The issue is properly one for the fact finder—as are all issues relative to the credibility of the witness.' [*Chapman v. State,*] 638 P.2d at 1282.

"And we carefully inquired in *Chapman v. State,* supra, as to whether or not the defendant had adequate opportunity to determine and present to the jury the evidence relative to aspects of hypnotism and its use on the particular witness." *Gee,* 662 P.2d at 104.

*See Chapman,* 638 P.2d 1280; *Napue v. People of the State of Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *People v. Pugh,* 156 Cal.App.3d 544, 203 Cal.Rptr. 43 (1984). The failure to disclose the use of hypnosis deprived Engberg of the opportunity to effectively cross-examine an important eye witness; the jury was not privy to the use of hypnosis in weighing the credibility of Kay Otto.

The federal standard is that the failure of the prosecution to disclose evidence found to be material requires reversal of a conviction. *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In a shift from the approach suggested in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held in *Bagley,* 473 U.S. 667, 105 S.Ct. 3375, that no specific request is required for disclosure of impeachment evidence. The test with respect to materiality, however, now reads:

"* * * The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 33.

The federal courts of appeal have considered the rule in *Bagley* to be retroactive. *Trujillo v. Sullivan,* 815 F.2d 597 (10th Cir.1987), *cert. denied* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); *United States v. Ingraldi,* 793 F.2d 408 (1st Cir. 1986); *Brogdon v. Blackburn,* 790 F.2d 1164, *reh'g denied* 793 F.2d 1287 (5th Cir. 1986), *cert. denied* 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824, *reh'g denied* 483 U.S. 1012, 107 S.Ct. 3245, 97 L.Ed.2d 749, *cert. denied sub nom. Brogdon v. Butler,* 483 U.S. 1040, 108 S.Ct. 13, 97 L.Ed.2d 802 (1987); *United States v. Pflaumer,* 774 F.2d 1224 (3rd Cir.1986), *cert. denied* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986); *State v. Hall,* 329 S.E.2d 860 (W.Va.1985). Trial counsel for Engberg did request all statements of proposed witnesses and submitted a general request for all exculpatory evidence. These requests were granted by the trial court. We need not determine whether the request should have been understood to cover use of hypnosis to enhance the testimony of the witness. If the evidence of hypnosis was ma-

terial under the federal definition, disclosure was required. *Brady; Bagley.*

The reasoning which explains that there was no prejudicial error under our state rule also applies to the claim under *Brady* and *Bagley.* This conclusion is consistent with several federal cases which have found that the product of overwhelming evidence is that any evidence relating to hypnosis is not material and that no error occurred under federal standards. *Trujillo; Ingraldi; Pflaumer; United States v. Risken,* 788 F.2d 1361 (8th Cir.1986). *Compare Bowen v. Maynard,* 799 F.2d 593 (10th Cir.1986), *cert. denied* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986) (identification evidence against defendant significantly impeachable by withheld evidence and case otherwise weak); *Hall,* 329 S.E.2d 860 (most important issue was identification testimony of a witness which was subject to impeachment by withheld evidence). This analysis under the federal standard resulting in a conclusion that non-disclosed evidence of hypnosis was not material further persuades us that the failure to disclose the hypnotic session, in accordance with *Gee,* 662 P.2d 103, was harmless.[2]

▪ Engberg's claim that he was denied effective assistance of appellate counsel, as advanced in his 18th stated issue, is not subject to the rule of waiver because it could not be raised in his appeal. His argument that ineffective assistance may be found because of the failure of counsel to raise every issue argued in his motion for post-conviction relief is not persuasive. The failure to raise an issue on appeal, even if meritorious, does not demonstrate ineffective assistance of appellate counsel. *Cutbirth,* 751 P.2d 1257. We noted in *Cutbirth,* 751 P.2d at 1263, that, as a matter of tactical choice, counsel presenting an ap-

peal may choose not to raise certain issues to avoid lessening "the impact of specific issues which counsel feels offer a reasonable chance of success," citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). *See Kennedy v. Shillinger,* 759 F.Supp. 1554 (D.Wyo.1991). We have followed the majority of the federal courts in adopting the standard articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), for the purpose of determining effective assistance of appellate counsel. Appellant must persuade us that the representation afforded to him was deficient by demonstrating errors so serious that appellate counsel could not be considered to be functioning in accordance with the constitutional guarantee and that, furthermore, the deficient performance was prejudicial to the appellant.

▪ Because of the inherent difficulty in applying that standard, developed for evaluating the effectiveness of trial counsel, to appellate proceedings, we adopted a process in *Cutbirth* pursuant to which the claim of ineffective assistance of appellate counsel is resolved by the application of objective criteria. We held that ineffective assistance of appellate counsel is demonstrated by showing: first, the particular facts, as found in the trial record without resort to speculation or equivocal interference, upon which the claim of inadequate representation by appellate counsel rests; and, second, that those record facts serve to invoke a clear and unequivocal rule of law which was transgressed in a clear and obvious, not merely arguable, way. In addition, the appellant must show that he was prejudiced because the failure to present the issue on direct appeal resulted in an

---

**2.** The State has suggested that this issue should be treated under the newly discovered evidence standard articulated in *Opie v. State,* 422 P.2d 84 (Wyo.1967), as recently applied in *Gist v. State,* 737 P.2d 336 (Wyo.1987), *appeal after remand* 766 P.2d 1149 (Wyo.1988). *See Lacey v. State,* 803 P.2d 1364 (Wyo.1990). The fact that the evidence was not discovered because of a failure by the prosecution to follow the rule of *Gee* is a significant distinction. Under those circumstances, it is inappropriate to invoke the newly discovered evidence rule. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). As quoted in *Agurs,* 427 U.S. at 111, "If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice."

adverse effect upon some substantial right possessed by him; that is, had this court been presented the issue on direct appeal, it would have reversed the conviction.

We have weighed Engberg's claims against this standard, and we conclude that most of his arguments do not even suggest a clear and obvious transgression of a clear and unequivocal rule. It is appropriate to consider specifically two of those claims because, arguably, they meet the standard. We shall consider Engberg's contention that he should have been permitted to present expert testimony relating to the identification by an eye witness. We also will consider his claims relating to the exclusion of the testimony of his wife, Donna Engberg.

■■■ Engberg claims that the trial court erred in refusing to allow the testimony of an expert witness, Dr. Loftus, with respect to factors which she, and others, have identified, through experimental research, as influencing the reliability of eye witness identification. Engberg presented a memorandum to the trial court in which he advanced the following reasons for admissibility of the testimony:

"1. It will assist the trier of fact to understand the evidence or determine the facts in issue.

"2. The unreliability of eyewitness identification poses one of the most serious problems in the administration of criminal justice.

"3. The psychological facts and their effect on the witness' credibility are clearly beyond the common knowledge of most juries.

"4. The psychological expert does not invade the province of the jury because it need not involve any opinion on the credibility of a particular witness' testimony, but merely reviews the relevant psychological findings and enumerates the various factors affecting the reliability of eyewitness identification."

The State of Wyoming opposed admission of the testimony by a memorandum which advanced these arguments:

"1. Such testimony is not proper subject matter for expert testimony under Wyoming law as it relates to opinion evidence in the area of common knowledge.

"2. Such testimony at best could be classified as speculation, generalization and theory.

"3. Cross-examination and argument are the proper means of dealing with eye-witness identification testimony.

"4. The testimony would be an invasion of the jury's function to be the sole judge of the weight and credibility of evidence.

"5. Any probative value of the testimony is substantially outweighed by prejudice to the State.

"6. Any probative value of the testimony is also substantially outweighed by its tendency to mislead, distract and confuse the real issues of the case."

The district court ruled that the testimony would not be received because it invaded the province of the jury. In addressing this claim in the post-conviction proceeding, the trial court determined that exclusion of the testimony was within its discretion and, further, that any error was harmless.

A traditional rule had been developed, prior to Engberg's trial, that courts generally would not admit expert testimony as to the reliability of eye witness identification because that testimony either would not be helpful or would invade the province of the jury.[3] More recent research seems to demonstrate that the process is more complex than earlier assumed, and some of the research findings are contrary to intuitive perceptions. *See State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011 (Cal. 1984), and articles cited therein. Furthermore, the liberal policy reflected in Rule 702, F.R.E., which is identical to Rule 702,

3. *E.g., Dyas v. United States*, 376 A.2d 827 (D.C.App.1977), *cert. denied* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *United States v. Brown*, 540 F.2d 1048 (10th Cir.1976), *cert. denied* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973).

W.R.E., and the elimination of the ultimate issue rule has caused some courts to review the viability of previously accepted holdings with respect to the admissibility of expert testimony relating to eye witness identification. *United States v. Moore*, 786 F.2d 1308 (5th Cir.1986), *reh'g denied* 791 F.2d 928 (1986); *United States v. Downing*, 753 F.2d 1224 (3rd Cir.1985). There does appear to be a modern trend more favorable to the admission of expert testimony relating to eye witness identification. The rule still is, however, that such testimony is subject to the discretion of the trial court in any given instance. *United States v. Poole*, 794 F.2d 462; *opinion amended, reh'g. denied* 806 F.2d 853 (9th Cir.1986); *Moore; United States v. Smith*, 736 F.2d 1103 (6th Cir.1984), *cert. denied* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *Downing; Chapple; McDonald; People v. Beaver*, 725 P.2d 96 (Colo.App.1986); *Bloodsworth v. Maryland*, 307 Md. 164, 512 A.2d 1056 (1986), *cert. denied* 548 A.2d 128 (1988); *State v. Buell*, 22 Ohio.St.3d 124, 489 N.E.2d 795 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165, *reh'g denied* 479 U.S. 1000, 107 S.Ct. 609, 93 L.Ed.2d 607 (1986); *State v. Moon*, 45 Wash.App. 692, 726 P.2d 1263 (1986), *appeal after remand* 48 Wash.App. 647, 739 P.2d 1157 (1987). When we couple that specific concept with our consistent rule in Wyoming that the admission of expert testimony is within the discretion of the trial court, *Price v. State*, 807 P.2d 909 (Wyo. 1991); *Triplett v. State*, 802 P.2d 162 (Wyo.1990); *Brown v. State*, 738 P.2d 1092 (Wyo.1987); *Jahnke v. State*, 682 P.2d 991 (Wyo.1984); *Buhrle v. State*, 627 P.2d 1374 (Wyo.1981); we must conclude that there was no transgression of a clear and unequivocal rule of law. Also, if the effectiveness of appellate counsel is evaluated in the light of the prevailing law at the time of the appeal, which is appropriate, the case law clearly favored exclusion of the testimony. Although this claim would not have been specious if raised on appeal, the failure to raise it did not constitute ineffective assistance of appellate counsel.

▇▇▇ We also shall consider Engberg's sixth claim of error, set forth in the appendix, under the claim of ineffective assistance of appellate counsel. In arguing that the trial court erred in permitting his wife to invoke the privilege of spousal immunity despite his waiver, Engberg contends that the privilege is that of the party spouse. He also asserts error in the exclusion of hearsay testimony of Janet Garner, who would have testified as to earlier statements by the wife, Donna Engberg. Engberg's position is that Donna's refusal to testify made her an unavailable witness and this circumstance justified admission of the hearsay pursuant to Rule 804, W.R.E. At trial, and in its resolution of Engberg's motion for post-conviction relief, the district court found that the spousal privilege was vested in the witness spouse. It also ruled that the proffered hearsay testimony of Janet Garner could not be received.

Early in the case, Engberg invoked his right to prevent his wife from testifying against him under the privilege of spousal immunity. When it later became apparent that certain damaging hearsay testimony concerning what Donna Engberg had stated to a police officer could be received, Engberg then waived his right to prevent his wife from testifying. It appears that this tactical decision was premised on the proposition that Engberg would benefit if Donna testified favorably to him and, if she did not, that is, if her testimony was consistent with what she earlier told the police officer, Engberg would be able to impeach her by relying upon the statements that she had made to Janet Garner.

Subsequent to Engberg's advice to the court of his decision to waive the privilege, given in chambers, Donna Engberg was called to the stand by the State.[4] We quote the ensuing dialogue from the record:

4. Engberg has not chosen to challenge the invocation of the privilege in front of the jury. We already have considered situations in which witnesses have invoked their own privilege not to testify because of their right not to incriminate themselves. *Haselhuhn v. State,* 727 P.2d 280 (Wyo.1986), *cert. denied* 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987); *Hopkinson v. State,*

"MR. GUETZ: Mrs. Engberg, you are the wife of the defendant, Roy Engberg, are you not?

"MRS. ENGBERG: Yes.

"MR. GUETZ: Is it your wish to testify in this case?

"MRS. ENGBERG: No.

"MR. GUETZ: Are you willing to testify in this case.

"MRS. ENGBERG: Not if I don't have to.

"MR. GUETZ: Mrs. Engberg, you know, that is your choice to make and we are asking you now what choice you want to make in this case, whether you want to testify or not?

"MRS. ENGBERG: No, I don't.

"MR. GUETZ: May we approach the bench, Your Honor?

"THE COURT: You may."

Thereafter, this discussion was conducted at the bench:

"THE COURT: Mr. Guetz, she doesn't want to testify.

"MR. GUETZ: We can't force her to.

"THE COURT: No, you can't force her to.

"MR. SKAGGS: I want the opportunity to cross-examine her and assert the immunity on every question.

"THE COURT: You want what?

"MR. SKAGGS: I want the opportunity to cross-examine her and assert the immunity on every question.

"THE COURT: I don't think if she refused to testify that—I would ask you, Mr. Guetz, to explain to her clearly that she has spousal immunity and she doesn't have to testify.

"MR. SKAGGS: I oppose that. She does not have the privilege. Roy has the privilege.

"THE COURT: She can assert the privilege.

"MR. SKAGGS: Your Honor, under case law, it is Roy's privilege to assert, not hers.

"THE COURT: Under the more recent rule, she can assert the immunity herself. Absolutely, she can assert that immunity on her own.

"MR. SKAGGS: Your Honor, now the prosecution is going to be in a position where they can comment on her asserting the immunity.

"MS. MILLER: If we could take a short recess. Obviously the State has had an opportunity to talk to her. Perhaps we should have the same opportunity to talk to this witness before she asserts the immunity on behalf of our client.

"THE COURT: Do you have an objection?

"MR. GUETZ: I suppose not, Your Honor, but she voiced what her feelings are."

We understand the trial judge's reference to the modern rule to reflect a misapprehension on his part that his decision was controlled by recent authority from the Supreme Court of the United States. The same position is reflected in the conclusions of law filed in connection with the denial of Engberg's motion for post-conviction relief.

In *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court of the United States held that a witness spouse may invoke the privilege of spousal immunity. That was said to be the rule of the federal common law and was contrary to what had been proposed as Rule 505, W.R.E., which would have limited the privilege of spousal immunity to the party spouse but was not adopted by Congress. In a similar vein, the court rejected the earlier decision of *Hawkins v. United States,* 358 U.S. 74, 79

632 P.2d 79 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). More recently we have reversed a conviction in a case in which the trial court permitted the prosecution to call witnesses in the presence of the jury who the court and the prosecution knew would invoke the Fifth Amendment privilege not to testify. *Jones v. State,* 777 P.2d 54 (Wyo.1989). In an instance such as this, as in *Haselhuhn* and *Hopkinson,* if counsel or the

court is aware that the privilege may be invoked, it is far better to approach the matter in chambers. Certainly, the proceeding should be adjourned to chambers as soon as that possibility becomes apparent. Otherwise, there is a clear risk of a reversal as in *Jones.* We deplore the unnecessary presentation of such an issue in front of the jury because of the potential for prejudice.

S.Ct. 136, 3 L.Ed.2d 125 (1958), in which the court held that the privilege of spousal immunity could be claimed by both the witness spouse and the party spouse. The United States Supreme Court decisions are not controlling. Consequently, the position of the federal courts with respect to federal common law is nothing more than persuasive authority.

The rule of privilege arising out of spousal immunity is set forth in Wyoming by statute. Section 1-12-101, W.S.1977, provides:

"(a) the following persons shall not testify in certain respects:

\* \* \* \* \* \*

"(iii) husband or wife, except as provided in W.S. 1-12-104; \* \* \*."

In the absence of the exception, this statutory provision would sound in competency, not privilege. Section 1-12-104, W.S.1977, referred to in the preceding statute, then provides:

"No husband or wife shall be a witness against the other except in criminal proceedings for a crime committed by one against the other, or in a civil action or proceeding by one against the other. They may in all civil and criminal cases be witnesses for each other the same as though the marital relation did not exist."

This statutory language described different situations to which different rules apply. The first sentence of the statute clearly states that a husband or wife shall not be a witness against the other except in certain situations which are not found in the circumstances of this case. The second sentence provides that a husband or wife may be a witness for the other as though the marital relation did not exist. Engberg's claim of error must be examined under the first sentence of this statute because the record is clear that his wife was called as a witness by the State. A spouse who is called as a witness by the State in a criminal proceeding perforce must be called as a witness against the defendant. The record also is clear that Engberg did not attempt to call his wife as a witness for him.

In the prior cases in which this court has considered the statute, it never has had occasion to address a situation like this. In *Chamberlain v. State*, 348 P.2d 280 (Wyo. 1960), the wife was called as a rebuttal witness against the husband in a prosecution of the husband for statutory rape of a minor child. The court there concluded that the statute was subject to judicial interpretation; that the exception relating to a crime committed by one against the other was not limited to corporal violence against the person of the wife; and that the crime for which the defendant was prosecuted was such a special wrong and personal offense against his wife as justified her being permitted to testify. In *Pike v. State*, 495 P.2d 1188 (Wyo.1972), the court recognized that it would be error *per se*, if the husband objected, to permit a wife to testify when called by the State as a witness unless the exception found in the statute was invoked. The court also held that the error under the circumstances of that case was not prejudicial. In *Simms v. State*, 492 P.2d 516, *cert. denied* 409 U.S. 886, 93 S.Ct. 104, 34 L.Ed.2d 142 (1972), the court recognized a waiver of the privilege by the husband who was the defendant. When the claim of privilege was asserted, the trial court ruled that the State could use the transcript of her testimony at the preliminary examination, which was given prior to the marriage, if the wife did not testify. Although complaining that he was forced to so elect, the husband waived the privilege, and this court found no error. Then in *Seyle v. State*, 584 P.2d 1081 (Wyo. 1978), the court, citing *Chamberlain*, held that, in a case in which the charge was first degree murder of a child, the testimony of the wife is equally available to the State and to the defendant under this statute. The husband complained, on appeal, of comment by the prosecutor upon his failure to call the wife as a witness, and the court simply held that was not plain error. The court relied upon *State v. Spears*, 76 Wyo. 82, 300 P.2d 551 (1956), in which the court held that it was proper to comment upon the defendant's failure to produce the wife as a witness when she was available to him but not to the prosecution.

In none of these cases did the court directly consider whether a witness spouse might directly invoke the privilege if called to testify against a party spouse. Because we address the issue only with respect to the effective assistance of appellate counsel, we are limited to a determination of whether a clear and unequivocal rule of law was transgressed. In this regard, it seems fair to say that the first sentence of § 1-12-104, W.S.1977, perpetuates the common law rule of the privilege of spousal immunity in instances in which the testimony of a spouse is offered against a party spouse, although the statute, as construed, may explain the exception of what constitutes a crime against a witness spouse. *See Chamberlain.* We again turn to the eminent authority on rules of evidence, Professor Wigmore, relied on in *Chamberlain.* In 8 Wigmore, *Evidence* § 2241 (McNaughton rev. 1961), there is a discussion of who possesses the privilege. It begins with the recognition that the reason most commonly offered in support of this privilege, the prevention of marital dissention, results in the privilege belonging to the party only and not to the witness. It goes on:

" * * * But taking the other suggested reason for the privilege, namely, immunity from the repugnant situation of being condemned by one's spouse or of becoming the instrument of a spouse's condemnation (§ 2228 *supra* ), the privilege seems to be *equally* that of *party* and of *witness.* In other words, while the defendant husband is entitled to be protected against condemnation through the wife's testimony, the witness wife is also entitled to be protected against becoming the instrument of that condemnation— the sentiment in each case being equal in degree and yet different in quality.

"The latter view seems generally to be accepted by implication underlying the various judicial utterances, but precise rulings are naturally rare and depend much on the wording of statutes. It is established in some courts that at least the privilege belongs to the *party* spouse against whom the other is offered as a witness. Rarely is the privilege denied to belong to the *witness* spouse; and rarely also is it denied to belong to the *party* spouse. 8 Wigmore, *Evidence* § 2241 at 254–55 (McNaughton rev. 1961) (footnotes omitted; emphasis in original).

A conclusion that the legislature intended to make the privilege available to both the witness spouse and the party spouse is consistent with this language. The mandatory words "shall be," read in the light of the concept of privilege, properly can be construed to permit the witness spouse to avoid "becoming the instrument of that condemnation" even though the party spouse chooses to waive that protection. If we accept Wigmore's description of the concept of entitlement to invoke the privilege, it certainly is arguable that the trial court correctly ruled that Mrs. Engberg could claim the privilege albeit an erroneous reason may have been advanced. Under those circumstances, we cannot discern any clear and unequivocal rule of law which was violated and, therefore, we cannot find ineffective assistance of appellate counsel for failure to assert error in the direct appeal with respect to permitting the witness spouse to claim the privilege. We agree with the trial court that Engberg was not entitled to post-conviction relief for these reasons.

■ To complete the examination of Engberg's contentions in this regard, we also consider the claim of error premised upon the refusal of the trial court to admit the hearsay testimony of Janet Garner. That hearsay testimony could only be received if Donna Engberg were not available as a witness. Engberg insists that the extension to Donna Engberg of the right to claim the privilege of spousal immunity made her unavailable but, at that stage in the trial, she was unavailable as a witness only for the State of Wyoming. Even though she might have been the possessor of a privilege not to testify against Engberg, nothing in the statute extends a privilege to the spouse when called by the defendant in a criminal case. In order for Engberg to demonstrate unavailability to him, he had to call his wife as a witness. If she then had continued to refuse to

testify, the court could have found that she was unavailable and the Janet Garner testimony possibly would have been admissible. In the absence of an effort to call her as a witness in his behalf, Engberg cannot assert error for the refusal of the trial court to receive the hearsay testimony.

Even assuming that Engberg was misled by the trial court and, for this reason, believed he could not call his wife as a witness on his behalf, we still could find no error in the decision of the trial court not to receive the hearsay testimony of Janet Garner. If a witness is allowed to rely upon a privilege erroneously, unavailability has been found by some courts. *See United States v. McCloskey*, 682 F.2d 468 (4th Cir.1982). *But see United States v. Mathis*, 559 F.2d 294 (5th Cir.1977); 4 D. Louisell & C. Mueller, *Federal Evidence* § 406 at 1029 (1985). Unavailability is only one prerequisite for receiving hearsay testimony under Rule 804(b)(6), W.R.E. *See Hopkinson v. State*, 632 P.2d 79 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). As the language of the rule requires, the hearsay testimony also must be supported by circumstantial guarantees of trustworthiness. The contradictory versions of the events reported by Donna Engberg to the police officer and Janet Garner concerning Engberg's involvement in the murder demonstrate that the circumstantial guarantee of trustworthiness was not present. There was no corroborating evidence presented which could be relied upon to enhance the trustworthiness of the version reported to Janet Garner. In the absence of the circumstantial guarantees of trustworthiness, the hearsay testimony could not be admitted properly. *See* 4 D. Louisell & C. Mueller, *Federal Evidence* § 491, and cases cited at n. 12. For the same reason, admission of this testimony was not required in order to meet fundamental standards of due process. *See Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Our conclusions with respect to these issues also dispose of the claim of cumulative error which Engberg asserts. *See Schmunk v. State*, 714 P.2d 724 (Wyo. 1986); *Browder v. State*, 639 P.2d 889 (Wyo.1982). The result of those cases depends, of course, upon the existence of error. In this instance, we conclude that there was no error and, consequently, there is no claim to consider of the cumulative effect of trial errors. *Jennings v. State*, 806 P.2d 1299 (Wyo.1991); *Justice v. State*, 775 P.2d 1002 (Wyo.1989).

As a final matter, we turn to Engberg's arguments raised in issues 19 and 20. We can see no demonstration of any prejudice to Engberg even if one could conclude that error was committed by the representation by the attorney general of the state in this action when a present member of his staff represented Engberg in his direct appeal. We can discern no way in which that alleged conflict would have been disadvantageous to Engberg in the post-conviction process. Furthermore, in Wyoming, we require something more than simply assertions of impropriety. We cannot acknowledge, without some factual showing, that a member of the attorney general's staff who had a conflict of this nature would have any involvement in, or knowledge of, the work done on behalf of the State of Wyoming. In addition, the objective evaluation of effective assistance of counsel on appeal avoids the concern that the attorney general might involve the member of his staff who did serve as counsel for Engberg in order to insulate that staff member from the ineffectiveness accusation.

As to Engberg's argument that the post-conviction procedure which has been adopted in Wyoming is fundamentally unfair, that argument must be advanced by someone who was disadvantaged by the process. We are satisfied that Engberg's claims have received every consideration to which they are entitled under our statute and under the Constitutions of the State of Wyoming and the United States. If a different post-conviction procedure is to be invoked, that is a matter which must be

addressed by the legislature. The one which is in place, as applied to Engberg, did not result in any deprivation of his constitutional rights.

Our review of the issues raised by Engberg in this appeal from the denial of his motion for post-conviction relief persuades this court that, with respect to Engberg's conviction of first degree murder, we correctly held that:

" * * * Our examination of the record and the law persuades us that there is no error with respect to any of the claims made by the appellant, * * *." *Engberg*, 686 P.2d at 544.

Insofar as his guilt of the crime of first degree murder is concerned, we affirm the order of the district court dismissing Engberg's petition for post-conviction relief and conclude that Engberg has exhausted any substantial state remedies.

## APPENDIX I

### STATEMENT OF THE ISSUES

1. Whether the Court's refusal to permit appellant to call an expert on eye-witness identification was error which deprived appellant of his right to a fundamentally fair trial and his right to compulsory process.

2. Whether the State's failure to disclose its use of hypnosis as means of enhancing Kay Otto's memory violated its ethical obligations and denied appellant his right to due process of law, his right of confrontation, and his right to effective assistance of counsel.

3. (a) Whether appellant was denied due process of law by the extradition procedure used to bring him to Wyoming such that the proceedings here must be declared null and void.

(b) Whether appellant was denied due process by the introduction of evidence that he had to be beaten by the police officers who arrested him in order to prevent him from fleeing.

4. Whether the State's introduction of evidence showing that appellant frequently used aliases denied him his right to a fundamentally fair trial.

5. (a) Whether appellant's rights under the Fifth Amendment to the United States Constitution and Article 1, § 11 of the Wyoming Constitution were violated when evidence that he refused to wear a stocking cap so that he could be photographed was introduced at his trial and argued as evidence of guilt.

(b) Whether appellant's right to confront witnesses was denied him by the court's refusal to permit cross-examination of the police officer who photographed him concerning appellant's medical condition.

6. (a) Whether a defendant's spouse can invoke spousal privilege and decline to testify when the defendant seeks to have the spouse testify.

(b) Whether the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution were violated by the trial judge's erroneous ruling that appellant could not call Donna Engberg as a witness, cross-examine her, nor introduce her prior statements for impeachment purposes.

(c) Whether a defendant's spouse who refuses to testify is an unavailable witness whose hearsay statements may be admitted into evidence.

7. Whether the use of a conclusive presumption to convict appellant of first degree murder is plain error and requires reversal of the conviction.

8. Whether appellant's rights under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution were violated by the introduction of evidence seized by the police during a warrantless search of appellant's trailer.

9. Whether the testimony of the ballistics expert was incompetent and should have been disregarded, and should be disregarded now, and thus whether there is insufficient evidence to support the conviction.

10. (a) Whether the prosecution's use and manipulation of the press prior to appellant's trial deprived appellant of his right to a fair trial.

(b) Whether appellant's right to effective assistance of counsel was denied him by

his initial court-appointed attorney's failure to combat the prosecution's misuse of the media.

11. Whether the trial court's failure to excuse venireman Alberts for cause deprived appellant of his right to a fair trial by an impartial jury.

12. Whether the voir dire procedure used at appellant's trial denied him his right to a fair trial by an impartial jury.

13. (a) Whether the introduction of evidence in the penalty phase that appellant had escaped from the authorities in Missouri denied him his right to due process and a fundamentally fair finding that the death penalty should be imposed.

(b) Whether the prosecutor's closing argument in the penalty phase of the trial deprived appellant of his right to due process and fundamentally fair trial when the prosecutor argued appellant needed to be executed in order to restrain him and when the Wyoming Supreme Court has previously recognized that kind of argument is only proper where the heinous, atrocious, or cruel aggravating circumstance is involved.

14. Whether the court's refusal to permit appellant the opportunity to present evidence of a mitigating circumstance, the cruelty of the manner of execution, denied appellant his right to due process of law and a fundamentally fair finding to impose the death penalty.

15. Whether appellant's right to due process and to be free from cruel and unusual punishment was violated by the statutory presumption in favor of death under Wyoming law which requires the defendant to bear the burden of demonstrating that sufficient mitigating circumstances outweigh the aggravating circumstances so as to warrant leniency.

16. Whether appellant's right to be free from cruel and unusual punishment and to due process was violated by the jury's finding as aggravating circumstances that the murder was committed for pecuniary gain and while the defendant was engaged in the commission of a robbery when the robbery had already been used to elevate the crime to capital murder.

17. Whether the cumulative nature of the error is such that, regardless of the harmlessness of any one error, together they prejudiced appellant's rights to due process, fundamental fairness, and a reliable determination that the death penalty should be imposed.

18. Whether appellant was afforded effective assistance of counsel during his appeal to the Wyoming Supreme Court.

19. Whether it was improper for the office of the Attorney General to represent the State in post-conviction proceedings to urge that an Assistant Attorney General's proper representation was a procedural bar to the issues raised in appellant's petition for post-conviction relief.

20. Whether this Court's discussion and holding in prior cases with regard to petitions for post-conviction relief ignore the plain and obvious statutory language and establish a procedure which is violative of fundamental fairness due process and equal procedure and whether it has established a confusing and unworkable process wherein courts simply dismiss petitions for post-conviction relief to get rid of them."

CARDINE, Justice, concurring in the opinion of THOMAS, Justice, except with respect to issues relating to the sentencing phase of the trial.

I

The jury returned a death verdict in appellant's sentencing trial. This case is before us upon a petition for post-conviction relief. Death penalty cases are different from all other cases. The punishment is final. If it is wrong, it cannot be corrected; it cannot be undone; it cannot be made right. And so, we review this case with utmost care and detail for the purpose of assuring ourselves that we do not impose the death penalty unlawfully, arbitrarily, or unjustly by slavish adherence to doubtful application of technical doctrine.

Appellant claims error, presenting the following issue for our review:

"Whether appellant's right to be free from cruel and unusual punishment and to due process were violated by the jury's finding as aggravating circumstances that the murder was committed for pecuniary gain and while the defendant was engaged in the commission of a robbery when the robbery had already been used to elevate the crime to capital murder."

This issue was raised in part on direct appeal and addressed in part by Justice Rose, dissenting, in *Engberg v. State*, 686 P.2d 541, 558–62 (Wyo.1984), *cert. denied* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984) (*Engberg I*). Subsequent developments in case law and revision of our statutes require that we review death penalty sentencing in this post-conviction relief proceeding.

The issues we here address are whether the use of the underlying robbery to support two independent aggravating circumstances, and the use of the robbery as an aggravating circumstance when it had already been used to elevate the crime to capital murder were permissible. We conclude that both uses of the robbery were impermissible; that jury instructions relating to the aggravating and mitigating circumstances were incorrect; and that, accordingly, appellant's sentence must be vacated and this case remanded for resentencing.

Appellant was convicted of felony murder under W.S. 6–4–101 (Dec.1977 Repl.) (now W.S. 6–2–101):

"(a) Whoever * * * in the perpetration of, or attempt to perpetrate, any * * * robbery * * * kills any human being * * * is guilty of murder in the first degree.

"(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

Wyoming allows assessment of the death penalty only upon conviction of first degree murder, which is murder with premeditated malice or felony murder. Felony murder occupies a unique place in our jurisprudence. It allows a defendant who commits an unpremeditated murder to be convicted of first degree murder. The only requirement is that the murder occur during the defendant's perpetration, or attempt to perpetrate, one of the felonies listed in the statute. Thus, we consider whether the death penalty was properly invoked following appellant's conviction of first degree (felony) murder, the felony being robbery.

 The United States Supreme Court has stated that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the states through the Fourteenth Amendment, prohibits a state from imposing the death penalty in an arbitrary and capricious manner. Instead, the sentencing body must be provided with standards which will genuinely narrow the class of crimes and the persons against whom the death penalty is imposed by allowing it to make an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens*, 462 U.S. 862, 878–80, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983)

"To avoid [unconstitutional, arbitrary and capricious sentencing], an aggravating circumstance * * * must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.*, 462 U.S. at 877, 103 S.Ct. at 2742.

See also *Gregg v. Georgia*, 428 U.S. 153, 206–07, 96 S.Ct. 2909, 2940–41, 49 L.Ed.2d 859, *reh. denied* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976); *Furman v. Georgia*, 408 U.S. 238, 294, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346 (Brennan, J., concurring), *reh. denied* 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 164 (1972).

Wyoming has chosen to meet this requirement by creating a separate statutory sentencing procedure under which the jury considers aggravating and mitigating factors in deciding whether the death penalty should be imposed in each case of first degree murder. The pertinent part of Wyoming's death penalty statute read as follows:

"(d)(i) After hearing all the evidence, the jury shall deliberate and render a recom-

mendation of sentence to the judge, based upon the following:

"(A) Whether one (1) or more sufficient aggravating circumstances exist as set forth in subsection (h) of this section;

"(B) Whether sufficient mitigating circumstances exist as set forth in subsection (j) of this section which outweigh the aggravating circumstances found to exist; and

"(C) Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.

\* \* \* \* \* \*

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foremen of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. \* \* \* If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

"(f) Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to death but shall sentence the defendant to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.

\* \* \* \* \* \*

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney or former county and prosecuting· attorney, during or because of the exercise of his official duty.

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"(v) The defendant acted under extreme duress or under the substantial domination of another person;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired;

"(vii) The age of the defendant at the time of the crime." W.S. 6–4–102 (Dec. 1977 Repl. & 1982 Cum.Supp.).

The jury, applying the statutory provisions detailed above, found the following aggravating circumstances:

"1. That the murder was committed by a person under sentence of imprisonment.

"2. That the Defendant was previously convicted of another murder in the first

degree or a felony involving the use or threat of violence to the person.

"3. That the Defendant knowingly created a great risk of death to two (2) or more persons.

"4. That the murder was committed while the Defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit any robbery.

"5. That the murder was committed for pecuniary gain."

The constitutional difficulty with W.S. 6–4–102 as it existed at the time of Engberg's sentencing was that it allowed Engberg's felony murder to both convict him and, without more, sentence him to death by allowing imposition of the death penalty upon the jury finding: "at least one (1) * * * aggravating circumstance"—that being "(h)(iv) murder * * * committed * * * in the commission of * * * any robbery." This statute provided no requirements beyond the crime of felony murder itself to narrow and appropriately select those to be sentenced to death and therefore, on its face, permitted arbitrary imposition of the death penalty. This statutory scheme of death sentencing preserved in felony murder the very evil condemned and held unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726. It permitted in felony murder cases a sentence to death without applying any standards that generally narrowed the class of crimes and persons who were given the death penalty. The statute recreated a sentencing scheme that the United States Supreme Court found resulted in death sentences being imposed unevenly, unfairly, arbitrarily and capriciously. The infirmity in this statute has since been corrected by the legislature as we shall later discuss.

In *Furman*, the Court, faced with the same kind of sentencing scheme as now before us, observed that:

"Juries (or judges, as the case may be) have practically untrammeled discretion to let an accused live or insist that he die." 408 U.S. at 248, 92 S.Ct. at 2731.

and stated further that:

"When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." 408 U.S. at 293, 92 S.Ct. at 2754 (Brennan, J., concurring).

The Court held that imposing the death penalty under statutes without guidelines and criteria to rationally and uniformly select cases for imposition of death rather than life to be arbitrary in application and therefore unconstitutional.

In this case, the enhancing effect of the underlying felony (robbery) provided two of the aggravating circumstances which led to Engberg's death sentence: (1) murder during commission of a felony, and (2) murder for pecuniary gain. As a result, the underlying robbery was used not once but *three* times to convict and then enhance the seriousness of Engberg's crime to a death sentence. *All* felony murders involving robbery, by definition, contain at least the two aggravating circumstances detailed above. This places the felony murder defendant in a worse position than the defendant convicted of premeditated murder, simply because his crime was committed in conjunction with another felony. This is an arbitrary and capricious classification, in violation of the *Furman/Gregg* narrowing requirement.

Additionally, we find a further *Furman/Gregg* problem because both aggravating factors overlap in that they refer to the same aspect of the defendant's crime of robbery. While it is true that the jury's analysis in capital sentencing is to be qualitative rather than a quantitative weighing of aggravating factors, *Engberg I*, at 553, the jury should not be presented with two aggravating factors merely because the underlying felony was robbery, rather than some other felony. The mere finding of an aggravating circumstance implies a qualitative value as to that circumstance. The qualitative value of an aggravating circumstance is unjustly enhanced when the same underlying fact is used to create multiple aggravating factors.

When an element of felony murder is itself listed as an aggravating circumstance, the requirement in W.S. 6–4–102 that at least one "aggravating circumstance" be found for a death sentence becomes meaningless. *Black's Law Dictionary*, 60 (5th ed. 1979) defines "aggravation" as follows:

> "Any circumstance attending the commission of a crime or tort which increases its guilt or enormity or adds to its injurious consequences, *but which is above and beyond the essential constituents of the crime or tort itself.*" (emphasis added)

As used in the statute, these factors do not fit the definition of "aggravation." The aggravating factors of pecuniary gain and commission of a felony do not serve the purpose of narrowing the class of persons to be sentenced to death, and the *Furman/Gregg* weeding-out process fails.

In our review of state precedent applying the *Furman/Gregg* criteria to statutory aggravating factors, we find the case of *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980), particularly persuasive. In that case, the defendant shot and killed a supermarket employee during a robbery. The jury convicted the defendant of felony murder. During the sentencing phase, the jury was submitted, and found as an aggravating circumstance, among others, that the murder was committed while the defendant was engaged in the commission of robbery with a firearm. The North Carolina Supreme Court stated that "[o]nce the underlying felony has been used to obtain a conviction of first degree murder, it has become an element of that crime and may not thereafter be the basis for additional prosecution or sentence." *Cherry*, 257 S.E.2d at 567. The court held that "when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony." *Id.*, at 568.

We distinguish *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568, *reh. denied* 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988), which involved the killing of three persons and a conviction of three counts of first degree murder in Louisiana. The sole aggravating circumstance found by the jury was that "the offender knowingly created a risk of death or great bodily harm to more than one person." *Lowenfield*, 484 U.S. at 243, 108 S.Ct. at 554. The Court reaffirmed the requirement of a statutory narrowing scheme for application of the death penalty, stating:

> "To pass constitutional muster, a capital-sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *cf. Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)." 484 U.S. at 244, 108 S.Ct. at 554.

That Court noted the statutes of the state of Louisiana provide five grades of homicide and, within the statute, narrows the class of offenders who receive death or life by providing separately for those who receive life without possibility of parole. Thus, two statutory schemes were permissible. The Court stated:

> "[T]he narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Lowenfield*, 484 U.S. at 246, 108 S.Ct. at 555.

and continued:

> "Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three

counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally-required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion." 484 U.S. at 246, 108 S.Ct. at 555.

The United States Supreme Court found in the *Lowenfield* case that Louisiana provided the narrowing process at the guilt phase of the trial. The clear provisions of the Wyoming statute provide that the narrowing occur in the sentencing phase of the trial. *Lowenfield*, therefore, does not govern our disposition in this case.

■ Another compelling reason for reversing appellant's death sentence is that since he was sentenced, the legislature has modified the death penalty statute by making three changes which affect the aggravating circumstances used in his case.

First, the legislature removed most of the previous list of felonies, including robbery, from the list of crimes which constitute aggravating circumstances in W.S. 6-2-102(h)(iv). The new version reads as follows:

"The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb." W.S. 6-2-102(h)(iv) (1991 Cum.Supp.).

Second, the legislature has qualified the question of what kinds of crimes are deemed motivated by pecuniary gain:

"The murder was committed for compensation, the collection of insurance benefits or other similar pecuniary gain." W.S. 6-2-102(h)(vi) (1991 Cum.Supp.)

Finally, the legislature made murder connected with other violent felonies an aggravating circumstance only when premeditated malice is present:

"The defendant killed another human being *purposely and with premeditated malice* and while engaged in, or as an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary or kidnapping." W.S. 6-2-102(h)(xii) (1991 Cum.Supp.). (emphasis added)

We think these changes demonstrate a recognition by the legislature that the system of aggravating circumstances in place at Engberg's sentencing was problematic because of the bootstrapping effect of felony murder convictions. The current statute should govern a second sentencing phase trial because it does not contain the deficiency of the earlier statute. *Cf. Attletweedt v. State*, 684 P.2d 812 (Wyo.1984).

■ Our disposition in this case requires that we overrule a portion of our opinion in *Engberg I*. In *Engberg I*, we addressed the contention that submission to the jury of "murder for pecuniary gain" and "murder * * * committed while the defendant was engaged * * * in the commission of * * * any robbery" was improper because both aggravating circumstances referred to the same aspect of the defendant's crime. We found the reasoning of the North Carolina court persuasive:

"In *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), that court held that the aggravating circumstance identified as murder for pecuniary gain examines the defendant's motive, not his conduct, and while not an element of the offense the jury properly may consider his motive with respect to the issue of a capital sentence. Later that court held that the aggravating circumstance of murder for pecuniary gain almost always appropriately will be submitted to the jury where the murder is committed during the

course of an armed robbery. *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981). The thrust of the North Carolina court's holdings is that these two aggravating circumstances both may be submitted to the jury." *Engberg*, 686 P.2d at 553. Since the entry of our opinion in *Engberg I*, the North Carolina Supreme Court—relied upon and cited by us with approval—has further explained *Oliver*, in *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987). In *Quesinberry*, the court synthesized *Oliver* and *Cherry* and held that, where a defendant is convicted of felony murder only, it is inappropriate to consider both pecuniary gain and the fact that a robbery was committed as separate aggravating factors because the motive cannot be divorced from the act for the purpose of aggravation. *Quesinberry*, 354 S.E.2d at 452. Accordingly, we no longer find *Oliver* valid for the principle cited in *Engberg I*. We agree with the North Carolina court and, for this and the other reasons cited, overrule *Engberg I* to the extent that it is inconsistent with this opinion. We now hold that where an underlying felony is used to convict a defendant of felony murder only, elements of the underlying felony may not again be used as an aggravating factor in the sentencing phase. We acknowledge the jury's finding of other aggravating circumstances in this case. We cannot know, however, what effect the felony murder, robbery and pecuniary gain aggravating circumstances found had in the weighing process and in the jury's final determination that death was appropriate.

■ Although the above issues are dispositive in the penalty phase of this case, we also make note of amended W.S. 6–2–102 concerning jury determination of mitigating circumstances. W.S. 6–2–102(e) (1991 Cum.Supp.) states in part:

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence. *The jury, if its verdict is a sentence of death, shall designate in writing signed by the foreman of the jury:*

"(i) *The aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt;*

"(ii) *The mitigating circumstance or circumstances which it unanimously found by a preponderance of the evidence; and*

"(iii) *The mitigating circumstance or circumstances which any individual juror found by a preponderance of the evidence.*" (emphasis added)

The emphasized portion was added in 1989. 1989 Wyo.Sess.Laws ch. 171, § 1. The version of the statute in effect at the time of the sentencing phase simply stated:

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foreman of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence." 1977 Wyo.Sess. Laws ch. 122 § 1. *See* W.S. 6–4–102 (Dec.1977 Repl.).

The change reflects the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), a decision made while this petition was still pending before this court. In *Mills*, the Court held that the trial court in a death sentence case must clearly instruct the jury that each individual juror may consider any mitigating circumstance he or she finds to exist in making a sentencing determination, regardless of whether the jury unanimously found that mitigating circumstance to exist. 486 U.S. at 377–80, 108 S.Ct. at 1867–68. Reversal is required unless a "substantial possibility" that this occurred can be ruled out.

The sentencing phase instructions in this case required that the jury find an aggravating circumstance beyond a reasonable doubt and mitigating circumstances by a preponderance of evidence. The instruction for weighing the factors against each other did not indicate whether the mitigating factors must be found unanimously. Another instruction told the jury that it must unanimously agree on a verdict of death, and if it is unable to do so, the court will impose a sentence of life. The verdict form gave the jury two choices. The jury could either find the mitigating circumstances outweighed the aggravating circumstances and sentence Engberg to life, or that the mitigating circumstances did not outweigh the aggravating circumstances and sentence him to death. Nowhere in the instructions or verdict form was the jury told that the mitigating circumstances need not be found unanimously by the jury but that the mitigating circumstances may be found by individual jurors and weighed by them individually in deciding the life or death question.

Because W.S. 6-2-102 (1991 Cum.Supp.) will govern retrial of the sentencing phase of this case, we need not decide whether to extend the *Mills* decision to Engberg in a retroactive manner. *See Sawyer v. Smith*, — U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Flores v. State*, 572 P.2d 746 (Wyo.1977). Nevertheless, it is important to remember that our law has always been "that matters which convict require unanimity, and failure to convict can result from the vote of one juror and that aggravating and mitigating circumstances should be dealt with in the same way." *Hopkinson v. State*, 798 P.2d 1186, 1190 (Wyo.1990) (Cardine, J., dissenting). The right to a unanimous verdict is beyond dispute. *Taylor v. State*, 612 P.2d 851, 853 (Wyo.1980); *see* Wyo. Const. Art. I, § 9. It is essential that Engberg be accorded the proper instructions on finding and considering mitigating circumstances in a retrial of the penalty phase of his felony murder conviction.

## II

The dissenting opinion quotes the author of this opinion's writing from *Hopkinson*, at 1188—first out of context and then to suggest that I have no feeling for victims of crime.

First, out of context, I am quoted as refusing to accept the law of capital punishment because "I am convinced now that this is an unwise policy." Omitted from the quote is the very next sentence:

"I am convinced also that, at this time in our history, these statutes are constitutional and, therefore, the law. I have taken an oath to support, obey and defend the constitution and will honor that oath." *Hopkinson*, at 1188.

Second, it is said that my discussion of death and killing applies only to perpetrators, implying that I have no feeling for victims of crime. Thus, quoting me again from *Hopkinson* and then editorializing it is stated:

"These are noble words. Would they had been uttered to memorialize a torture victim, a family literally blown apart, or an innocent victim of an armed robbery rather than in support of convicted, cold-blooded killers." Thomas, J., dissenting, at 5.

I assure the dissenting justice that my feelings about life and death and killing apply to victims as well as all mankind. I do not apologize for a feeling of regret over the killing of other human beings—something in which others seem to revel. My greatest hope is that someday we, as a civilized society, will stop the slaughter—the killing—of all human beings. Educating people about how to live with each other is the surest path to achievement of this result. Now we do it either poorly, or not at all.

The dissent, after quoting other writings of the author of this opinion, referencing him by name and stating that his words have a "hollow ring," incredulously asserts that these references are not to that justice at all. The illogical discussion to support this claim could be understood only had it come from Alice in Wonderland, *see Harvey v. State*, 774 P.2d 87, 113 (Wyo.1989) (Thomas, J., dissenting). The dissent lec-

tures that the majority opinion, because joined by two other justices, is the product of the court, not the drafter, and therefore a direct reference to a single justice is not a reference to that justice at all. Surely, what is sauce for the goose is sauce for the gander. The dissenting opinion is joined by a second justice. Therefore, it is the product of the court in dissent and, as suggested, nothing said in reference to a justice is a reference to that justice at all.

With that rule established, and being sensitive to the feelings of my colleagues, I agree that the time has come for candor in our discussion. Perhaps the real basis for my esteemed colleague's vigorous dissent can be gleaned from its observation that the majority opinion would "have the effect of eliminating the death penalty in the only two remaining cases in Wyoming * * *." Op. at 168. How tragic it is to lament the perceived loss of opportunity to kill these two men. However, there is no need for sorrow. The statement is incorrect. It is incorrect because Engberg will now, on remand, be given a lawful sentencing hearing at which a jury can correctly consider life or death upon proper instructions on the law and, if appropriate, impose the death penalty.

The dissent criticizes the majority for its citation of a dissenting opinion and alleged reliance on dictum. Op. at 168. However, the proposition that " 'matters which convict require unanimity, and failure to convict can result from the vote of one juror and that aggravating and mitigating circumstances should be dealt with in the same way,' " *Hopkinson v. State*, 798 P.2d 1186, 1190 (Wyo.1990) (Cardine, J., dissenting), is not merely dictum or a hypothetical argument in a dissent. Rather, that is the premise for the current statutory scheme and required instruction under the Wyoming death penalty statute. W.S. 6–2–102(e)(i) through (iii). The changes in the statutory mitigating factor scheme are relevant and not an "effort to eliminate capital punishment in Wyoming, * * * by articulating dictum," dis. op. at 3, because Engberg will be resentenced under that amended scheme. Therefore, the revised Wyoming statutory scheme as well as the controlling United States Supreme Court precedent of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), are mandatory and important considerations in our disposition of this case and not merely "articulating dictum[.]"

The dissent states—without empirical data, study, citation of authority or any basis whatsoever—that "there is evidence of the fact that prosecutors are not seeking the death penalty in cases in which a sentence to death well might be appropriate because they do not believe that the judiciary will permit the execution." Op. at 168. This bald assertion is unsupported. But there is evidence to support the proposition that spending limits in district attorneys' offices result in plea bargains. As a long-time, most respected Wyoming district attorney said when interviewed,

"he is aware of two possible capital cases in other counties that never went to court because the counties couldn't afford the expense. The prosecutors settled for a plea bargain."

and

"[i]f a prosecution means bringing in witnesses from out-of-state, the cost may be the deterrent that fosters a plea bargain." Barron, *Defense needs $, prosecutor can deal*, Casper Star–Tribune, Sept. 22, 1991, at A8, col. 3, 4.

Unfounded, unsupported blame for lack of death penalty executions placed on decisions of this court is neither constructive nor helpful. The effect, as always, is to oversimplify the debate with the 'I'm tough-on-crime, you're soft-on-crime' accusations. It is the sort of demagoguery that political candidates seize upon and unfairly exploit. The problem with these simplistic buzz words and slogans is that they often obscure the real and specific issues and do not aid in the solution of pressing problems. For example, a populous state in this country recently passed a milestone in that, for the first time in its history, it counted more than 100,000 persons incarcerated in its prisons. That is a milestone because it is more persons in prison than in any industrialized nation anywhere in the

world, except the United States of America. Should we begin to look at that state's milestone and ask ourselves if the 'tough-on-crime' approach is really working? We have more violent crime than any of the other western industrialized nations. We have a greater drug problem than any others. We have more murders. We are one of a small minority of developed countries that retains the death penalty. All of this deserves serious and thoughtful study. While recognizing that crime must be punished and offenders incarcerated, we should also understand that in doing so we treat the disease and not the cause. The causes are many, and they deserve serious study, debate, and consideration.

The business of law, by its very nature, involves conflict, controversy, and disagreement. A healthy discussion of different points of view is the very essence of law—it is the way we grow, live better with each other, and improve our system of law to better serve society. It was in this spirit that discussion of the important questions presented in this case was undertaken.

It is said by the dissent that we have abolished the death penalty. The claim is absurd. The death penalty exists pursuant to legislation adopted in 1989 by the Wyoming legislature. Because we are a government of laws and not of men, we must reverse the sentencing phase of this case.

Whether a prosecutor, a member of the executive branch of government, seeks capital punishment or life imprisonment is a decision placed with his office. The decision ought to result from an honest, fair assessment of the facts and circumstances present in each particular case. I am confident the prosecutor will not shirk the duty in this case by whining about the court or complaining about the difficulty caused by

delay. Presenting to a sentencing jury aggravating and mitigating factors is not really burdensome or difficult. Surely the prosecutor will eschew the suggestion of such difficulty and do his job honestly, reasonably, and as required by law.

Conviction affirmed. Sentence vacated and case remanded for proceedings consistent with this opinion.

MACY, Justice, dissenting in part and concurring in part.

I dissent to that portion of Justice Thomas' opinion pertaining to the question of Engberg's guilt or innocence. It is unreasonable for this Court to require that, in order to avoid procedural default, defense counsel should have called Engberg's wife a second time after she had already refused to testify. This is the very type of secondguessing of defense counsel's trial strategy which we have said we will not do when we are reviewing a claim of ineffective assistance of counsel. *See Seeley v. State*, 715 P.2d 232 (Wyo.1986). Also, while the record shows that at trial both counsel and the court ignored Wyo.Stat. § 1–12–104 (1988), Justice Thomas' construction of the statute violates Engberg's constitutionally protected right to obtain witnesses in his favor. U.S. Const. amend. VI; Wyo. Const. art. 1, § 10. *See also* Section V.B. of Chief Justice Urbigkit's opinion dissenting in part and concurring in part.

I concur with Justice Cardine that it was impermissible to use the underlying robbery as an aggravating circumstance when it had already been used to elevate the crime to first-degree murder. It is also impermissible to use the robbery to support two independent aggravating circumstances.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | HISTORY OF THE PROCEEDINGS AND ISSUES PRESENTED | 96 |
| II. | FACTS | 100 |
| III. | SCOPE OF REVIEW | 100 |
| | A. Introduction and Outline | 100 |
| | B. Scope of Review in Death Penalty Cases | 101 |
| | C. Constitutional Right Forfeiture by Procedural Default | 103 |

| | | Page |
|---|---|---|
| IV. | INEFFECTIVENESS OF COUNSEL | 104 |
| V. | GUILT PHASE ISSUES | 116 |
| | A. Errors Contended | 116 |
| | B. The Refusal by the Trial Court to Allow Engberg the Right to Call his Wife as a Witness | 116 |
| | C. What the Record and Totality of Procedures Established | 122 |
| | D. Use of Secondary Evidence From an "Unavailable Witness" | 123 |
| | E. Prejudice in Witness Presentation in Open Court | 127 |
| | F. Eyewitness Identification Witness—Refusal of the Trial Court to Allow the Engberg to Call an Expert Witness to Testify on the Potential for Error in Identification | 128 |
| | G. The Failure of the Prosecutor to Inform Engberg and His Attorney That They Had the Principal Eyewitness Hypnotized to Enhance Her Memory and Subsequent Denial of a Post–Trial Hearing | 139 |
| | H. Additional Guilt Phase Issues Raised by Engberg | 152 |
| VI. | DEATH PENALTY ISSUE | 153 |
| | A. The Death Penalty in "Modern" America | 154 |
| | B. Felony Murder as a Predicate for Capital Punishment | 156 |
| | C. Present Wyoming Statute | 160 |
| | D. Weighing and Burden of Persuasion Conflicts Now Ameliorated by Present Law | 163 |
| | E. Other Death Penalty Issues | 165 |
| VII. | CONCLUSION | 166 |

---

URBIGKIT, Chief Justice, dissenting in part and concurring in part.

This post-conviction-relief appeal provides this court's second consideration of Roy Lee Engberg's conviction and death sentence for the murder of a Wells Fargo guard delivering money to a grocery store in Casper, Wyoming. I dissent in this second absolution of trial and appellate advocacy errors involved in conviction and concur with the opinion of Justice Cardine in death penalty reversal.

## I.

### HISTORY OF THE PROCEEDINGS AND ISSUES PRESENTED

Following jury verdict and death sentence, initial appeal was taken with five issues stated: (1) right to individual voir dire of jurors; (2) peremptory challenges used to create a death qualified jury; (3) insufficient evidence of intent to kill to justify the death penalty; (4) duplicate use of robbery and an offense committed for pecuniary gain as aggravating factors; and (5) proportionality of the death penalty.

In *Engberg v. State*, 686 P.2d 541, 544 (Wyo.), *cert. denied* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984) (*Engberg I*), this court observed that "[t]he only factual issue at the trial of this case was the identity of the perpetrator." In decision, this court found "[t]he desideration and methodology of voir dire examination of the jurors" was discretionary. *Id.* at 547. On the second issue, use of peremptory challenges going beyond *Witherspoon* expendables, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, *reh'g denied* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), we said:

> Within the limits imposed by *Swain v. State of Alabama*, supra [380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, *reh'g denied* 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965)], peremptory challenges must be recognized as partisan in nature and idiosyncratic in application. They are part of the tools of interested and able advocates. As such they always have been viewed as wholly discretionary and beyond inquiry with respect to motivation and intention.

*Engberg I*, 686 P.2d at 549. The intent to kill issue was addressed by this court in decision that intentional homicide would

not be a requirement for the felony murder death penalty sentence.

The most significant issue addressed in *Engberg I* was dual use of murder for pecuniary gain and robbery as distinct aggravating circumstances. In validating the instruction, this court concluded that "the rule [permitting submission of both as separate circumstances] is premised upon an assumption that the number of aggravating circumstances has some independent significance." *Id.* at 553. This was the thesis of aggregating numerically aggravating circumstances. Finally, *Engberg I* determined that the death penalty was neither excessive nor disproportionate when compared with other capital cases in Wyoming. *Id.* at 555.

Initial appellate briefing was apparently prepared by law school students in the Defender Aid Program at the University of Wyoming. The appellate attorney in the public defender's office left that position and new counsel filed a petition for rehearing first presenting what is now the *Lockhart–Lowenfield* issue, *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568, *reh'g denied* 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988), of use of the aggregative factor to achieve the felony murder status and then use of the same factor for an aggravating death penalty circumstance. The issue was foreclosed to Engberg by the denial of the petition for rehearing.

In this second appeal (*Engberg II*), following trial court denial of post-conviction relief, we are now presented with a 212–page appellant brief stating additional or differently phrased issues:

### ISSUE 1

* * * the court's refusal to permit appellant to call an expert on eye-witness identification was error which deprived appellant of his right to a fundamentally fair trial and his right to compulsory process.

### ISSUE 2

* * * the State's failure to disclose its use of hypnosis as means of enhancing Kay Otto's memory violated its ethical obligations and denied appellant his right to due process of law, his right of confrontation, and his right to effective assistance of counsel.

### ISSUE 3

(a) * * * appellant was denied due process of law by the extradition procedure used to bring him to Wyoming such that the proceedings here must be declared null and void.

(b) * * * appellant was denied due process by the introduction of evidence that he had to be beaten by the police officers who arrested him in order to prevent him from fleeing.

### ISSUE 4

* * * the State's introduction of evidence showing that appellant frequently used aliases denied him his right to a fundamentally fair trial.

### ISSUE 5

(a) * * * appellant's rights under the Fifth Amendment to the United States Constitution and Article 1, § 11 of the Wyoming Constitution were violated when evidence that he refused to wear a stocking cap so that he could be photographed was introduced at his trial and argued as evidence of guilt.

(b) * * * appellant's right to confront witnesses was denied him by the court's refusal to permit cross-examination of the police officer who photographed him concerning appellant's medical condition.

### ISSUE 6

(a) * * * a defendant's spouse can invoke spousal privilege and decline to testify when the defendant seeks to have the spouse testify.

(b) * * * the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution were violated by the trial judge's erroneous

ruling that appellant could not call Donna Engberg as a witness, cross-examine her, nor introduce her prior statements for impeachment purposes.

(c) * * * a defendant's spouse who refuses to testify is an unavailable witness whose hearsay statements may be admitted into evidence.

## ISSUE 7

* * * the use of a conclusive presumption to convict appellant of first degree murder is plain error and requires reversal of the conviction.

## ISSUE 8

* * * appellant's rights under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution were violated by the introduction of evidence seized by the police during a warrantless search of appellant's trailer.

## ISSUE 9

* * * the testimony of the ballistics expert was incompetent and should have been disregarded, and should be disregarded now, and thus whether there is insufficient evidence to support the conviction.

## ISSUE 10

(a) * * * the prosecution's use and manipulation of the press prior to appellant's trial deprived appellant of his right to a fair trial.

(b) * * * appellant's right to effective assistance of counsel was denied him by his initial court-appointed attorney's failure to combat the prosecution's misuse of the media.

## ISSUE 11

* * * the trial court's failure to excuse venireman Alberts for cause deprived appellant of his right to a fair trial by an impartial jury.

## ISSUE 12

* * * the voir dire procedure used at appellant's trial denied him his right to a fair trial by an impartial jury.

## ISSUE 13

(a) * * * the introduction of evidence in the penalty phase that appellant had escaped from the authorities in Missouri denied him his right to due process and a fundamentally fair finding that the death penalty should be imposed.

(b) * * * the prosecutor's closing argument in the penalty phase of the trial deprived appellant of his right to due process and fundamentally fair trial when the prosecutor argued appellant needed to be executed in order to restrain him and when the Wyoming Supreme Court has previously recognized that kind of argument is only proper where the heinous, atrocious, or cruel aggravating circumstance is involved.

## ISSUE 14

* * * the court's refusal to permit appellant the opportunity to present evidence of a mitigating circumstance, the cruelty of the manner of execution, denied appellant his right to due process of law and a fundamentally fair finding to impose the death penalty.

## ISSUE 15

* * * appellant's right to due process and to be free from cruel and unusual punishment was violated by the statutory presumption in favor of death under Wyoming law which requires the defendant to bear the burden of demonstrating that sufficient mitigating circumstances outweigh the aggravating circumstances so as to warrant leniency.

## ISSUE 16

* * * appellant's right to be free from cruel and unusual punishment and to due process were violated by the jury's finding as aggravating circumstances that the murder was committed for pecuniary gain and while the defendant was engaged in the commission of a robbery

when the robbery had already been used to elevate the crime to capital murder.

## ISSUE 17

* * * the cumulative nature of the error is such that, regardless of the harmlessness of any one error, together they prejudiced appellant's rights to due process, fundamental fairness, and a reliable determination that the death penalty should be imposed.

## ISSUE 18

* * * appellant was afforded [in]effective assistance of counsel during his appeal to the Wyoming Supreme Court.

## ISSUE 19

* * * it was improper for the office of the attorney general to represent the State in post-conviction proceedings to urge that an assistant attorney general's proper representation was a procedural bar to the issues raised in appellant's petition for post-conviction relief.

## ISSUE 20

* * * this court's discussion and holding in prior cases with regard to petitions for post-conviction relief ignore the plain and obvious statutory language and establish a procedure which is violative of fundamental fairness[,] due process and equal procedure [sic] and whether it has established a confusing and unworkable process wherein courts simply dismiss petitions for post-conviction relief to get rid of them.

The State frames these issues as:

Argument I

Was there error in the procedures followed in the lower court on Engberg's petition for post-conviction relief?

Argument II

Was it error to admit evidence of consciousness of guilt at trial?

Argument III

Was Engberg's motion to suppress evidence seized at the trailer properly denied?

Argument IV

Did any impropriety or illegality in Engberg's extradition to Wyoming affect the jurisdiction of the Wyoming courts?

Argument V

Was Engberg denied a fair trial due to pretrial publicity; was Engberg denied effective trial counsel due to pretrial publicity?

Argument VI

Was the jury selection process * * * proper?

Argument VII

Was the admission or exclusion of expert testimony discretionary and did the exercise of that discretion affect a constitutional right in this case?

Argument VIII

Was Engberg deprived of a fair trial, due process or confrontation by the failure of the State to disclose Kay Otto's contact with a hypnotist?

Argument IX

Was Engberg denied due process by the trial court's ruling that his spouse had a privilege not to testify?

Argument X

Was evidence of Engberg's status as an escapee properly admitted in the penalty phase; was the prosecution's closing argument at the penalty phase proper?

Argument XI

Was Engberg's proffer of evidence in "mitigation" to show the effects of lethal gas, etc., properly excluded; is this issue moot?

Argument XII

Is there a presumption in favor of the death penalty under Wyoming statutes in violation of due process or cruel and unusual punishment?

Argument XIII

Was the jury * * * properly instructed as to statutory aggravating circumstances; was Engberg denied due process or subjected to cruel and unusual punishment?

Argument XIV

Did Engberg receive effective assistance of counsel on appeal?

Argument XV

Does the cumulative nature of any errors in this case warrant relief?

Argument XVI

Is the attorney general's entire staff disqualified from post-conviction proceedings because one of Engberg's four attorneys on direct appeal has since become an assistant attorney general? [1]

## II.

## FACTS

Vernon Rogers and his sister, Kay Otto, employed by Wells Fargo, were making an armored van money delivery to a grocery store in Casper. The two left the store to find themselves face to face with a man armed with a gun. Vernon Rogers was almost instantly shot and killed in front of his sister and the robber escaped with a bag of money. About a week later, Engberg was arrested while drunk in Las Vegas, Nevada on New Years Day following a family violence complaint by his wife. The injury Engberg received from the police during arrest required both hospitalization and a surgical operation.

Engberg was eventually brought to Wyoming and charged with premeditated murder and felony murder. During the trial, Engberg was denied the right to call his wife as his witness when the trial judge incorrectly applied federal rather than controlling state law on testimonial privilege. Additionally, he was denied the opportunity to introduce expert witness testimony on the potential for error in eyewitness identification. Furthermore, Engberg and his attorney were kept unaware that the police attempted to have the principal eyewitness hypnotized to enhance her memory. Engberg was convicted of felony murder and aggravated robbery and sentenced to death on the murder conviction and a consecutive term of twenty-five to thirty years on the robbery conviction.[2]

## III.

## SCOPE OF REVIEW

### A. *Introduction and Outline*

Consideration of this death penalty appeal within the limited issues raised on initial appeal and the broad based attack now made in post-conviction relief requires application of three different concepts. First, the heightened scrutiny standard of review for death penalty cases requires recognition. Second is the limitation that post-conviction relief addresses a constitutional issue which is found in this case to be primarily ineffectiveness of appellate counsel in failure to raise the issues in initial appeal. Finally, constitutional forfeiture by procedural default is presented in contended waiver by the omission of appellate counsel in the initial appeal since *Cutbirth v. State*, 751 P.2d 1257 (Wyo.1988) must also be considered. I cannot join the majority of this court for guilt phase reso-

---

1. In trial court filing during the pendency of the post-conviction-relief proceeding and by direct filing of a separate petition in this court, Engberg challenged the State's representation by the office of the attorney general since his appellate counsel for initial appeal had changed to join the staff of the attorney general's office. Representation preclusion attacks by Engberg were denied both in trial court and with rejection of the filing of the direct proceeding in this court by an order entered May 1, 1985. *State ex rel. Roy Lee Engberg, Petitioner, v. A.G. McClintock, Attorney General of the State of Wyoming, The Office of the Attorney General, Gerald A. Stack, Deputy Attorney General, John W. Renneisen, Senior Assistant Attorney General of the State of Wyoming and J. Scott Evans, Natrona County District Attorney, Respondents,* No. 85–76 (Wyo. 1985). For a recent comparison involving disqualification of defense counsel, see *United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y.1991).

2. No appeal was taken from the robbery conviction and no double jeopardy question has ever been raised and need not now be considered. *Schultz v. State*, 751 P.2d 367 (Wyo.1988); *State v. Wood*, 208 Conn. 125, 545 A.2d 1026, *cert. denied* 488 U.S. 895, 109 S.Ct. 235, 102 L.Ed.2d 225 (1988); *State v. Ah Choy*, 70 Haw. 618, 780 P.2d 1097 (1989); *Woods v. State*, 547 N.E.2d 772 (1989), *reh'g* 557 N.E.2d 1325 (Ind.1990), *cert. denied* — U.S. —, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991); *State v. McCovey*, 803 P.2d 1234 (Utah 1990). See, in current review, Comment, *Application of the Merger Doctrine to the Felony Murder Rule in Texas: The Merger Muddle*, 42 Baylor L.Rev. 535 (1990). *See also State v. Ortega*, — N.M. —, 817 P.2d 1196 (N.M.1991).

lution which justifies the conviction by a combination of our absolution and denial of procedural default committed by both trial and appellate counsel.

This court should assess these concepts within post-conviction-relief review standards applicable to a capital case. I will pursue the substantive issues, including denied testimony of Engberg's wife, expert eyewitness identification and hypnotism of a witness. Other *Engberg II* issues will only be considered to the extent that consideration will be helpful for future cases, although I will not significantly reconsider the issues raised and determined in initial appeal which occurred before I came on this court. This is not a broad based sufficiency of the evidence case but instead confined to post-conviction-relief review of W.S. 7–14–101 through 7–14–108 initially enacted by the Wyoming legislature to address constitutional issues in criminal convictions. Present discussion is developed within a massive body of case law since this homicide occurred and also since the opinion in *Engberg I* was written. Thousands of appellate death penalty decisions have been published and segmented issues, penalty or guilt, have been addressed by the United States Supreme Court in at least thirty significant decisions.[3]

### B. *Scope of Review in Death Penalty Cases*

When the penalty of execution is provided for criminal punishment, this court should consider assignments of error now first presented under the same standard used by the supreme courts of Utah, Louisiana, and Ohio. These courts carve out a death penalty exception to their contemporaneous objection rule.

The State responds to a number of defendant's claims of reversible error by urging this Court not to consider or rule on such claims because they were inade-

quately preserved at trial. We decline to adopt that approach and instruct the State to hereafter brief all issues on their merits in death penalty cases.

A general rule of appellate review in criminal cases in Utah is that a contemporaneous objection or some form of specific preservation of claims of error must be made a part of the trial court record before an appellate court will review such claim on appeal. As early as 1931, however, this Court recognized an exception to the general rule governing the scope of appellate review in criminal cases where the death penalty was imposed. * * * Nevertheless, *because of the serious and permanent nature of the penalty imposed in such cases, there needs to continue to be a death penalty exception to the contemporaneous objection rule.* Accordingly, this Court has customarily considered assignments of error which were not preserved at trial but were raised and briefed for the first time on appeal.

* * * * * *

* * * [W]e have the sua sponte prerogative in such cases to notice, consider, and correct manifest and prejudicial error which is not objected to at trial or assigned on appeal, but is palpably apparent on the face of the record. Not only is *such standard in keeping with controlling statutory and case law, but it also furthers the policy of safeguarding a defendant's right to a fair trial in a death penalty case* by permitting review of the proceedings below even in the absence of compliance with procedural technicalities.

*State v. Tillman,* 750 P.2d 546, 551–53 (Utah 1987) (footnotes omitted and emphasis added). *See Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346, *reh'g denied* 409 U.S. 902, 93

---

3. Recognition of the change of the law is found from the significant changes in Wyoming death penalty statutes in Wyo.Sess.Laws ch. 171 (1989). See, *infra,* majority opinion on death penalty by Justice Cardine and section VI(C) of this dissent. I would not conclude that the death penalty statute as applied in either *Engberg I* or the *Hopkinson* case could possibly

meet any appropriate constitutional standards today. *Hopkinson v. State,* 664 P.2d 43 (Wyo.), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). In addition, the conflicting aggravation-mitigation instruction actually given in this case meets neither present standards nor even proper application of constitutional principles when *Engberg I* was written.

S.Ct. 89, 34 L.Ed.2d 164, *reh'g denied* 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163, *reh'g denied* 409 U.S. 902, 93 S.Ct. 90, 34 L.Ed.2d 164 (1972), Stewart, J., concurring; *Reid v. Covert,* 354 U.S. 1, 65, 77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148 (1957), Harlan, J., concurring; *Hamblen v. State,* 527 So.2d 800, 808 (Fla.1988), Barkett, J., dissenting; *State v. Bay,* 529 So.2d 845 (La.1988); and *State v. Kirkpatrick,* 443 So.2d 546 (La.1983), *cert. denied* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). The Louisiana Supreme Court uses the same standard and holds that "in cases where the death penalty is imposed, this Court reviews assignments of error not briefed as a matter of policy." *Kirkpatrick,* 443 So.2d at 553. The Supreme Court of Ohio phrases their approach similarly:

> Our analysis begins by addressing the propositions of law advanced by appellant. *Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention.* In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties.

*State v. Williams,* 38 Ohio St.3d 346, 528 N.E.2d 910, 914, *reh'g denied* 39 Ohio St.3d 717, 534 N.E.2d 93, *cert. denied* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238, *reh'g denied* 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989) (emphasis added). In similar summation, see *State v. Bey,* 112 N.J. 45, 548 A.2d 846 (1988). For a broad perspective, see Ledewitz, *Procedural Default in Death Penalty Cases: Fundamental Miscarriage of Justice and Actual Innocence,* 24 Crim.L.Bull. 379 (1988).[4]

The New Mexico Supreme Court recently stated in *State v. Henderson,* 109 N.M. 655, 789 P.2d 603, 607 (1990):

"[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) (quoting *California v. Ramos,* 463 U.S. [992] at 998–99, 103 S.Ct. [3446] at 3452 [77 L.Ed.2d 1171 (1983)]).

The foundational Wyoming judicial legacy is not inapposite. Indeed, traditional Wyoming jurisprudence found greater value in affirming a death sentence only with caution than in devotion to procedural technicalities. In *State v. Morris,* 41 Wyo. 128, 146–47, 283 P. 406, 411 (1929) (emphasis added), Justice Riner indicated:

> But the familiar rule heretofore announced by this court in *Parker v. State,* 24 Wyo. 491, 161 P. 552 [(1916)]; *Cirej v. State,* 24 Wyo. 507, 161 P. 556 [(1916)]; and *Ohama v. State,* 24 Wyo. 513, 161 P. 558, [(1916)], touching the failure to save exceptions to prejudicial rulings and instructions in capital cases, should, we think, govern here. Under that rule, which we believe to be a wholly salutary one, *it is our duty to consider and determine the effect of [the contended error] attacked by appellant in his brief,* as before indicated.

The editor in 5 ABA Remand Nos. 3–4, *Review of Capital Cases: Should Death Make a Difference?,* at 1 (1990) stated:

> "What is this mystery that men call death?" The question broached by poet Jerome Bell is much on the minds of appellate judges these days. In state and federal circuits where the death penalty exists, judges are finding that capital cases impose extraordinary demands upon their time, their emotions and their intellectual resources.

---

**4.** The United States Supreme Court recently stated that "[w]e have recognized on more than one occasion that the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death." *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 2769, 106 L.Ed.2d 1 (1989), *cert. denied* — U.S. —, 111 S.Ct. 83, 112 L.E.2d 55 (1990). It is recognized that this quotation is suspect considering the statements of limitation that followed. It is an interesting footnote to history that Joseph Giarratano received a death penalty commutation from the Governor of the State of Virginia. *See also* Essay, *"To the Best of Our Knowledge, We Have Never Been Wrong": Fallibility vs. Finality in Capital Punishment,* 100 Yale L.J. 1005 (1991) and Essay, *Teetering on the Brink: Between Death and Life,* 100 Yale L.J. 993 (1991).

In the abstract, capital cases are like other forms of litigation. They require appellate courts to apply legal principles to facts found at the trial level. Yet these cases, where life hangs in the balance, are akin to the "great" cases described by Justice Holmes, where "immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Northern Securities Co. v. United States*, 193 U.S. 197, 400–01 [24 S.Ct. 436, 468, 48 L.Ed. 679] (1904).[5] The significance occurs here not in contended omissions by very competent trial counsel, but in failure of appellate counsel on first appeal to present issues clearly developed in the trial. *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821, *reh'g denied* 470 U.S. 1065, 105 S.Ct. 1783, 84 L.Ed.2d 841 (1985); Comment, *Harris v. Reed: A New Look at Federal Habeas Jurisdiction Over State Petitioners*, 58 Fordham L.Rev. 493 (1989).

The finality of capital punishment mandates that states insure reasonable, rational and fair procedures when imposing it, *State v. Bolder*, 635 S.W.2d 673 (Mo.1982), *cert. denied* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983) (citing *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, *reh'g denied* 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976)), and adequate assistance of counsel constitutes the first constitutional requirement. Wyo. Const. art. 1, § 6, due process of law; Wyo. Const. art. 1, § 10, right of accused to defend. *See* Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L.Rev. 299 (1983) and Comment, *The Ohio Supreme Court's Move Toward Quality Control of Court–Appointed Counsel for Indigent Defendants Charged With Capital Offense Crimes*, 21 Akron L.Rev. 503 (1988).

5. If these authorities are not persuasive, we could find other justification for care and attention in this court's recent experience with the *Osborn* case, *Osborn v. State*, 672 P.2d 777 (Wyo.1983), *cert. denied* 465 U.S. 1051, 104 S.Ct.

## C. *Constitutional Right Forfeiture By Procedural Default*

Although my disagreement is well stated therein, constitutional forfeiture by procedural default as defined in *Cutbirth*, 751 P.2d 1257 cannot be morally or constitutionally ignored here. *See also Murray v. State*, 776 P.2d 206 (Wyo.1989); *Kallas v. State*, 776 P.2d 198 (Wyo.1989); and *Amin v. State*, 774 P.2d 597 (Wyo.1989). Within the strictures of *Harris*, 109 S.Ct. 1038, this court is required to address constitutional ineffectiveness of appellate counsel. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984) for illustration of the failure of the attorneys responsible to brief and present obvious claims of trial error on initial appeal. Any application of the *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, *reh'g denied* 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977) cause and prejudice factors as presently denominated in *Cutbirth* will not be ignored within the trial issues which are hereinafter substantively discussed in detail.

On one issue, for example, where the attorney general admitted error in oral argument, it would not have been unreasonable for the importance and pervasiveness of the subject to have been recognized by Engberg's law school and public defender representation considering the singular exposure it had at trial. Furthermore, by reversal and remand, we should not only here but as we did in *Jones v. State*, 777 P.2d 54 (Wyo.1989) recognize prejudice. The egregiousness of the *Jones* problem for this case was highlighted by parading Engberg's wife, previously identified in opening statement by the prosecutor to have turned in her husband in the Nevada police complaint, to then appear openly at the guilt phase of the trial and refuse to testify before the jury. In *Jones*, 777 P.2d at 60, we said:

1331, 79 L.Ed.2d 726 (1984); *Osborn v. Shillinger*, 639 F.Supp. 610 (D.Wyo.1986), *aff'd* 861 F.2d 612 (10th Cir.1988) and finally, *Osborn v. State*, 806 P.2d 259 (Wyo.1991).

Under the circumstances of this case the invoking of the Fifth Amendment in the jury's presence by Keeler and Haefner, who the jury at least suspected to be alleged co-conspirators with appellants in the attempted murder, was too strongly prejudicial to be overcome by a cautionary instruction. We cannot consider this error harmless. The jury could easily have inferred, and the only purpose this testimony could have served was to demonstrate, that the witnesses were invoking the Fifth Amendment because they were guilty of the underlying conspiracy. The probability that the jury could reasonably infer an admission of guilt through a transfer process to appellants is highly prejudicial. Because of the extreme probability of transference, the calling of Keeler and Haefner added critical weight to the prosecution's case by creating the quintessential inference of guilt not clearly elicited through other testimony at trial.

For Engberg in trial perspective, the participation by his wife in the "flight to Las Vegas" accentuated the suggestion persuasively created by open presentation and non-testimony at trial that she would have only confirmed guilt if her testimony had been permitted. Of no less importance, the very serious death penalty phase trial defect questions will be avoided by retrial under the present statute.

## IV.

### INEFFECTIVENESS OF COUNSEL

To the extent that within this present society denominated by greed, characterized by cruelty and energized by extremism, leaving little to be actually shocking, a current article, Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, XVIII N.Y.U.Rev.L. & Soc. Change 245, 249–54 (1990–91) (quoting Minority Report of Stephen B. Bright, *Toward a More Just and Effective System of Review in State Death Penalty Cases: Recommendations and Report of the ABA Task Force on Death Penalty Habeas Corpus* app., at A–38 (1989) and *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55,

64, 77 L.Ed. 158 (1932)) (emphasis in original and footnotes omitted), is profoundly shocking in two illustrative segments:

Some attorneys (undoubtedly those in *House [v. Balkcom*, 725 F.2d 608 (11th Cir.), *cert. denied* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984) ] and *Mitchell [v. Kemp*, 762 F.2d 886 (11th Cir.1985), *cert. denied* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) ]) are simply incompetent. Approximately 90% of capital defendants are poor, and the poor all too frequently are represented by the incompetent or inexperienced. Amazingly, *one-quarter* of Kentucky's death row inmates had trial attorneys who have since been disbarred or resigned rather than face disbarment!

\* \* \* \* \* \*

\* \* \* Put in a nutshell, it is possible that much of this country simply lacks the political will to stop the type of travesty embodied in cases such as *House* and *Mitchell*.

Yet, stop it we must. To quote Steve Bright, the death-penalty expert who served as Tony Amadeo's lawyer in the Supreme Court: "There are many small communities that do not have surgeons. But that does not mean that we allow chiropractors to do brain surgery in those communities." We do, however, let "chiropractors" with law degrees perform the equivalent of brain surgery in capital cases and, predictably, the "patient" often dies. This is intolerable. Whatever the views of particular lawyers might be on the merits of capital punishment, members of the bar should at least support the proposition—accepted since *Powell v. Alabama* [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ]—that a defendant may not be condemned and sent to his death without "the guiding hand of counsel at every step in the proceedings against him." In the last decade of the twentieth century, the promise of *Powell* remains to be kept.

*See* O'Brien, *Addressing the Needs of Attorneys for the Damned*, 58 UMKC L.Rev. 517, 518 (1990), where the expression was changed to substitute a podiatrist for the

chiropractor. *See also* Burr, *Representing the Client on Death Row: The Politics of Advocacy,* 59 UMKC L.Rev. 1 (1990).

*Engberg II* portrays an inextricable principle of logic enfolding constitutional right forfeiture by procedural default and ineffectiveness of counsel. *By definition, if there was a right which was subjected to constitutional forfeiture by procedural default, the represented accused was subjected to ineffectiveness of counsel.* Consequently, any contention of constitutional forfeiture always raises an equivalent ineffectiveness issue. The jurist is obligated to substantively analyze the scope of the right defaulted in order to weigh the dispossessive effect of the failure of counsel to avoid the default invoked error in competent practice. For this reason, we serve justice quicker and better by addressing claimed mistakes in justice delivery system operation directly instead of first raising the specter of constitutional right forfeiture by procedural default and then centering on the required second phase for consideration of why the trial counsel permitted the procedural default to occur. I would eliminate constitutional right forfeiture and procedural default as buzz phrases [6] of denied due process and equal protection in the search for justice and directly examine in one single analysis: what happened, why, was it wrong, and what was its effect.

The packaging into which mistakes, neglect, and sloppy counseling is last stuffed to avoid and ignore its practical harm is the unreality to ignore ineffectiveness of appellate counsel. It is obvious that the *Cutbirth, Amin, Murray,* and *Kallas* [7] attachment to *Strickland,* 466 U.S. 668, 104 S.Ct. 2052 is embodied in a self-produced justification that conviction should be affirmed without regard for the due process, fairness, and even reasonably error-free proceeding from which the conviction is grasped. To revisit the record is to contemplate the enormity of this capacity to ignore. In actual fact, the guilt phase majority simply does not substantively address the ineffectiveness issue, except as this case was pre-staged by the *Cutbirth* opinion and followed by *Amin, Murray,* and *Kallas.* [8] In most jurisdictions, post-conviction relief is the preferable process to consider ineffectiveness issues and inevitably required where evidence is obtained to challenge the conduct of first appeal appellate counsel. *United States v. Pelletier,* 845 F.2d 1126 (1st Cir.1988); *Williams v. Lockhart,* 849 F.2d 1134 (8th Cir.1988); *United States v. Griffin,* 699 F.2d 1102 (11th Cir.1983); *In re Cordero,* 46 Cal.3d 161, 249 Cal.Rptr. 342, 756 P.2d

**6.** Justice Holmes, dissenting in *Hyde v. United States,* 225 U.S. 347, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912), said "[i]t is one of the misfortunes of the law that ideas become encysted in phrases and thereafter * * * cease to provoke further analysis."

**7.** *Amin,* 774 P.2d 597; *Murray,* 776 P.2d 206; *Kallas,* 776 P.2d 198.

**8.** It has been necessary in this dissent to catalogue the arguments which Engberg's counsel failed to offer in behalf of her client, not because I conclude that Engberg was likely to obtain a reversal on appeal on each specific omission, but only to demonstrate that appellate counsel did not render the thoughtful service to which Engberg was entitled. Engberg need not establish that he was entitled to reversal in order to show prejudice in the denial of counsel.

I find "that the inexcusable failure of petitioner's appellate counsel to raise crucial assignments of error, which arguably might have resulted in a reversal, deprived petitioner of the effective assistance of appellate counsel to which he was entitled under the Constitution."

*In re Smith,* 3 Cal.3d 192, 90 Cal.Rptr. 1, 474 P.2d 969, 975 (1970). "'[W]e have never intimated that the right to counsel is conditioned upon actual innocence.'" *Osborn v. Shillinger,* 861 F.2d 612, 629 n. 17 (10th Cir.1988) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986)).

When justifying constitutional forfeiture by procedural default, the incapacity of appellate counsel to either find the forest or see the trees remains unexplained; one need only read the explicit Wyoming statute and evidence rule, W.S. 1–12–104 and W.R.E. 501, in conjunction with Note, *Spouse's Testimony in Criminal Cases,* 19 Wyo. L.J. 35 (1964), as well as Comment, *Symposium on the Federal Rules of Evidence: Their Effect on Wyoming Practice if Adopted,* XII Land & Water L.Rev. 601, 628–29 (1977) (footnotes omitted), where the authors commented:

Some jurisdictions grant the witness-spouse the privilege not to testify and some grant the privilege to both. The issue is unresolved in Wyoming. The judicial analysis that does exist suggests that the privilege may belong only to the party-spouse.

1370 (1988); *Heyward v. State,* 524 N.E.2d 15 (Ind.App.1988); *Com. v. Moore,* 373 Pa.Super. 603, 542 A.2d 106 (1988); *State v. Tooher,* 542 A.2d 1084 (R.I.1988). *See Osborn v. Shillinger,* 861 F.2d 612 (10th Cir.1988).

Appellate counsel, in initial appeal, only presented for review a composite jury inquiry concern embracing in part the *Witherspoon* expendable issue and individual voir dire for adequacy of prejudicial examination. Then finding intent to kill as an issue, counsel recognized the division of robbery into two circumstances, but not the improvidence of the robbery itself, which then became a proportionality issue. Broad, clear, and well-defined concerns, including both guilt and penalty phase questions, were unnoticed or ignored, not the least of which was the clearly defined *Sandstrom* issue of the reversed or presumed burden of proof. Any second-year law school student's familiarity with criminal law should have afforded immediate recognition of the aggravating issue of including robbery in the felony murder as only first raised on petition for rehearing and then summarily ignored by this court. Admittedly, I would find this court to have been procedurally wrong there, as it is substantively wrong now. If what we are presented in totality in this case constitutes effective assistance of counsel, woe to the common litigants who are faced with that standard in seeking justice within this jurisdiction.

To understand the ineffective issue as presented, it is seen that the first appellate counsel found (1) individual voir dire; (2) intent to kill; (3) divided use in penalty or pecuniary gain and robbery; and (4) constitutionality of death penalty. Apparently not seen, but in any event certainly not included initially, were twenty-six subjects presented in post-conviction, including eyewitness identification challenge, undisclosed hypnosis (not available to first appeal), extradition, arrest beating/bad person evidence, alias bad person evidence, refusal to be photographed in hospital as consciousness of guilt, denied cross-examination, spousal immunity, admissible substantive hearsay, *Sandstrom* conclusive presumption, search and seizure, invalidly used expert, excess prejudicial publicity pre-trial process, misuse of media, voir dire—*Witherspoon* expandable, prior reputation bad person evidence, prosecutorial misconduct in final argument—need to be killed like animal—evidence of manner of execution as cruel and inhumane, improper burden of proof in penalty phase, double up of divided pecuniary gain and robbery for felony murder to become dual aggravating factors for death penalty, as well as cumulative error. Those subjects as presented could not include the additional present issues of conflict of interest of first appellate counsel (not available to first appeal), inaneness of Wyoming's post-conviction relief (not available to first appeal), and ineffectiveness of prior appellate counsel (not available to first appeal). The litany is overwhelming in demonstrated ineffectiveness of counsel for first appeal.

The duplicitous cause and result conclusions derived in *Cutbirth* cannot academically be emplaced to justify result by preordained conclusion. *Osborn,* 861 F.2d 612. Procedural default is inimical to competency of performance. The majority cannot properly ignore the character of appellate counsel nonperformance which occurred in this case and excommunicate those concerns by virtue of the nonperformance, and then say that nothing is left to be considered. *Hannon v. Maschner,* 845 F.2d 1553 (10th Cir.1988); Robson & Mello, *Ariadne's Provisions: A "Clue of Thread" to the Intricacies of Procedural Default, Adequate and Independent State Grounds, and Florida's Death Penalty,* 76 Calif.L.Rev. 89 (1988). *Cf. Harris v. State,* 528 So.2d 361 (Fla.1988) (majority and dissent). A reversal of *Osborn v. State,* 672 P.2d 777 (Wyo.1983), *cert. denied* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984) by the federal judiciary affirming *Osborn v. Shillinger,* 639 F.Supp. 610 (D.Wyo.1986), *aff'd* 861 F.2d 612 (10th Cir.1988), can hardly afford comfort to this court in present conclusions and reasoning in an ineffectiveness of counsel issue now presented ·in this succeeding death case.

The obvious failure of the appellate attorneys in this case is not dissimilar from trial performance reflected in the Nebraska case of *State v. Broomhall,* 221 Neb. 27, 374 N.W.2d 845 (1985) (*Broomhall I*) where, on direct appeal, the conviction was affirmed on a trial court discretionary decision to deny a continuance to obtain an important witness after due diligence by the defendant's counsel was not shown. On post-conviction, raising the same lack of due diligence of counsel, the conviction was reversed. *State v. Broomhall,* 227 Neb. 341, 417 N.W.2d 349 (1988) (*Broomhall II*). In that reversal, as a critique of conduct of counsel, the court enumerated:

> It is difficult, if not impossible, to understand how the failure to call a highly qualified and apparently credible witness to refute the most important ingredient of the State's case—witness credibility—could by any stretch of the imagination amount to reasonable trial strategy. Certainly defense counsel did not advance such reason during his testimony.

*Broomhall II,* 417 N.W.2d at 354.

Similarly, Justice Mosk addressed this subject in *In re Smith,* 3 Cal.3d 192, 90 Cal.Rptr. 1, 474 P.2d 969, 971–72 (1970) (quoting from *People v. Feggans,* 67 Cal.2d 444, 62 Cal.Rptr. 419, 432 P.2d 21, 23 (1967)):

> "Counsel must prepare a brief to assist the court in understanding the facts and the legal issues in the case. The brief must set forth a statement of the facts with citations to the transcript, discuss the legal issues with citations of appropriate authority, and argue all issues that are arguable. Moreover, counsel serves both the court and his client by advocating changes in the law if argument can be made supporting change.
> * * *." * * *

Judged by the foregoing criteria, representation by the appointed counsel for petitioner before the Court of Appeal was demonstrably inadequate. Indeed, petitioner would have fared better had his attorney withdrawn in favor of a pro se brief from petitioner, despite petitioner's acknowledged legal ineptitude. In a case bristling with arguable claims of error, petitioner's counsel filed an opening brief consisting of a 20–page recitation of the facts and a one-page argument. * * *

Of course, an appellate counsel is not to be held responsible for an actual frivolous appeal by his client, and we do not hold that *Anders* [*v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)] and *Feggans* require the advocate to contrive arguable issues. But in the instant action, each of the counts on which petitioner was convicted was potentially vulnerable to legitimate and provocative appellate contentions that should have been manifest to an alert and responsive attorney.

*See also In re Cordero,* 756 P.2d at 1377 as addressing errors of not only ignoring obvious defenses of impairment, but also failure to object to statement introduction, failure to research and argue defenses of law and failure to introduce evidence of third party ownership of an inculpatory article as described by the court as "fail[ing] egregiously to pursue the leads and evidence made available to him."

As illuminated in this case, I find thoughtful theory and powerful persuasion in the critique of David Rudovsky in Rudovsky, *The Right to Counsel Under Attack,* 136 U.Pa.L.Rev.1965, 1971–72 (1988):

> This problem is seriously aggravated by the failure of the courts to establish meaningful standards to test the effectiveness of trial counsel. The most incompetent and indefensible actions of defense counsel are rationalized as tactical decisions. In all too many cases, lawyering that should trouble the collective conscience of the courts and bar is determined to be within the realm of competent assistance.

> * * * * * *

> * * * I find it somewhat ironic that while we are increasing our ethical demands on defense counsel, we denigrate the central purpose of the sixth amendment: meaningful and effective assistance of counsel.

However, compare the analysis in *Hayes v. Lockhart*, 852 F.2d 339, 352 (1988), *reh'g denied* 869 F.2d 358 (8th Cir.), *cert. granted and judgment vacated* 491 U.S. 902, 109 S.Ct. 3181, 105 L.Ed.2d 691 (1989) (quoting from *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir.1987)):

> In holding that defense counsel's representation was not constitutionally deficient, we are mindful that our function is not to insulate trial counsel's performance from post-trial review and criticism, especially in death penalty cases, for a lawyer's professional reputation is not to be preserved at the expense of a defendant's constitutional rights. At the same time, however, we must resist
>> "the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed in the proceedings to that point, and his best judgment as to the attitudes and sympathies of judge and jury."

No counsel is probably not much worse than incompetent counsel. *Cf. McCoy v. Court of Appeals of Wisconsin, Dist. 1*, 486 U.S. 429, 108 S.Ct. 1895, 100 L.Ed.2d 440 (1988) and *Giarratano v. Murray*, 847 F.2d 1118 (4th Cir.), *cert. granted* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988), *rev'd* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), *cert. denied* —— U.S. ——, 111 S.Ct. 83, 112 L.Ed.2d 55 (1990). The Wisconsin process assures that counsel has looked at the record and considered the appeal substantively. *Anders v. State of California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, *reh'g denied* 388 U.S. 924, 87 S.Ct. 2094, 18 L.Ed.2d 1377 (1967). By its very nature, this could not be a first appeal issue even if in the unusual case appropriate there. *Turner v. Company*, 827 F.2d 526 (9th Cir.1987), *cert. denied* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595, *reh'g denied* 490 U.S. 1031, 109 S.Ct. 1770, 104 L.Ed.2d 205 (1989); *Harris v. Reed*, 822 F.2d 684 (7th Cir.1987), *cert. granted in part* 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988), *judgment rev'd* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *People v. Pope*, 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859 (1979). "Typi-

cally, a claim of ineffective assistance of counsel cannot be raised on direct appeal because its resolution often requires evidence which is not contained in the record on appeal." *Harris*, 822 F.2d at 686. See comprehensive consideration in *Osborn*, 861 F.2d at 626 n. 13. *See also United States v. Long*, 857 F.2d 436 (8th Cir.1988) and *United States v. Dubray*, 727 F.2d 771 (8th Cir.1984).

Another problem strains forth out of this morass. This record is barren of any justification of why the attorney who worked on the initial appeal chose to disregard trial error objections originally established by Engberg's attorney. Lacking an evidentiary foundation for explanation to be provided by hearing which most courts require for ineffectiveness consideration, procedural default apparently anticipates that neither the adequate testimony of the client nor more particularly the testimony of trial counsel should be preserved for review. *State v. Hatch*, 144 Wis.2d 810, 425 N.W.2d 27 (1988). *See also United States v. Hayman*, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952). This is not the state of this appeal since the record actually shows the specific procedural defaults which, by definition, constitute malpractice and ineffectiveness whenever the omitted issue had any arguable validity in a case such as this death penalty appeal. On this record we can see what did not happen on first appeal. The federal cases teach that "when a court disposes of a [post-conviction relief] petition without a hearing, allegations must be accepted as true except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *United States v. Mosquera*, 845 F.2d 1122, 1124 (1st Cir.1988). Here, as there, *absent requested hearing for explanation of cause for observable ineffectiveness, "[p]etitioner's allegations are not contradicted by the record." Id.* at 1124 (emphasis added).

At the time of Engberg's first appeal, as today, the University of Wyoming, College of Law sponsored a law school student defender aid program to provide students with clinical trial experience under the su-

pervision of a law professor. Appellate counsel for the public defender's office assigned Engberg's case to that clinical program for brief writing assistance. Nothing of record now available on this appeal or from documentation furnished on the first appeal reveals who did what in issue analysis or preparation of appellate briefs, but relevant comparisons in scope and strength are informatively valuable. The direct appeal appellate brief for this death case cited forty-five cases, a half dozen texts and considered four issues. A statement of facts occupied thirty-nine pages and legal argument only seventeen more, not including the conclusion. In relative comparison, we are now faced with twenty-six numbered and subcategory issues, in a brief of 212 pages, citation of about 160 cases, with a singular number of pages attached in appendices.

The syllogism as defined within this *Cutbirth—Engberg* definition of Wyoming justice cannot be utilized for declination to realistically consider basic rights of an individual to be adequately represented. A difficult death penalty case with novel and significant issues was given the most cavalier treatment by both appellate counsel for Engberg and this court on first appeal decision. *See* Geimer, *Law and Reality in the Capital Penalty Trial*, XVIII N.Y.U.Rev.L. & Soc. Change 273 (1990–91).

The hard work and perceptiveness of successor appellate counsel is now denied effective consideration to most guilt phase questions by the majority's application of procedural default resulting from failure and defect of representation by counsel on first appeal. In result, procedural default is then used to deny ineffectiveness of appellate counsel. The majority uses the conclusion to prove the premise and then uses the premise to establish the appropriateness of the result determined conclusion. The anomaly of this case is self-illustrated, but the procedural result in substantive conclusion is far more disturbing. An absurdly insufficient death penalty case brief is filed under at least the primary responsibility of a representative of the office of the public defender. After that representative leaves before completion of appeal,

rehearing is denied for an issue which should have been included in the initial brief. Post-conviction relief in reality becomes the only comprehensive and matured appellate process that this death penalty case has before and will now receive in the state court system.

This decision is a classic example of why I would follow the spirit of the post-conviction-relief statute to assure that in criminal cases, all legitimate legal issues relating to post-conviction relief are accorded one substantive review without the existentialism of cause and prejudice so that constitutional rights of the accused do not become synonymous with appellate counsel lawyer bashing and defensive rationalizations of the obvious error, mistake, neglect or ignorance. *Williams*, 849 F.2d 1134; *State v. Wiley*, 228 Neb. 608, 423 N.W.2d 477 (1988). How much preferable both to the justice delivery system and to this court would it have been if the State brief and present court could have substantially determined appellate issues instead of determining that prior counsel, for undisclosed reasons, waived those interests of Engberg by failure to initially present in initial appeal? I find in present context at this post-conviction relief juncture that Engberg has an ineffectiveness of counsel—conflict of interest—contention that, for whatever else may be stated, bypasses *Cutbirth* and mandatorily requires substantive consideration of each appellate issue presently offered.

*Osborn*, in present context, should teach us that much. A further difficulty exists here in that the State organized its order of presentations in its appeal brief differently from Engberg. Innumerable hours of coordination analysis is consequently required which is saved to the majority by procedural disposition in its constitutional forfeiture versus ineffectiveness of counsel dual decision. Without realistic attention to the real issues, I would not find, under these circumstances of insufficiency of representation on initial appeal, that *Cutbirth* is controlling since Engberg was neither given personal choice nor a fair hearing which would meet state or federal constitu-

tional criteria. *See Cutbirth,* 751 P.2d 1257, Urbigkit, J., dissenting. This is not the deliberative action waiver of *Coleman v. O'Leary,* 845 F.2d 696 (7th Cir.), *cert. denied* 488 U.S. 972, 109 S.Ct. 507, 102 L.Ed.2d 542 (1988). *See Hardin v. Black,* 845 F.2d 953 (11th Cir.1988).

As I stated in dissent in *Cutbirth,* 751 P.2d at 1292:

> Syllogisms aside, neglect or deficient decision of the attorney is innately prejudicial, and the only question for address is to what extent and with what reasoned result. * * *
>
> * * * * * *
>
> * * * If pragmatism in result is justified, pragmatism in calling the procedural process what it is will be more appropriate in reason and logic. Knowing the fiction of client waiver, this court poses an irrational burden on the liberty interest of the client to demonstrate effectiveness where stupidity, slovenliness or just lack of reasoned preparation will not necessarily suffice.

The vice of *Cutbirth* is failure to recognize that procedural default, and particularly so for appellate counsel, does not occur in a vacuum. The action or inaction of brief writing counsel was either intended or unintended, negligent or slothful, misguided or ignorant and by definition if defaulted cannot be wise, thoughtful or intelligently presented. *Only what is wrong can be defaulted; what is right cannot be.* The majority has not afforded any facts or even viably presented contentions why brief writers on initial appeal in *Engberg* completely failed to present an adequately planned review as an adequate address for a death case appellate brief. Waiver of the omission of earlier challenge is certainly not here in issue. *People v. Ginther,* 390 Mich. 436, 212 N.W.2d 922 (1973); *Wiley,* 423 N.W.2d 477; *Moore,* 542 A.2d 106. Moreover, the standard of effectiveness is the same for both appellate and trial counsel. *Thompson v. State,* 525 So.2d 816 (Ala.Cr.App.1984), *aff'd* 525 So.2d 820 (Ala. 1985), *cert. denied* 488 U.S. 834, 109 S.Ct. 94, 102 L.Ed.2d 70 (1988); *Heyward,* 524 N.E.2d 15; *Com. v. Knapp,* 374 Pa.Super. 160, 542 A.2d 546 (1988).[9]

At a minimum in post-conviction relief, evidence addressing the subject should be developed before the convicted death penalty criminal is assigned the ultimate responsibility of execution or even now a life sentence as a direct result of the sins of omission or commission by counsel.[10] *Osborn,* 861 F.2d 612. *See also Osborn v. State,* 806 P.2d 259 (Wyo.1991). In this case, cross-examination inquiry of brief writers of initial appeal, whoever they were and whatever they separately did, would be informative including time spent, research made, conferences regarding issues, effort expended in review of the original record, and especially why so many clearly developed trial time issues were casually ignored in the appeal. In context, the brief, as then filed, seems to have ended before it

9. It is worrisome that we find critiques of counsel performance as reflected in *Morgan v. Zant,* 743 F.2d 775, 780 (11th Cir.1984), *overruled sub nom. Peek v. Kemp,* 784 F.2d 1479 (11th Cir.), *cert. denied* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), *reh'g denied* 479 U.S. 1047, 107 S.Ct. 912, 93 L.Ed.2d 862 (1987):

> Morgan also asserts ineffectiveness of counsel on appeal. It is uncontradicted in the record that Morgan's trial counsel did not file a notice of appeal and filed a brief only after the Georgia Supreme Court threatened to impose sanctions. The brief, which included only five pages of argument, failed to raise as an issue the trial court's charge to the sentencing jury. Counsel failed to attend oral argument before the Georgia Supreme Court and failed to heed a request by the court that he file a supplemental brief on the adequacy of the trial court's penalty charge. We find this

> conduct on the part of Mr. Morgan's attorney woefully inadequate and likely ineffective.

Despite what the federal court thereafter said, it is obvious that there was prejudice since the decision by the Georgia Supreme Court in *Morgan v. State,* 241 Ga. 485, 246 S.E.2d 198, 199 (1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073, *reh'g denied* 444 U.S. 976, 100 S.Ct. 475, 62 L.Ed.2d 393 (1979) produced a dissent on the non-briefed issue and the Eleventh Circuit Court of Appeals then reversed by unanimous decision. There was not any prejudice left in ineffectiveness of counsel after the Eleventh Circuit Court of Appeals had corrected the trial mistake and appellate brief neglect.

10. The life, trials, and death of Willie Darden as so recently completed is expressively informative. *Hatch,* 425 N.W.2d 27.

began with the foreclosed issue of the constitutional viability of the death penalty. I would uniformly and always reject procedural default absolution of legal malpractice—ineffectiveness of counsel—unless the record is clear on its face that neither ineffectiveness nor malpractice existed, or unless alternatively, the record is comprehensively developed in post-conviction proceedings. *Smith v. Wainwright*, 777 F.2d 609 (1985), *reh'g denied* 785 F.2d 1037 (11th Cir.), *cert. denied* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565, *reh'g denied* 478 U.S. 1032, 107 S.Ct. 12, 92 L.Ed.2d 767 (1986). As currently witnessed in *Jurek*, 428 U.S. 262, 96 S.Ct. 2950, and more recently revisited in *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155, *reh'g denied* 487 U.S. 1263, 109 S.Ct. 25, 101 L.Ed.2d 976 (1988) death case brief writing is a proper responsibility for the dedicated, experienced specialist and perhaps not for the willing, thoughtful, but untrained college law student.[11]

It is in the nature of a recognition of practical experience and training as related to competency that Rule 1.1 of the Wyoming Rules of Professional Conduct for Attorneys at Law was provided. This subject was specifically addressed in *United States v. Cronic*, 466 U.S. 648, 653–54, 104 S.Ct. 2039, 2043, 80 L.Ed.2d 657 (1984) (quoting from Schaefer, *Federalism and State Criminal Procedure*, 70 Harv.L.Rev. 1, 8 (1956) and *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)) (footnotes omitted):

An accused's right to be represented by counsel is a fundamental component of our criminal justice system. Lawyers in criminal cases "are necessities, not luxuries." Their presence is essential because they are the means through which the other rights of the person on trial are secured. Without counsel, the right to a

trial itself would be "of little avail," as this Court has recognized repeatedly. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."

The special value of the right to the assistance of counsel explains why "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel."

The relationship of constitutional right to counsel has been intrinsically woven into the fabric of American society since at least the clarion call of Justice Sutherland in *Powell*, 287 U.S. 45, 53 S.Ct. 55. Not only must we be concerned with the competency of counsel, but also the level of effective assistance from that "competent" attorney. Procedural default in appellate brief omission is the anathema of both performance and competency. Being merely a spectator does not suffice in the death penalty adjudicatory process for the defense counsel. *Smith*, 777 F.2d 609. Reasonable competence and undivided loyalty is required. *Williams*, 849 F.2d 1134; *Mannhalt v. Reed*, 847 F.2d 576 (9th Cir.), *cert. denied* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). As is well-stated generally and with specificity by Judge Seymour in *Osborn*, 861 F.2d at 624 (quoting *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063):

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

That ineffectiveness shown was so egregious that the defendant was in effect denied meaningful assistance in the appellate representation. Cf. *Chadwick v. Green*, 740 F.2d 897, 901 n. 5 (11th Cir.1984), as a

---

11. There was adequate advance warning that Jurek was in trouble, but even the most thoughtful and informed may not necessarily have the perceptiveness to anticipate what the future of a majority of nine may foretell. *See* Floyd, *Survey, Criminal Procedure*, 22 Tex.Tech.L.Rev. 493, 500 (1991) and Sicola & Shreves, *Jury Consider-* *ation of Mitigating Evidence: A Renewed Challenge to the Constitutionality of the Texas Death Penalty Statute*, 15 Am.J.Crim.L. 55 (1988). For an example, see *Pyles v. State*, 755 S.W.2d 98, 123 (Tex.Cr.App.), *cert. denied* 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988).

chronic failure as well as a conceptual investigation of the *Strickland,* 466 U.S. 668, 104 S.Ct. 2052 delineation. This is not totally different from the "failure to participate * * * deliberate trial tactic * * *." *Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir.1984). In like accord, see *Broomhall I,* 374 N.W.2d 845 and *Broomhall II,* 417 N.W.2d 349. As there, my imagination does not stretch sufficiently here to justify any strategy for the omitted presentation of appellate issues on initial appeal. This is not dissimilar to trial counsel failure to present mitigative circumstance of mental defect. *Stephens v. Kemp,* 846 F.2d 642, *reh'g denied* 849 F.2d 1480 (11th Cir.), *cert. denied* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); *Wilson v. Butler,* 813 F.2d 664 (5th Cir.1987), *cert. denied* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021, *reh'g denied* 485 U.S. 1015, 108 S.Ct. 1491, 99 L.Ed.2d 719 (1988); *Smith v. Martin,* 37 Ohio App.3d 213, 525 N.E.2d 521 (1987). *See also Com. v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988) (failure to object to testimony of expert witness). See likewise on the conflict of interest denigration of representation, *People v. Easley,* 46 Cal.3d 712, 250 Cal.Rptr. 855, 759 P.2d 490 (1988).

In *Palmer v. Dermitt,* 102 Idaho 591, 635 P.2d 955, 960 (1981), the Idaho Supreme Court related that an appeal omission was by counsel, not client:

The allegations of ineffective assistance of prior postconviction counsel, if true, would warrant a finding that the omission in the prior postconviction proceeding of the allegations now being raised anew by Palmer was not a result of an active, knowing choice made by Palmer through this prior court-appointed attorney, and would therefore provide sufficient reason for permitting the newly asserted allegations to be raised in the

instant petition. Other jurisdictions have similarly held that a claim of ineffective assistance of appellate counsel or prior postconviction counsel provides sufficient reason to permit newly asserted allegations to be raised in a subsequent postconviction proceeding. See *Sims v. State,* 295 N.W.2d 420 (Iowa 1980); *Curtis v. State,* 37 Md.App. 459, 381 A.2d 1166 (1978) *rev'd on other grounds,* 284 Md. 132, 395 A.2d 464 (1978); *Stewart v. Warden, Nevada State Prison,* 92 Nev. 588, 555 P.2d 218 (1976).

Engberg has not been given any posttrial demonstration of any reasonably arguable, realistic and plausible, or academically premised tactical choice justifying appellate counsel's failure to present appropriate appellate issues as so easily perceived and comprehensively presented in this present proceeding.[12] I will not subscribe to or accept the dual standard of attorney competency performance recently attributed to the Fifth Circuit Court of Appeals:

The court's approach to the performance of trial counsel depends on the context. In claims by the petitioner of ineffective assistance of counsel, the court was content with extremely low standards for trial counsel. On the other hand, in claims by the state that a claim is barred by a procedural default by the defendant's trial counsel, the Fifth Circuit held trial lawyers to a very strict standard.

Floyd, *Survey, Criminal Procedure,* 22 Tex.Tech L.Rev. 493, 525 (1991) (footnote omitted). *See also* Coyle, *Effective Assistance: Just a Nominal Right?,* 12 Nat'l L.J., June 11, 1990, No. 40, at 42.

In comprehensive research, although confined to trial as I would recognize to be applicable to appeal, the author considered and concluded in part in Goodpaster, *su-*

---

**12.** *Lint v. State,* 750 S.W.2d 620 (Mo.App.1988). Compare the majority and dissent in *People v. Miranda,* 44 Cal.3d 57, 241 Cal.Rptr. 594, 744 P.2d 1127 (1987), *cert. denied* 486 U.S. 1038, 108 S.Ct. 2026, 100 L.Ed.2d 613, *reh'g denied* 487 U.S. 1246, 109 S.Ct. 4, 101 L.Ed.2d 956 (1988). *See Stephens,* 846 F.2d at 651; *United States ex rel. Kubat v. Thieret,* 679 F.Supp. 788 (N.D.Ill. 1988) as compared to the state appeal of *People v. Kubat,* 94 Ill.2d 437, 69 Ill.Dec. 30, 447 N.E.2d

247, *cert. denied* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). *See also Brevard County Bd. of County Com'rs v. Moxley,* 526 So.2d 1023 (Fla.App.1988); *Owens v. State,* 662 S.W.2d 323 (Mo.1983); Note, *Effective Assistance of Counsel, Strickland and the Illinois Death Penalty Statute,* 1987 U.Ill.L.Rev. 131 (1987); and Note, *State v. Smith: The Standard of Effectiveness of Counsel in Hawaii Following Strickland v. Washington,* 9 U.Haw.L.Rev. 371 (1986).

*pra,* 58 N.Y.U.L.Rev. at 360 (footnotes omitted):

> This discussion leads to the conclusion that, absent some kind of capital case attorney certification system, there is no feasible way to insure attorney competence in advance of trial. Direct and collateral postconviction review, as inefficient and inadequate as they may be, remain the best means of vindicating a capital defendant's right to the effective assistance of a competent attorney. The only issues regarding such review are its nature and what specific competency standards it is to apply.

> \*　\*　\*　\*　\*　\*

> In a capital case, defense counsel has duties and functions definably different from counsel in ordinary criminal cases. The Constitution requires great reliability and individualization in capital sentencing and gives a capital defendant the right to present his sentencer with any mitigating evidence [expert presentation on appeal] that might save his life. These particular sentencing requirements shape capital duties and functions and provide the basis for defining "reasonably competent counsel" in capital cases.[13]

*See also* Mello, *Facing Death Alone: The Post–Conviction Attorney Crisis on Death Row,* 37 Am.U.L.Rev. 513 (1988).

In analysis by Geimer and Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases,* 15 Am.J.Crim.L. 1, 53 (1988) (quoting from an undisclosed source), we learn that defense counsel performance is indeed significant in the outcome as related by a juror in a death case where execution resulted:

> "I shouldn't say it, but I feel it in my heart and always have, his lawyer left a lot to be desired. I realize he was hired by the state to do a job and probably not paid much.... I didn't mention it at the jury room but I think he was not determined enough. He didn't try enough and that affected the jury. They had less sympathy, I guess. I mean, clearly he was guilty, but there were times that, and I know I'm not a lawyer, but even I know, times when he should have been on his feet and he wasn't. That's sad because even if (defendant) was a sorry one, he deserved a trial and someone to care for him and look out for him."

Of similar conclusion, see Tabak, *The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s,* 14 N.Y.U.Rev.L. & Soc. Change 797, 848 (1986), as an item in verse description, and then to recite as ineffectiveness:

> Too many attorneys for capital defendants, due to a combination of inexperience and lack of time and resources, fail to mount adequate defenses, particularly in sentencing proceedings.

Tabak then concludes in effect that the death penalty system is not working and should be abolished for the arbitrary and capricious way in which it operates. *See also* Sevilla, *Investigating and Preparing an Ineffective Assistance of Counsel Claim,* 37 Mercer L.Rev. 927 (1986) and particularly footnote three thereof. Likewise informative is Ruthenbeck, *You Don't Have to Lose Your Shirt on Death Penalty Cases,* ABA Criminal Justice, Spring 1988, at 10.

Of even more concern in effectiveness consideration and the need for particular expertise is Amsterdam, *The Supreme Court and Capital Punishment,* 14 Human Rights 14 (1987), where the author discerns that the death-proneness in the

---

**13.** Additionally, the author's guidelines and standards have applicability as preparation, research, communication, coordination and ingenuity in result as the lawyer's work product and responsibility:

> These standards, as rules of conduct infused with the attitudes and orientations expressed by the guidelines, state the elements constituting reasonably competent attorney performance in capital cases. Only through such guidelines and standards, and close judicial scrutiny in enforcing them, will the death penalty be reserved for those few who, because there is truly nothing to mitigate their death-qualifying crimes or elicit mercy, may be deemed unworthy of life. This is the true purpose of the trial for life.

Goodpaster, *supra,* 58 N.Y.U.L.Rev. at 362.

United States means that system protection is *less*—not more—than in other cases, and consequently, that a higher level of counsel expertise is required. *See* Catz, *The Death Penalty and Federal Habeas Corpus: A Modest Legislative Proposal,* 20 Conn.L.Rev. 895 (1988) and Ledewitz, *supra,* 24 Crim.L.Bull. 379.

The level of our state's ignorance or inattention is more starkly reflected in the Goodpaster article where, in footnote, he relates to the Wyoming home grown variety:

> Some experienced criminal trial counsel simply do not understand the nature or significance of the penalty trial in a capital case. In *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), for example, defense counsel competently conducted the guilt phase trial of a complex and lengthy capital case. Before the penalty trial, however, when asked by the trial judge how much time he would need for the sentencing hearing, counsel replied: "Two minutes. I'm serious. I have been in this position probably more than anybody in this room, multiplied by 5, okay, and there ain't nothing you can say. They [the jury] will do what they want and there is no point." *Id.* at 197 n. 13 (Rose, C.J., dissenting in part and concurring in part).

Goodpaster, *supra,* 58 N.Y.U.L.Rev. at 303–04 n. 22. Neither Engberg nor the large volume of death cases, which by some statistics are reversed at least in part nearly fifty percent of the time, can afford the luxury and attitude that "appellate courts increasingly find themselves questioning the competency of appellate counsel who are questioning the competency of trial counsel." *People v. Eckstrom,* 43 Cal. App.3d 996, 118 Cal.Rptr. 391, 395 (1974). *See* Radelet & Mello, *Executing Those Who Kill Blacks: An Unusual Case Study,* 37 Mercer L.Rev. 911 (1986) and Tabak, *supra,* 14 N.Y.U.Rev.L. & Soc. Change 797. Those authors reflect the obvious fact that the escalated and pervasive ineffectiveness challenges are the direct result of the arbitrary elimination of rights of the defendant by virtue of counsel conduct, unapproved and usually unknown to the client. Since the criminal defendant facing a death penalty lives or dies with the character of legal representation, he is called to question the justice delivery system if substantial mistake of his attorney is beyond review. Although differing only as trial counsel, the factual array of failure of representation found in *United States ex rel. Kubat v. Thieret,* 679 F.Supp. 788 (N.D.Ill.1988) is disturbingly similar to the service afforded Engberg on his appeal. Reliance on mercy is not sufficient.

Although conviction review by a post-conviction-relief proceeding searches for constitutional right violations which ordinarily considers errors of law, questions of ineffective assistance of counsel address the " 'fundamental fairness of the proceeding whose result is being challenged.' " *State v. Risdal,* 404 N.W.2d 130, 131 (Iowa 1987) (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069). *See People v. Ruiz,* 132 Ill.2d 1, 138 Ill.Dec. 201, 547 N.E.2d 170 (1989), *cert. denied* — U.S. ——, 110 S.Ct. 2632, 110 L.Ed.2d 652 (1990) and *Smith v. State,* 547 N.E.2d 817 (Ind.1989). *See also Harris v. Dugger,* 874 F.2d 756, *reh'g denied* 885 F.2d 877 (11th Cir.), *cert. denied* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989) and *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1251 (9th Cir.), *cert. denied* 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989).

The review is de novo, *Mannhalt,* 847 F.2d 576, considering the totality of the circumstances in application of a prescription that counsel performed competently. *Van Hoff v. State,* 447 N.W.2d 665 (Iowa App.1989). The search is for a full and fair review, *Martin v. Dugger,* 891 F.2d 807 (1989), *reh'g denied* 898 F.2d 160 (11th Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 222, 112 L.Ed.2d 178 (1990), and the right to counsel is the right to effective assistance of counsel which is for this case to provide proper appellate review. *State v. Davis,* 116 N.J. 341, 561 A.2d 1082 (1989) (citing and quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063). Obviously, the measure of an advocate's competency depends on the task to be accomplished. The best intentions and the most devoted of

efforts do not necessarily equate with capital competence. We expect capital defense (or appellate) counsel to have an expertise regarding the specific considerations present in capital cases. *Davis,* 561 A.2d at 1089.

This present proceeding comes from the failure of Engberg's appellate counsel to discuss, by inclusion in the initial appeal, well matured contentions of trial court errors. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052. This appeal is essentially presented with dispositive questions whether Engberg's life and death trial issues, which were then identified by objection, could now be waived by incompetently performing appellate counsel by issue exclusion from the *Engberg I* appeal. *Smith,* 547 N.E.2d 817. A simple comparison of the post-conviction brief with the initial appellate brief relates the entire story.

The answer is provided by assessment of what did occur at trial, did error happen and was it prejudicial. *Smith,* 547 N.E.2d 817. Proper review requires us now to consider substantive trial issues and their effect on the fairness of the trial to assess whether Engberg was provided the constitutionally required competent counsel for first appeal when those trial objections were apparently disregarded. It is to be recognized that a constitutional error committed in a criminal proceeding is not harmless unless the appellate court is convinced beyond a reasonable doubt that any reasonable jury would not have reached the same conclusion about the error. *State v. Ng,* 110 Wash.2d 32, 750 P.2d 632 (1988).[14] *See Johnson v. State,* 806 P.2d 1282 (Wyo. 1991), Urbigkit, C.J., dissenting; *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) and *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh'g denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

It can be found by case analysis that habeas corpus reversals in federal courts for ineffectiveness of counsel in state courts demonstrate normally that an equal or greater failure of appellate counsel compared to trial counsel can be found if a proper appeal was ever originally taken. *Johnson v. Dugger,* 911 F.2d 440, *reh'g granted and opinion vacated* 920 F.2d 721 (11th Cir.1990); *Chambers v. Armontrout,* 907 F.2d 825 (8th Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990); *Murphy v. Puckett,* 893 F.2d 94 (5th Cir.1990); *Nixon v. Newsome,* 888 F.2d 112 (11th Cir.1989); *Harrison v. Jones,* 880 F.2d 1279 (11th Cir.1989); *Fitzpatrick,* 869 F.2d 1247.

Whether an attorney has rendered effective assistance of counsel is a mixed question of law and fact reversible de novo on appeal. *Fitzpatrick,* 869 F.2d at 1251; *Mannhalt,* 847 F.2d 576. *See also* Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict,* 64 S.Cal. L.Rev. 235 (1991). The same standard applies to both trial and appellate counsel. *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987). In the state courts, the rule is identically structured in an astronomical number of cases. *Cacatian v. State,* 70 Haw. 402, 772 P.2d 691 (1989); *State v. Bryant,* 237 N.J.Super. 102, 567 A.2d 212 (1988), *rev'd* 117 N.J. 495, 569 A.2d 770 (1990); *State v. Burgins,* 44 Ohio App.3d 158, 542 N.E.2d 707 (1988); *Com. v. Melson,* 383 Pa.Super. 139, 556 A.2d 836 (1989); *Grier v. State,* 299 S.C. 321, 384 S.E.2d 722 (1989); *Long v. State,* 764 S.W.2d 30 (Tex.App.1989); *Pennington v. State,* 768 S.W.2d 740 (Tex.App.1988).

I revisit the enormity of the problem presented for justice by this court's pathway from *Cutbirth v. State,* 663 P.2d 888 (Wyo.1983); *Amin,* 774 P.2d 597; *Kallas,* 776 P.2d 198 through *Murray,* 776 P.2d 206 in an effort to directly face the simple

---

**14.** This court cannot accept the first year law student school test (even a first year law student would know *that* ), *State v. Bryant,* 237 N.J.Super. 102, 567 A.2d 212, 214 (1988), *rev'd* 117 N.J. 495, 569 A.2d 770 (1989), as the measure of sufficiency for appeal in a serious criminal case

and particularly so in a death penalty case. *See Cooper v. State,* 769 S.W.2d 301 (Tex.App.1989). *See also* Sevilla, *supra,* 37 Mercer L.Rev. 927 and Note, *Effective Assistance of Counsel: Strickland and the Illinois Death Penalty Statute,* 1987 U.Ill.L.Rev. 131 (1987).

axiom that procedural default—constitutional or otherwise—in counseled trial processes cannot occur without counsel mistake. *If it exists to be defaulted, it was created by mistake.* It is far better to look first at the conduct instead of reaching for the absolution by characterization to try to sweep under the rug where justice is not to be found. Compare *Meders v. State*, 260 Ga. 49, 389 S.E.2d 320, 325 (1990) in which the Supreme Court granted remand for a current and immediate hearing to examine ineffectiveness of counsel following *the wise request of counsel for the state.* Understanding the constitutional requirement involved, I will move to the Engberg substantive issues in appellate review.

V.

### GUILT PHASE ISSUES

#### A. *Errors Contended*

In present appeal, the guilt phase issues presented include:

1. In open court, Engberg's wife was presented by the State as its witness after Engberg's waiver of interspousal privilege and, in the presence of the jury, she was given the election not to testify;

2. Engberg was consequently denied the right to call his wife as his witness;

3. After invocation by his wife of a privilege not to testify, Engberg was also denied introduction of her statements to a third party as inadmissible hearsay;

4. Denial of the right by Engberg to present a witness to provide expert testimony on the validity of eyewitness identification at the crime scene; and

5. Attempted hypnotism of the principal identifying witness had not been revealed to Engberg until after conviction when first discovered during post-conviction-relief investigation.

Cursory consideration will then be given for bad acts evidence of being badly beaten by police officers at the time of arrest, which is contended to be evidence of fleeing and constituting evidence of guilt, and bad acts evidence of the use of an alias. Further included will be the introduction of evidence of events at the Nevada hospital where Engberg was taken following his injury during arrest. This testimony discussed his refusal to put on a stocking cap for a photograph in the absence of and without advice of the right to an attorney and was introduced for primary proof substantively demonstrating the attempt to avoid detection as evidence of guilt. This will be followed by subsequent denial of the trial right of Engberg to introduce the doctor's statement concerning delusional state when photographed in the hospital bed without the cap. Finally, Engberg was denied cross-examination of the police officer about his injured and delusional condition during the photography session.

#### B. *The Refusal by the Trial Court to Allow Engberg the Right to Call His Wife as a Witness*

A principal issue presented involves Engberg's challenge of the trial court decision to deny him the right to call his wife as a witness. I would reverse on this obvious and clearly significant error.

In oral argument before this court, the State's appellate counsel related that *"[o]n the issue of spousal privilege, it is our position that there was probable error here in the exclusion of the spouse's testimony."* (Emphasis added.) The State then explains the exclusion to have been harmless error. I conclude the denial of the testimony to be not only erroneous, but prejudicially harmful. It does not even come close to the constitutional criteria for harmless error. It not only may have but probably did have an effect on the decision of the jury. *See Jones*, 777 P.2d 54. *Accord Limbaugh v. State*, 549 So.2d 582 (Ala.Cr.App.1989) and *Cooper v. State*, 769 S.W.2d 301 (Tex.App.1989). The prosecutor's opening statement discussed Engberg's Las Vegas arrest and claimed Donna Engberg fingered her husband for the Casper murder. The opening statement by Engberg's attorney denied that claim and indicated the defense would produce evidence at trial to show the prosecution was wrong. That intended proof was circumvented when the State successfully invited

Engberg's wife to assert her privilege not to testify. She complied.[15] The issue environment for jury understanding had been prejudicially created *without evidence* and Engberg was then denied opportunity to contest or defend.

On October 25, 1982, Engberg's counsel moved "to sup[p]ress testimony by his spouse as such testimony is completely inadmiss[i]ble by reason of Wyo.Stat.Ann. * * *." At a subsequent hearing on November 17, 1982, the subject was again addressed:

> [Defense Counsel]: Okay, Your Honor, we want—I think this motion for disclosure of informer is the easiest one. The State of Wyoming in its pretrial memorandum stated they have an informer and I don't know who the informer is.
>
> It would be paragraph 8(k), use of informer. There was an informer involved and I would assume from the giggle at counsel table over here that it was, probably, Donna Engberg, but I want to make sure.
>
> [Prosecution Counsel]: His assumption is correct, Your Honor.
>
> THE COURT: That's correct, Mr. Skaggs; that takes care of that.
>
> [Defense Counsel]: We have a ruling on that, that it is disclosed as Donna Engberg?
>
> THE COURT: Yes, counsel.
>
> * * * * * *
>
> [Defense Counsel]: Now, Your Honor, you have not made a motion—let's see—

let's take up an easier one first. We have filed a motion to suppress the testimony of one Donna Engberg who just happens to be the wife of Roy Lee Engberg. I am at that time—at this time going to withdraw that motion. We have been given a notice of hearsay statements by Donna Engberg, so it's apparent that if the State of Wyoming cannot force her to testify, they will just simply rely on this hearsay statement that they have already obtained from her which may or may not be admissible; I don't know. I haven't looked into it far enough, but I am going to withdraw the motion to suppress her testimony and at this time will give notice that I will consent to her being allowed to be called in the State's case in chief.

> At this time I would respectfully give notice that I am going to object to the use of hearsay statements upon my withdrawal of the motion to suppress her testimony.
>
> THE COURT: Okay.
>
> [Defense Counsel]: So that part of my pretrial memorandum where I said we would rely on that, I'm going to drop that. It's an interesting issue, what would come up if we were forced into the issue of spousal testimony, whether or not her hearsay statements would be admissible; it would be interesting.

On November 4, 1982, the State had a subpoena served on Donna Engberg in Gothenburg, Nebraska.[16]

---

**15.** *See United States v. Morrison,* 535 F.2d 223 (3rd Cir.1976), where the activities of the prosecution "convinced" the witness as defendant's girlfriend to take the fifth amendment rather than testify in favor of defendant as a denial of the constitutional right which affords the opportunity to call a defense witness. *See also United States v. Hammond,* 598 F.2d 1008, *reh'g* 605 F.2d 862 (5th Cir.1979) and *United States v. Thomas,* 488 F.2d 334 (6th Cir.1973).

**16.** In pretrial conference form filed on October 14, 1982, the State stated:

K. Use of informer:

(1) There x was ___ was not an informer involved.

(2) The informer ___ will ___ will not be called as a witness at the trial.

(3) X It has supplied the name, address, and phone number of the informer.

(4) ___ The State will claim privilege of nondisclosure as to No. 8K—(1), (2), or (3).

Engberg referenced the same subject in Section K of his pretrial submission filed October 25, 1982 as follows:

K. X (1) Any information about the use of an informer or lookout in this case.

X (2) A statement of the State's intention of calling the informer or lookout as a witness.

* * * * * *

C. X Other motions to suppress: Motion to suppress testimony of the spouse of the Defendant on the grounds and for the reasons that there is absolute spousal immunity.

Thereafter, the motion to suppress was filed October 25, 1982, as well as a request for disclosure of informer:

COMES NOW, the Defendant, by and through his attorney and moves the Court for

The trial panorama then developed in mid-trial:

[Prosecution Counsel]: As the Court is aware, the next witness we intend to call is Donna Engberg, the wife of the Defendant, and we are now here in chambers and the Defendant is present with his attorneys and we want to make it absolutely clear on the record that they are willing to waive any privilege or immunity for the wife to testify and agree to allow her to testify.

THE COURT: Mr. Skaggs?

[Defense Counsel]: Okay, Your Honor, at this particular point, we have advised our Defendant—with respect to this particular problem, we have advised him that it is his absolute right to claim spousal immunity and prevent her from testifying. We have further advised our client that if he elects to claim spousal immunity, there is a chance of the hearsay statements from Las Vegas to Officer Jim Cooper becoming available for use by the prosecution under the witness unavailable exception to the hearsay rule. Those statements are extremely damaging in themselves. We have reason to believe that she may change her testimony to some degree from those statements of benefit to Roy. Secondly, we have advised Roy of Wyoming Supreme Court decisions that indicate if the Defendant were to claim spousal immunity the prosecution could comment in closing on the Defendant's failure to call his wife as a witness. Those factors mitigated against claiming any spousal immunity. Roy, at this time, do you wish to assert the privilege of spousal immunity?

THE DEFENDANT: No, go as you suggested, Wyatt. Let her get on the stand.

THE COURT: You're saying, Mr. Engberg, that you are waiving spousal immunity?

THE DEFENDANT: That is really the only alternative, isn't it?

THE COURT: Well, I am not—

THE DEFENDANT: Yeah, I will waive.

the disclosure of the Informer stated in Paragraph 8(k) of the State's *Pretrial Conference Form,* and whether the Informer will be called at trial.
(Emphasis in original.)

By a list of prospective witnesses filed October 29, 1982, Donna Engberg was included as an anticipated witness for the State.

Engberg, in defense witness list filed November 22, 1982, included:

1. All witnesses and addresses listed on State's Witness List and State's Supplementary Witness List.

An Application for Certificate for Attendance of Out Of State Witness was filed by the State on December 7, 1982, which included:

3. That petitioner believes that Donna Engberg is residing in Gothenburg, Nebraska, is a necessary and material witness to be called in the prosecution of said action for the following reasons:

Donna Engberg was with defendant on December 22, 1981 and thereafter traveled with him to Las Vegas, Nevada where they stayed until defendant was arrested on January 1, 1982. Donna Engberg has given statements to law enforcement agents implicating the defendant in the crimes for which he is charged.

\* \* \* \* \* \*

Petitioner believes that unless said witness is taken into immediate custody she may fail to appear even though so ordered. Such belief is based on the fact that the said Donna Engberg agreed to appear in Douglas, Wyoming on the 6th day of December 1982 but has now failed to appear and has asserted that she will not appear. Petitioner, therefore, respectfully requests that the court recommend in its Certificate that said witness be taken into immediate custody and be delivered to the Deputy Sheriff of Converse County, State of Wyoming, an officer of the State of Wyoming, to assure [her] attendance in this state as a witness in said criminal proceeding.

On the same day, a Certificate for Attendance was issued by the trial court, as prepared by the county attorney, and in part stated:

3. That [the State] believes that Donna Engberg is residing in Gothenburg, Nebraska is a necessary and material witness to be called in the prosecution of said criminal trial for the following reasons:

Donna Engberg was with defendant on December 22, 1982 and thereafter traveled with him to Las Vegas, Nevada where they stayed until defendant was arrested on January 1, 1982. Donna Engberg has given statements to law enforcement agents implicating the defendant in the crimes for which he is charged.

\* \* \* \* \* \*

7. That the court recommends that said witness be taken into immediate custody and be delivered to Deputy Sheriff of Converse County, State of Wyoming, to assure her attendance in the State of Wyoming, as a witness in said criminal proceeding.

THE COURT: Okay, we will convene in about five minutes, folks.

[Defense Counsel]: Your Honor, at this time we would request that after her testimony on direct, we all have a recess so we can go over her testimony.

THE COURT: I have no problems with that.

\* \* \* \* \* \*

[Prosecution Counsel]: \* \* \* The State calls Donna Engberg.

## DONNA ENGBERG

having been called as a witness by the State, was first duly sworn and testified as follows, to wit:

## DIRECT EXAMINATION

BY [Prosecution Counsel]:

Q. For the record, could you please tell the Court and jury your name?

A. Donna Engberg.

Q. Where do you reside?

A. Gothenb[u]rg, Nebraska.

Q. Mrs. Engberg, you are the wife of the Defendant, Roy Engberg, are you not?

A. Yes.

Q. Is it your wish to testify in this case?

A. No.

Q. Are you willing to testify in this case?

A. Not if I don't have to.

Q. Mrs. Engberg, you know, that is your choice to make and we are asking you now what choice you want to make in this case, whether you want to testify or not?

A. No, I don't.

[Prosecution Counsel]: May we approach the bench, Your Honor?

THE COURT: You may.

\* \* \* \* \* \*

THE COURT: Mr. Guetz, she doesn't want to testify.

[Prosecution Counsel]: We can't force her to.

THE COURT: No, you can't force her to.

[Defense Counsel]: I want the opportunity to cross-examine her and assert the immunity on every question.

THE COURT: You want what?

[Defense Counsel]: I want the opportunity to cross-examine her and assert the immunity on every question.

THE COURT: I don't think if she refused to testify that—I would ask you, Mr. Guetz, to explain to her clearly that she has spousal immunity and she doesn't have to testify.

[Defense Counsel]: I oppose that. She does not have the privilege. Roy has the privilege.

THE COURT: She can assert the privilege.

[Defense Counsel]: Your Honor, under case law, it's Roy's privilege to assert, not hers.

THE COURT: Under the more recent rule, she can assert the immunity herself. Absolutely, she can assert that immunity on her own.

The trial court was misadvised when it applied the federal *Trammel* rule on testimonial privilege which says "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). "Testimonial privilege" prevents a spouse from testifying against the other. A "confidential communication privilege" prevents testimony which would reveal what was said in marital confidence.[17]

The trial court should have applied Wyoming law found in W.S. 1–12–104:

No husband or wife shall be a witness against the other except in criminal proceedings for a crime committed by one

---

17. Comment, *Symposium on the Federal Rules of Evidence: Their Effect on Wyoming Practice if Adopted,* XII Land & Water L.Rev. 601, 627 (1977). A detailed analysis of the Wyoming statute is also found in Note, *Spouse's Testimony in Criminal Cases,* 19 Wyo.L.J. 35 (1964), which discusses witness disqualification and privileged evidence as a confidential communication.

against the other, or in a civil action or proceeding by one against the other. They may in all civil and criminal cases be witnesses for each other the same as though the marital relation did not exist.

This Wyoming statute has remained substantively unchanged since enacted in 1899. W.S. § 3681 (1899); Note, *Spouse's Testimony in Criminal Cases,* 19 Wyo.L.J. 35, 40 (1964). Direct consideration or at least implication of the issue of spousal testimony in Wyoming cases is found in *Biggs v. State,* 13 Wyo. 94, 77 P. 901 (1904); *Strand v. State,* 36 Wyo. 78, 252 P. 1030 (1927); *Fox v. Fox,* 75 Wyo. 390, 296 P.2d 252 (1956); *State v. Spears,* 76 Wyo. 82, 300 P.2d 551 (1956); *Chamberlain v. State,* 348 P.2d 280 (Wyo.1960); *Simms v. State,* 492 P.2d 516 (Wyo.), *cert. denied* 409 U.S. 886, 93 S.Ct. 104, 34 L.Ed.2d 142 (1972); *Pike v. State,* 495 P.2d 1188 (Wyo.1972); *Seyle v. State,* 584 P.2d 1081 (Wyo.1978); and *Amin v. State,* 695 P.2d 1021 (Wyo.1985).

It is obvious that these cases afford no support for the present decision unless the second sentence of the law is disregarded.[18] To analyze the explicit Wyoming statute in relation to this case requires consideration of due process, constitutional fairness, or even whether any clear and unequivocal rule of law was violated by the trial court's rejection of the testimony which was compounded by appellate counsel's failure to present the issue on original appeal. Specifically, in close review of each one of these prior Wyoming cases, there is nothing in Wyoming law and precedent to state that a wife has a privilege not to testify when affirmatively requested to testify by her husband in a criminal prosecution.

Among these numerous prior cases, W.S. 1–12–104 was considered in *Amin,* 695 P.2d 1021 in the context of a joint trial invoking spousal testimony in her own defense. This court settled the statutory violation problem in coerced result by first noting that privilege was not presented in objection to trial joinder and then concluding that the wife's testimony was not, in that court's present conception, exculpatory, although actually placing her husband at the scene with an availability of a gun for an armed robbery charge. *Amin* simply cannot support the present decision on the application of the Wyoming privilege statute as affording a right to the witness-spouse to refuse to testify when approved and requested to do so by the defendant. *See* 8 Wigmore, Evidence § 2242 (McNaughton rev. 1961). Consequently, this present post-trial construction of W.S. 1–12–104, which is now adopted, develops a differentiated application that has *never* been accepted in any prior Wyoming case.

Argument that the legislature intended to make the privilege available to both the witness-spouse and the party-spouse is unsupported by case law or apparent statutory text. Since Engberg wanted to call his wife as a witness, there was no privilege for Donna Engberg to exercise and avoid testifying. Engberg was denied the constitutional right to call a potentially beneficial witness and was also denied due process under both the Wyoming and federal constitutions. After the education of the jury had been completed by prosecutorial opening statements, response and contradiction by Engberg became a problem of high stakes and compelling significance for any attack on the eyewitness identification case structure to hope to achieve an acquittal. Realistically by opening statement and trial presentation, Donna Engberg became a prosecutorial witness with a persuasion that Engberg could not diminish or defeat by any validly submitted actual evidence.

While the admission of the wife's testimony in a criminal case where her hus-

---

**18.** Whatever standard of statutory interpretation this court applies, e.g., strict, realistic or accommodative, *White v. State,* 784 P.2d 1313 (Wyo.1989); *Hoem v. State,* 756 P.2d 780 (Wyo. 1988), the same standard should be consistently used and not whatever standard may from time to time serve to justify a result-oriented decision. In this case, the statute says what it says and should be applied as written without con-

tra-effect flavoring. *People v. VerMeulen,* 432 Mich. 32, 438 N.W.2d 36, 38 (1989). Compare, however, Justice Thomas' opinion and my specially concurring opinion on statutory consistency in *Allied–Signal, Inc. v. Wyoming State Bd. of Equalization,* 813 P.2d 214, 223 (Wyo.1991) (Thomas, J., majority; Urbigkit, C.J., specially concurring).

band is defendant is error per se unless coming under the exceptions of § 1–142 [W.S. 1-12-104], and circumstances determine whether or not it is prejudicial, nevertheless in view of the potential reversible error, no valid reason can be conceived why a trial court would admit the evidence of a spouse contrary to the directions of that statute.

*Pike*, 495 P.2d at 1189 n. 2. There is nothing in Wyoming law to support the claim that a wife has a privilege not to testify when requested to do so by her husband in a criminal prosecution.

In the circumstance of this case, since Engberg elected to permit the testimony as intended to be favorable by whomever presented, there was no privilege previously provided by Wyoming law for Donna Engberg to exercise in denial of his right to have admissible and singularly important defense evidence. Consequently, Engberg, as husband, was denied a constitutional right to a witness and also denied due process under both the Wyoming and federal constitutions. It is said with compelling logic in 8 Wigmore, *supra*, § 2241 at 254:

> But taking the other suggested reason for the privilege, namely, immunity from the repugnant situation of being condemned by one's spouse or of becoming the instrument of a spouse's condemnation * * *, the privilege seems to be *equally* that of *party* and of *witness.*

The trial court's adoption of the *Trammel* rule renders the Wyoming statute meaningless if the wife can elect not to testify for her husband when corrosive prosecutorial pressure is applied. With the explicit state statute in place, adoption of the inapplicable federal *Trammel* rule becomes reversible error.

Wyoming is not the only jurisdiction to reject the *Trammel* rule. The Texas court distinguished and disregarded *Trammel* in relying on their state statute in *Young v. State*, 603 S.W.2d 851 (Tex.Cr.App.1980). Similarly said in Montana:

> Whatever merit this view may possess [*Trammel*], it applies only in the federal courts and is contrary to the statutory

law of Montana. Our duty is to construe the law as we find it. * * * Absent constitutional or statutory infirmities, this Court is not empowered to change the statutory law of this state.

*State v. Roberts*, 633 P.2d 1214, 1218 (Mont.1981). *See also State v. Shafer*, 609 S.W.2d 153 (Mo.1980); *State v. Euell*, 583 S.W.2d 173 (Mo.1979); and *State v. Evans*, 170 W.Va. 3, 287 S.E.2d 922 (1982). It was recognized "[i]n Michigan, for well over a century, the spousal privilege has been controlled by statute." *People v. Wadkins*, 101 Mich.App. 272, 300 N.W.2d 542, 546 (1980). *See People v. VerMeulen,* 432 Mich. 32, 438 N.W.2d 36 (1989). *See also People v. Hamacher*, 432 Mich. 157, 438 N.W.2d 43 (1989); *People v. Thompson,* 111 Mich.App. 324, 314 N.W.2d 606 (1981); and Note, *People v. Hamacher: The Parameters of Privileged Marital Communications,* 1990 Det.C.L.Rev. 177 (1990). Consider also the prosecutorial use under W.R.E. 804(b)(6) and 803(24) in *State v. Bailey*, 365 S.E.2d 46 (W.Va.1987).

Kentucky recognizes two separate statutory limitations on husband-wife testimony. One is disclosure of confidential communication and the second is privilege to refuse to testify. Although different in text from Wyoming, the statutory system is controlled. *Estes v. Com.*, 744 S.W.2d 421 (Ky.1987). *Cf. Williams v. State*, 430 N.E.2d 759, 768 (Ind.), *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47, *reh'g denied* 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626 (1982), where only "privileged communication" is recognized.

After first recognizing that the error in form and substance is unquestioned, it becomes a bizarre recreation of the trial events to absolve the improper decision of the trial court by charging defendant's trial counsel with procedural default. Any such argument is misplaced in suggesting that for Engberg to protect the record against the error committed when the State called his wife to the stand in front of the jury, *Jones*, 777 P.2d 54, that he thereafter had to recall her again in his case to re-emphasize the prejudicial effect on the jury by her second election not to testify. No fac-

tual basis for charging trial counsel with this constitutional forfeiture by procedural default is found in trial events unless we ignore Engberg's continued effort to obtain the testimony of Donna Engberg. Obviously, to reach that answer to excuse the trial error, it is necessary to attach the procedural default failure and mistake to trial counsel. That would be novel both factually and in briefing for this case. Even if we adopt the convoluted construction of these facts argued by the State, then either appellate counsel had a duty to raise the failure as an ineffectiveness contention on initial appeal or that status is now properly before us as ineffectiveness of counsel, which has never been suggested by any prior brief writer, Engberg, the State or this court on initial appeal. Actually, there was no notice of objection failure of any significance by trial counsel and to suggest otherwise now in decision is highly inappropriate.

### C. *What the Record and Totality of Procedures Established*

The majority, in present decision, converts what was confused and confessed error into a non-argued and non-briefed conclusion to disregard the error. First, in the face of the specific ruling of the trial court that Donna Engberg would not testify, the defense thereafter had to again call her to the stand to be protected from something in the nature of "waived error" so that the trial court would make the same ruling. This contention belies recognition that the federal rules and succeeding Wyoming rules now in effect for more than a quarter of a century were intended to eliminate this kind of needless regurgitation in pointless process and procedure. *See* W.R.C.P. 1. Additionally, trial counsel should have been able to rely on the trial court's statement that "Donna Engberg has used her privilege" and believe that the trial court meant what was said; that the issue was decided as repeated by the trial court in answer to the State's objection to the offer of proof and hearsay introduction. Denial to Engberg of his wife's testimony was disastrous as the case developed from opening statement into other testimony in-

timating his involvement. In basic terms, the denial to Engberg of any testimony from his wife contravenes the posture of *Washington v. State of Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), defining the right of the accused defendant to have compulsory process to obtain witnesses in his behalf. *See* Wyo. Const. art. 1, § 10.

The federal approach which misdirected the trial court started with *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), *holding modified sub nom. Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), where conviction was reversed after the government used defendant's wife as a witness over his privilege objection based on a common law premise and construction. Justice Stewart, in concurrence, contended that the privilege should be that of the witness and not of the accused and said that "[u]nder such a rule the defendant in a criminal case could not prevent his wife from testifying against him, but she could not be compelled to do so." *Id.* 358 U.S. at 82, 79 S.Ct. at 141. The Tenth Circuit Court of Appeals, which did not apparently like its reversal in *Hawkins*, sent *Trammel* to the United States Supreme Court by denial of error in a co-conspirator spouse case where immunity was granted to the wife and she then elected, pursuant to her immunity, to testify over the husband's claimed privilege objection. Substantively, the common law evaluation was pursued.

> The various judicial utterances on the matter of the exercise of the privilege establish that the privilege belongs to the *party* spouse against whom the other is offered as a witness; however, it is firmly established that the privilege also belongs to the *witness* spouse.

*United States v. Trammel*, 583 F.2d 1166, 1169 (10th Cir.1978), *cert. granted* 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979), *aff'd* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (emphasis in original).

The United States Supreme Court authenticates its decision for federal law within historical perspective, changed mores, and review of the common law as

adverse to limited testimony for the non-statutory purposes of federal rules of evidence. "Accordingly, we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Trammel*, 445 U.S. at 53, 100 S.Ct. at 914.

No principle or concept was utilized in decision which applied to state rules of evidence or specific state statutes on privilege. *See Evans*, 287 S.E.2d 922. Also not considered was the exercise of the privilege by the witness-spouse when the accused in seeking her testimony, specifically withdrew any privilege.[19] *See United States v. Morrison*, 535 F.2d 223 (3rd Cir.1976), where the activities of the prosecution "convinced" the witness as defendant's girlfriend to take the fifth amendment rather than testify in favor of defendant as a denial of the constitutional right which affords the opportunity to call a defense witness. *See likewise United States v. Hammond*, 598 F.2d 1008, *reh'g* 605 F.2d 862 (5th Cir.1979) and *United States v. Thomas*, 488 F.2d 334 (6th Cir.1973).

In this case, we consider and apply an explicit Wyoming statute and not an abstract and attacked "sentimental relic" or "reasoned historical principle." Since the Wyoming privilege is not the provence of the federal judicial system, neither is it the right of the Wyoming courts to ignore what the legislature has provided as an established standard which has now existed for most of a century. *VerMeulen*, 438 N.W.2d 36. In the crucible of this case from opinion statement to appearance of this witness before the jury as the State's last witness, communicated prejudice from denied availability is undeniable. Whatev-

er the testimony might have been, Engberg clearly expected it to be preferable to whatever the police officer from Las Vegas would say Donna Engberg said when she filed the January complaint against her husband.

To conclude to the contrary directly violates the constitutional rights of the defendant to present relevant testimony addressed by *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). *See also Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798, *reh'g denied* 485 U.S. 983, 108 S.Ct. 1283, 99 L.Ed.2d 494 (1988); and *Washington*, 388 U.S. 14. We then have a further and even more serious defect, constitutional in nature, created by the majority's decision in justification of the denial to the accused of desired testimony of his wife. The denial of Engberg's access to the testimony denies a right to adequately defend and forecloses an interest protected by both state and federal constitutions (Sixth Amendment). Exculpatory testimony desired for use by Engberg was rejected by this decision. The right to defend including introduction of available material testimony has been addressed by the United States Supreme Court in *Rock*, further considered in *Olden* and *Taylor* and is controlling and decisive. Clearly, on this simple yet direct constitutional basis, Engberg's conviction resulted from his denial of Sixth Amendment rights to defend. Reversal is, as a result, constitutionally required.

### D. Use of Secondary Evidence From an "Unavailable Witness"

Since the testimony of Donna Engberg by direct examination had been denied, Engberg's counsel raised the subject again:

---

19. The troubling nature of *Trammel*, albeit as non-statutory adaptation through common law construction for the federal courts, is demonstrated by the question, conflict and confusion engendered. Consider the conflict found in the joint involvement case, *United States v. Parker*, 834 F.2d 408 (4th Cir.1987), *cert. denied* 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 279 (1988) with Lempert, *A Right to Every Woman's Evidence*, 66 Iowa L.Rev. 725 (1981); Note, *The Joint Participation Exception to the Marital Testimoni-*

*al Privilege: Balancing the Interests "In Light of Reason and Experience"*, 19 Ind.L.Rev. 645 (1986); Note, *Federal Marital Privileges in a Criminal Context: The Need for Further Modification Since Trammel*, 43 Wash. & Lee L.Rev. 197 (1986); Note, *Partners in Crime: The Joint Participants Exception to the Privilege Against Adverse Spousal Testimony*, 53 Fordham L.Rev. 1019 (1985); and Note, *Adverse Spousal Privilege: Dead or Alive?*, 63 Wash.U.L.Q. 509 (1985).

[Defense Counsel]: Okay, now, Your Honor, we would have an offer of proof related to Donna Engberg. We would offer at this particular time—and I have Janet Garner here and I will put her on the stand with respect to hearsay evidence that Donna Engberg has told her. Would that be okay? After that I would move to admit it under the hearsay exception.

THE COURT: [Prosecution Counsel], do you have any comment on that?

[Prosecution Counsel]: Well, as far as they want to preserve the record on that, I don't know if that is the proper way of going about this or not, but—

THE COURT: Well, I'll tell you what, Gentlemen. Donna Engberg has used her privilege. She is a spouse. It is her privilege and I'm not going to allow the hearsay evidence.

The effort was supported by an offer of proof in chambers, outlining the proposed trial testimony from an investigator which, as presenting statements from Engberg's wife, would have factually attacked the State's case and specifically controverted the opening statement contentions of the prosecution.

Following the offer of proof defining the prospective direct testimony of Donna Engberg, defense counsel pursued admissability in text substance as W.R.E. 804 evidence through testimony of an interviewing investigator:

[Defense Counsel]: Your Honor, at this particular point, I will make a motion to admit the testimony of Janet Garner pursuant to Rule 804. Under 804(b)(6) and (b)(5), I would state at this time that Mrs. Engberg is an unavailable witness. She is unavailable because of 804(a)(1). She is exempted on the grounds of privilege or, secondly, she fits under 804(b)(5) as being admissible because it is a statement of recent perception. Also, she fits under 804(b)(6) under the other exceptions, the catch-all phrase to 804. It is a statement offered as evidence of a material fact. It is a statement more probative on the point to which it is being offered than any other evidence which a proponent can procure through reasonable effort and I would state at this time we have made other efforts to procure her testimony and on these particular facts, there is no way we can procure any other testimony. We believe that under (c), 804(b)(6)(c), the general purpose of the rules in the interest of justice will best be served by the admission of her statement to Janet Garner into evidence.

THE COURT: Thank you. Would you respond to that, [Prosecution Counsel], please?

[Prosecution Counsel]: Just briefly, Your Honor. We have discussed this matter previously. With respect to the recent perception, there has been no evidence that this matter is a recent perception. With regard to the other items, we have discussed this matter in that she has exercised her spousal privilege, a privilege she holds. She desires not to testify and there is abundant authority that when one exercises that privilege, that even hearsay would be inadmissible and we would request that the motion be denied.

THE COURT: That is also my understanding. I'm going to deny the motion.

The obvious justification for admission was provided by *Simms*, 492 P.2d 516, where defense counsel was faced with prior testimony of a witness in a preliminary hearing when the parties were not married. The actual testimony in court after which defendant waived his right not to have his wife testify against him was available for introduction, including both her live testimony and hostile witness examination from the prior transcript. This court in *Simms*, 492 P.2d at 521 (footnote omitted and citing 5 Wigmore, Evidence, § 1409 (Chadbourn rev.1974)) said "that a disqualification of a witness by exercise of a privilege makes the witness's present testimony unavailable and accordingly should allow resort to his former testimony, a doctrine which was not accepted by early English common law courts but was well established in chancery practice and would probably be generally followed in our courts."

Why in this case similar evidence is not available to Engberg through the testimony of the witness investigator is not refined or defined, except in the context of what is good for the prosecution is frequently not available in defense. The State would ask us to ignore the phraseology of *Simms.* "Having chosen to have his wife testify as a witness, defendant is in no position to argue about his 'forced' election * * *." *Simms,* 492 P.2d at 521. *See also Pike,* 495 P.2d at 1189 n. 2. Whatever else might be said about the harmless error application in *Pike* as was impaled in dissent, the right of the *defendant* to foreclose the adverse testimony of the *spouse* was not in question.

Overtly and explicitly stated, the decision of the trial court was based solely on the exercised privilege as first announced when Donna Engberg was called as a witness by the State to continue to be determinative for her status as a witness for Engberg, or his introduction of hearsay testimony and statements that were available. It should also be recognized that within the analysis of *Simms,* 492 P.2d 516, exercise of privilege resulted in the unavailability of the witness, permitting substitute evidence introduction under W.R.E. 804(b)(6) (the same as F.R.E. 804(b)(5)). *See also State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, *cert. denied* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). This decision, albeit consistent in denial, added a third error as directly contrary to our precedent in *Simms.*

In citing that Wyoming case, Engberg claims that his wife became an unavailable witness by virtue of the privilege decision and that the hearsay was consequently admissible under W.R.E. 804(b)(6) and supported as well by the cases of *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); and *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which encompass a United States constitutional due process denial. In answer, the State now contends in appellate brief that the use of the hearsay evidence was properly denied because no sub-

poena by the defense for the spouse was ever obtained and she "never became a witness." The validity of the response within the facts of the trial are so self-evident that further comment is unneeded to dispose of this contention. *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988). Next, argument is presented that the testimonial privilege exclusion was valid which continues to disregard the specific criteria of the Wyoming statute providing the right to access, W.S. 1–12–104.

The more distinct and powerful argument supplied by the State for support of denial was procedural in failure of Engberg to give advance trial notice of intent to admit the hearsay. This basis was never considered by the trial court under the circumstances presented either before or at trial and is no more justified now. Finally, the State in appellate brief summarizes the evidence and contends that "[t]here is no possibility based on the offer of proof made at trial that the excluded hearsay testimony of Janet Garner would have affected the outcome of the proceedings. Appellant was convicted by *overwhelming evidence.*" In critical fact, the majority here again by this conclusion converts what was confused and confessed error into a non-argued and non-briefed issue decision based on separate evidentiary analysis.

Heaping hyperbole on imposed justification, the substantive basis of the majority, which occasions my most severe rejection, is the present and now first time determination as an analysis of the evidence that there was no corroborating evidence presented *which could be relied upon to enhance the trustworthiness of the version reported to the investigator* and lacking "circumstantial guarantees of trustworthiness," the hearsay testimony could not be admitted properly. 4 D. Louisell & C. Mueller, Federal Evidence § 491 (1980). It is possible, although not stated, that the majority now determines that the trial court should have determined that the investigator, Janet Garner, was herself untrustworthy. The more distinct problem with this conception is that it is unearthed for the first time. The trial court denied

admissibility on the basis of privilege and no corroborative pursuit was possible or considered. What the majority now does is to determine, as a first-time judicial inquiry as if it might have been the trial court, what a present construction of the reliability of unavailable witness repeated statements of the wife may have been in order to justify the trial court inadmissibility decision. *See* Black, *Federal Rules of Evidence 803(24) & 804(b)(5)—The Residual Exceptions—An Overview*, 25 Hous.L.Rev. 13 (1988) and 4 D. Louisell & C. Mueller, *supra*, §§ 472 and 491. In factual content and authoritative relevance, the unavailability case of *United States v. MacCloskey*, 682 F.2d 468 (4th Cir.1982) is directly in point.

It might be that the countervailing interests of justice attainment versus corroboration factors would weigh adversely to the criminal defendant's interest even where the evidence was not otherwise available. Such a decision may be sustained on appeal as exercised discretion of the trial court. *That is not what occurred in this trial.* The trial court did not rule on this basis and the objections by the State neither there, nor now here, were made on that basis. Consequently, the majority now presumes wrongly to exercise a nisi prius type discretionary evaluation of the evidence in denial of availability of testimony of a wife which was to be presented to support the trial posture of her defendant husband. Obviously, the premiere mistake made was in denial of the trial evidence. The second mistake made by appellate counsel was negligence and neglect to present this obvious trial court mistake on first appeal. Now, the majority compounds by extrapolation in utilizing its evidence weighing to determine by justification for what should have been considered and determined by the trial court. We again ignore the procedural posture long held by this court requiring discretionary decisions to be made by the trial court as repeated in *Smith v. State*, 715 P.2d 1164 (Wyo.1986), involving the identical subject of W.R.E. 804(b)(6) in criminal case defense.

The availability of W.R.E. 803(24) and 804(b)(6) to the criminal defendant is un-questionable for the prosecution. *See MacCloskey*, 682 F.2d 468 and 4 D. Louisell & C. Mueller, *supra*, §§ 472 and 491. The right to witness requirements of Wyo. Const. art. 1, § 10 and the Sixth Amendment of the United States Constitution are clearly presented. As the best possible proof available to a defendant facing death-conviction execution, the testimony should have been admissible for the weight to which it would have been justified to the jury. *See* 4 D. Louisell & C. Mueller, *supra*, § 491 and Black, *supra*, 25 Hous. L.Rev. 13. The subject should never have been reached since the wife should have testified when privilege was released by the husband.

The principle where we find ourselves, however, which should be applied is found in the converse of the *Morrison, Thomas* and *Hammond* line of cases as stated in *United States v. Carlson*, 547 F.2d 1346 (8th Cir.1976), *cert. denied* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), where the defendant scared the witness into taking the Fifth Amendment and the witness then became *available to the state* for prosecutorial use of other testimony. *See Hammond*, 598 F.2d 1008 and *Thomas*, 488 F.2d 334. Here, in exercised due process, this same right should apply in favor of Engberg. That result was afforded after reversal in *MacCloskey*, 682 F.2d 468, where denial of proffered prior testimony use by defendant was erroneously excluded when the witness took the Fifth Amendment under pressure from the prosecutor. *See also United States v. Salerno*, 937 F.2d 797 (2nd Cir.1991), where the prosecution withheld immunity and then opposed prior testimony under a hearsay objection resulting in a thirteen month "megatrial" reversal.

Surely the majority would not intend that, in consideration of state constitutional rights, W.R.E. 803(24) or 804(b)(6) are only available to prosecute but never to defend. The substantive justice considerations of *Williams v. Collins Communications, Inc.*, 720 P.2d 880 (Wyo.1986) would justify usage and the right to present witnesses in criminal defense under the Wyoming and

United States Constitutions. *Rodriguez v. State,* 711 P.2d 410 (Wyo.1985); *Faretta,* 422 U.S. 806, 95 S.Ct. 2525. *Cf. Smith,* 715 P.2d 1164; *Washington,* 388 U.S. 14, 87 S.Ct. 1920, and *Thomas,* 488 F.2d 334. This court should take stock of the well reasoned analysis of rights of a defendant to secure testimony in *Salerno,* 937 F.2d 797, but then this is only what we have done for the prosecution in *Cardenas v. State,* 811 P.2d 989 (Wyo.1991).

This error alone substantively requires conviction reversal to provide a new trial.

### E. *Prejudice in Witness Presentation in Open Court*

This concern is created by the trial process where the non-testifying witness was presented before the jury to invoke privilege or immunity. This subject is resolved by *Jones,* 777 P.2d 54.[20] In initial trial, the significance for jury effect was initiated by opening statements by the prosecution in discussing the arrest in Las Vegas and outlining evidence that Donna Engberg, in essence, turned in her husband. Argument response by Engberg was that this was not true, to be addressed by Engberg's evidence. Opportunity to present the evidence was precluded by the State's invitation for Donna Engberg to assert her privilege not to testify. The process used by the State commencing with opening statement to final appearance before the jury ran directly into the prosecutorial prejudice campaign rejected by most authorities. *See Douglas v. State of Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); *People v. Pirrello,* 166 Ill.App.3d 614, 117 Ill.Dec. 238, 520 N.E.2d 399 (1988); and *People v.*

*Crawford Distributing Co., Inc.,* 78 Ill.2d 70, 34 Ill.Dec. 296, 397 N.E.2d 1362 (1979). This was additional error in calling the witness for privilege exercise in open court with the near certainty that the jury would draw unfavorable inferences against Engberg solely from Donna Engberg's predetermined refusal to testify. *United States v. Chapman,* 866 F.2d 1326, *reh'g denied* 874 F.2d 821 (11th Cir.), *cert. denied* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989) (not plain error, however); *Limbaugh,* 549 So.2d 582. The Texas cases have been exceptionally expressive on the subject of reversible error in calling a recalcitrant witness before the jury where the spousal immunity exists. *Stewart v. State,* 587 S.W.2d 148 (Tex.Cr.App.1979); *Johnigan v. State,* 482 S.W.2d 209 (Tex.Cr.App.1972); *Wall v. State,* 417 S.W.2d 59 (Tex.Cr.App.1967). *See also Johnson v. State,* 803 S.W.2d 272 (Tex.Cr.App.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991) and *Cooper,* 769 S.W.2d 301; *but see People v. Ford,* 45 Cal.3d 431, 247 Cal.Rptr. 121, 754 P.2d 168 (1988). Wyoming should now have settled this issue in *Jones,* 777 P.2d 54.

The touchstone of *Jones,* 777 P.2d 54 was conscious prosecutorial impropriety by reference to *Douglas,* 380 U.S. 415, 85 S.Ct. 1074 and *Namet,* 373 U.S. 179, 83 S.Ct. 1151. Once that analysis is completed, I then consider the effect of an "admission of guilt through a transfer process" to the accused defendant. *Jones,* 777 P.2d at 60. The exchange here whereby the wife asked and was given the right to refuse to testify in open court could only serve to confirm her guilty knowledge as evidence of the guilt of her husband. The prejudice in this case was even more apparent and insidious than was the case when the two alleged

**20.** Technically speaking, open court presentation of the non-testifying witness is not presented by briefing as an issue for this appeal. First, justification can be found in the action of this court in *Haselhuhn v. State,* 727 P.2d 280 (Wyo. 1986), *cert. denied* 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987). *See also Prime v. State,* 767 P.2d 149 (Wyo.1989), *but see Jones,* 777 P.2d 54. Additionally, trial court proceedings and events foreclosed proper opportunity for Engberg's counsel to object at that time since he did not actually know the trial court would provide

the option to exercise privilege to the testifying spouse until the decision was made during trial. Any decision to have a privilege to testify exercise should be achieved without appearance and testimony before the jury in accord with the criteria this court has examined in *Jones,* 777 P.2d 54. In this case, Donna Engberg was factually in the custody of the prosecution by virtue of the out-of-state testimonial subpoena. Her intent not to testify if permitted by the trial court was undoubtedly known by the prosecution before she was put on the witness stand.

uncharged coconspirators were called to the witness stand and refused to testify as described in *Jones*.

It is apparent from close record review that the State brought Donna Engberg from Nebraska for the purpose of establishing a basis of unavailability to admit her prior statements as made to police officers under the purview of W.R.E. 804(b) if she chose not to testify or Engberg did not waive his privilege. Engberg's decision to withdraw suppression and release privilege was premised on a preference for her live testimony. Thereafter, when the trial court invoked her privilege by effectively excluding the provisions of the second sentence of W.S. 1-12-104, Engberg turned himself to hearsay as preferential to a record without any of her testimony by recognition of the intrinsic participation which other evidence had radiated about her.

Trial events not only denied Engberg the right to call his wife for desired testimony, but created a prejudice by implication with the jury that her testimony would have been hostile *since she was called and excluded as an apparent State witness in open court.* With Donna Engberg thus called as the last and apparently decisive witness, to *then* have her openly invoke a privilege before the jury created inferences and innuendos of Engberg's guilt. Prejudice in the eyewitness identification preeminence of proof of the case cannot be doubted. *Jones*, 777 P.2d 54; *Limbaugh*, 549

So.2d at 583; *State v. McGinty*, 14 Wash.2d 71, 126 P.2d 1086 (1942); *State v. Winnett*, 48 Wash. 93, 92 P. 904 (1907). With reversal of guilt conviction on other bases, we avoid either review of this issue on the basis of plain error or retroactivity of application of a determined principle of Wyoming law. See for example, in federal law, *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334, *reh'g denied* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989) and *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Unless totally unexpected, any invocation by a witness of immunity or privilege should occur outside of the presence of the jury. *Jones*, 777 P.2d 54; *State v. Smith*, 116 Idaho 553, 777 P.2d 1226 (1989).[21] *See also Jones v. State*, 86 Md.App. 204, 586 A.2d 55 (1991).

F. *Eyewitness Identification Witness—Refusal of the Trial Court to Allow the Engberg to Call an Expert Witness to Testify on the Potential for Error in Identification*

But just how accurate are eyewitnesses? The possibility of over 5,000 wrongful convictions in the United States annually and the steady trickle of news accounts of innocent persons imprisoned alert us to the fact that the human and legal process of identification contains risks of error. This conclusion is amply supported by research.

---

**21.** The reversible error of prejudice engendered by deliberately calling a non-testifying witness is frequently acknowledged in conviction reversal. This is exemplified prejudice by prosecution contrivance without a proper evidentiary purpose. *Tallo v. United States*, 344 F.2d 467 (1st Cir.1965); *People v. Solis*, 193 Cal.App.2d 68, 13 Cal.Rptr. 813 (1961); *People v. Terramorse*, 30 Cal.App. 267, 157 P. 1134 (1916); *Colson v. State*, 138 Ga.App. 366, 226 S.E.2d 154 (1976); *State v. Chrismore*, 223 Iowa 957, 274 N.W. 3 (1937); *People v. Trine*, 164 Mich. 1, 129 N.W. 3 (1910); *Warren v. State*, 336 So.2d 726 (Miss.1976); *Outlaw v. State*, 208 Miss. 13, 43 So.2d 661 (1949); *Hylton v. State*, 100 Nev. 539, 688 P.2d 304 (1984); *Velasquez v. State*, 700 S.W.2d 765 (Tex.App.1985), *aff'd* 727 S.W.2d 580 (Tex.Cr.App.1987); *Johnigan*, 482 S.W.2d 209; *Caldwell v. State*, 162 Tex.Crim. 486, 287 S.W.2d 176 (1956); *Moore v. State*, 45 Tex.Crim. 234, 75 S.W. 497 (1903); *Wilson v. Com.*, 157 Va. 962, 162 S.E. 15 (1932). *Cf. Haselhuhn*, 727 P.2d 280 (Urbigkit, J., dissenting). *See also De Gesualdo v. People*, 147 Colo. 426, 364 P.2d 374 (1961); *People v. Poma*, 96 Mich.App. 726, 294 N.W.2d 221 (1980); Annotation, *Propriety and Prejudicial Effect of Prosecution's Calling as Witness, to Extract Claim of Self-Incrimination Privilege, One Involved in Offense Charged Against Accused*, 19 A.L.R.4th 368 (1983); Annotation, *Prejudicial Effect of Prosecution's Calling as Witness, to Extract Claim of Self-Incrimination Privilege, One Involved in Offense With Which Accused Is Charged*, 86 A.L.R.2d 1443 (1962); Annotation, *Calling or Offering Accused's Spouse as Witness for Prosecution as Prejudicial Misconduct*, 76 A.L.R.2d 920 (1961); and 1 ABA Standards for Criminal Justice §§ 3-5.6(b) and 3-5.7(c) (2d ed. 1980).

Zalman & Siegel, *The Psychology of Perception, Eyewitness Identification, and the Lineup,* 27 Crim.L.Bull. 159, 160 (1991) (footnote omitted).

Mistaken identification is one part of a broader misidentification problem. A comprehensive public policy approach must suggest several techniques for lessening the incidence of wrongful convictions. For example, where guilt is based entirely on eyewitness testimony, extraordinary attention must be paid to the general and specific questions of reliability. Expert witnesses must always be allowed to testify on the issue of reliability and special training be given to police officers and to high-risk employees (e.g., of banks and convenience stores) on observation and documentation during criminal incidents.

*Id.* at 174 (footnote omitted).

Before any competent counsel today puts his client on trial in a case involving significant proof by eyewitness identification, reasonable competency would require reading the current book of E. Loftus & K. Ketcham, *Witness for the Defense: The Accused, The Eyewitness and The Expert Who Puts Memory on Trial* (1991). The authors lead us to initial thought by a quotation from William Shakespeare, *Hamlet,* Act III, scene ii:

*Hamlet:* Do you see yonder cloud that's almost in shape of a camel?

*Polonius:* By the mass, and 'tis like a camel, indeed.

*Hamlet:* Methinks it is like a weasel.

*Polonius:* It is backed like a weasel.

*Hamlet:* Or like a whale?

*Polonius:* Very like a whale.

The dedication to the book provides: "We dedicate this book to the women and men who have been wrongfully accused, convicted, imprisoned, or have otherwise suffered because of faulty eyewitness testimony." As will be later related, Elizabeth Loftus was the witness called to testify in this case regarding the singularly significant eye-witness identification evidence provided for conviction.[22]

One of the difficult issues of this appeal was denial to Engberg of the use of an identification expert witness. Within this fast evolving and tremendously litigated eyewitness issue involving usage of the expert witness or submission of a special jury instruction, little national consistency exists. Actually, within this state, the expert witness has been used in serious cases and, for appellate review, only this case has reached us. Similarly, the *Telfaire* instruction has been given and denied and denial has been previously approved on appeal.

When faced with a claimed error from denial to Engberg of an expert witness, the State again contended a constitutional forfeiture by procedural default "solution." This is an unsupportable resolution of the appellate issue created by trial rejection and exasperated by the failure of appellate counsel to include it in first appeal. As direction for retrial, I cannot casually disregard the constitutional rights of Engberg under Wyo. Const. art. 1, § 10, right of accused to defend, and Wyo. Const. art. 1, § 6, due process of law, in conjunction with the Sixth Amendment to the United States Constitution. *Faretta,* 422 U.S. 806, 95 S.Ct. 2525. This issue should be properly presented when intermixed with predominating consideration of ineffective assistance of appellate counsel. *Curry v. Zant,* 258 Ga. 527, 371 S.E.2d 647 (1988); *Palmer,* 635 P.2d at 960; *Sims v. State,* 295 N.W.2d 420 (Iowa 1980); *Curtis v. State,* 37 Md.App. 459, 381 A.2d 1166 (1977), *rev'd on other grounds* 284 Md. 132, 395 A.2d 464 (1978); *Stewart v. Warden, Nevada State Prison,* 92 Nev. 588, 555 P.2d 218 (1976). *Cf. Valeriano v. Bronson,* 209 Conn. 75, 546 A.2d 1380 (1988).

I do not understand why this issue was not raised on initial appeal considering the expense incurred by the public defender (at state expense) in having the witness available for the trial. This is re-emphasized by the fact that the same witness had previ-

---

**22.** One of the most interesting segments of the book is Chapter 4: "The All–American Boy: Ted Bundy". E. Loftus & K. Ketcham, *supra,* at 61.

ously testified in another Wyoming death case also involving identification. *Alberts v. State*, 642 P.2d 447 (Wyo.1982). There has to be a differentiation between justification, incapacity or misguided disinclination in adequacy of representation. Appellate counsel has a responsibility to pursue issues established at trial unless non-pursuit is mandated by research. *Valeriano*, 546 A.2d 1380. *See McCoy*, 108 S.Ct. 1895. *Cf. Anders*, 386 U.S. 738, 87 S.Ct. 1396. Extrication of the issue from appellate review cannot realistically be called thoughtfully unintended. *See* E. Arnolds, W. Carroll, M. Lewis & M. Seng, *Eyewitness Testimony: Strategies and Tactics* (1984) (hereafter E. Arnolds) and N. Sobel, *Eyewitness Identification: Legal and Practical Problems* (1988).

Since the denial, neglect or negligence of appellate counsel to include this issue on appeal is unexplained, we are mandated to a substantive analysis for post-conviction review. Initially, the hypnotism issue in this case aggravates the due process concern of the eyewitness identification validity. Justice in evenhanded application should require this court to reject any double standard of due process where the kind of experts available to the prosecution, if they assist the jury with foundational knowledge, would not be the kind of experts available to defend as either not helpful or invading the provence of the jury. *See Jackson v. Fogg*, 589 F.2d 108 (2nd Cir.1978); *State v. Long*, 721 P.2d 483 (Utah 1986); and Note, *Eyewitness Identification in Utah: A Changing Perspective*, 1988 Utah L.Rev. 113 (1988). *See also State v. Whaley*, 406 S.E.2d 369 (S.C.1991).

Analysis of eyewitness identification as a function of criminal prosecution presents that timeless clash between necessity and questionable validity. Little need be said about necessity. In many cases, eyewitness identification is the only or at least the principle prosecutorial evidence. *See United States v. Smith*, 563 F.2d 1361 (9th Cir.1977), *cert. denied* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978), Hufstedler, J., specially concurring. Extensive and well documented research suggests that eyewitness testimony is not only suspect and frequently completely mistaken, but the degree and frequency of error in such identification remains undisclosed to the fact-finding jury. Faulty eyewitness identification, second only to perjury, is considered a major cause of the conviction of innocent persons. *See* Bedau & Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stan.L.Rev. 21 (1987). This problem was highlighted by Justice Frankfurter in F. Frankfurter, *The Case of Sacco and Vanzetti* (1927). We could go back even further and find that Sir Walter Raleigh lost his head as the result of both hearsay and faulty identification.

Judicial consideration of the problem is not new. In the 1896 case of *In re Bryant's Estate*, 176 Pa. 309, 35 A. 571, 577 (1896), it was stated:

> The parties to the present litigation are claimants of his estate, and their claims depend upon the question of identity. There are few more difficult subjects with which the administration of justice has to deal. The carelessness or superficiality of observers, the rarity of powers of graphic description, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable of facts testified to even by actual witnesses who have seen the parties in question; and, where they have not, there is the added obstacle of the inadequacy of language to describe the minute variations of feature and color which go to make up the individual personality.

The incantation to keep the jury ignorant of the high degree of erroneous eyewitness identification has not diminished over a half century. Louisiana is alert to the problem with eyewitness identification to convict. "Where the key issue is the accused's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *State v. Carter*, 522 So.2d 1100, 1109 (La.App.1988). This is true since reliability is the linchpin in determining the admissibility of identification testimony. *Walker v. State*, 523

So.2d 528 (Ala.Cr.App.1988) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). *See also People v. Riley*, 70 N.Y.2d 523, 522 N.Y.S.2d 842, 517 N.E.2d 520 (1987).

One of the most thoughtful judicial treatments on this is found in *People v. Anderson*, 389 Mich. 155, 205 N.W.2d 461, 468 (1973):

> The psycho-legal fundamentals in this case derive from the tension between four factors involved in eyewitness identification in criminal cases. The four factors are:
>
> 1. The natural and usually necessary reliance on eyewitness identification of defendants by the police and prosecution;
>
> 2. The scientifically and judicially recognized fact that there are serious limitations on the reliability of eyewitness identification of defendants;
>
> 3. The scientifically and judicially recognized fact that frequently employed police and prosecution procedures often (and frequently unintentionally) mislead eyewitnesses into misidentification of the defendant;
>
> 4. The historical and legal fact that a significant number of innocent people have been convicted of crimes they did not commit and the real criminal was left at large.

In *United States v. Brown*, 461 F.2d 134, 145 (D.C.Cir.1971), Chief Judge Bazelon responded to the problems of eyewitness identification by stating "[n]o other aspect of the accusatory process creates so much opportunity for miscarriage of justice—for punishment of an innocent man." "Unquestionably, identifications are often unreliable—perhaps consistently less reliable than lie detector tests, which we have in the past excluded for unreliability." *Id.* at 145 n. 1.[23]

Erroneous eyewitness identification, many times given confidently in good faith, has led to the conviction and execution of innocent people charged with capital crimes. *See* Bedau & Radelet, *supra*, 40 Stan.L.Rev. at 91–172 (Appendix A: Catalogue of Defendants). The problem of faulty eyewitness identification has been comprehensively addressed in books, scientific publications and legal journals. For Wyoming law to be as fundamentally fair as we can make it, a defendant should be able to present evidence which can shake the confidence in eyewitness identification—just as the prosecution is free to use eyewitness identification. It is a matter of fundamental fairness.[24] After analyzing

---

**23.** *See also State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979); the *Wade* trilogy, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. State of California*, 388 U.S. 263, 87 S.Ct.1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and subsequent cases.

An interesting analysis is provided in Note, *Twenty-Years of Diminishing Protection: A Proposal to Return to the Wade Trilogy's Standards*, 15 Hofstra L.Rev. 583 (1987). *See also* Comment, *Erroneous Eyewitness Identification at Lineups—The Problem and Its Cure*, 5 U.S.F.L.Rev. 85 (1970), and compare the earlier article, Quinn, *In the Wake of Wade: The Dimensions of the Eyewitness Identification Cases*, 42 U.Colo.L.Rev. 135 (1970). In addition, see *Charpentier v. State*, 736 P.2d 724 (Wyo.1987) (Urbigkit, J., dissenting).

**24.** Representative only as more easily available sources are H. Munsterberg, *On the Witness Stand* (1908); E. Borchard, *Convicting the Innocent* (1932); F. Frankfurter, *supra;* P. Wall, *Eye-Witness Identification in Criminal Cases* (1975); E. Arnolds, *supra;* and N. Sobel, *supra.*

See also an excellent review in 6 Ordover, *Criminal Law Advocacy* (1988). With those standard texts must be included A. Yarmey, *The Psychology of Eyewitness Testimony* (1979) and E. Loftus & J. Doyle, *Eyewitness Testimony: Civil and Criminal* (1987). As illustrative merely of a small portion of the societal, scientific and psychology monograms and article reviews, see M. Treadway & M. McCloskey, *Cite Unseen: Distortions of the Allport and Postman Rumor Study in the Eyewitness Testimony Literature*, 11 Law and Human Behavior 19 (1987); D. Bersoff, *Psychologists and the Judicial System: Broader Perspectives*, 10 Law and Human Behavior 151 (1986); H. McAllister & N. Bregman, *Juror Underutilization of Eyewitness Nonidentifications: Theoretical and Practical Implications*, 71 J. Applied Psychology 168 (1986); K. Deffenbacher & E. Loftus, *Do Jurors Share a Common Understanding Concerning Eyewitness Behavior?*, 6 Law and Human Behavior 15 (1982); R. Christiaansen, K. Ochalek & J. Sweeney, *Individual Differences in Eyewitness Memory and Confidence Judgments*, 110 J. General Psychology 47 (1984); G. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Vari-*

the unquestioning reliance on eyewitness identification by the legal system, two prominent scholars argue for uniform rules to govern such identification:

> In light of the unenumerated inadequacies of eye-witness identification and testimony, new procedural safeguards are required. The following proposed protections are not suggested as alternatives to eyewitness evidence, for such evidence can play a very vital role in investigative and trial proceedings. Rather, these safeguards are suggested in order that eyewitness evidence might be presented to a jury in its proper and least prejudicial perspective.

Cunningham & Tyrrell, *Eyewitness Credibility: Adjusting the Sights of the Judiciary*, 37 Alabama Lawyer 563, 585 (1975). These scholars recommend that police avoid using suggestive lineups and that courts provide special jury instructions, require corroborating evidence, employ protective procedures for in-court identification, and require pretrial identification procedures (*Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (*Denno* hearing)).

The literature is nearly endless. A representative analysis is found in Levine & Tapp, *The Psychology of Criminal Identification: The Gap From Wade to Kirby*, 121 U.Pa.L.Rev. 1079, 1079 (1973) (quoting *United States v. Wade*, 388 U.S. 218, 235, 87 S.Ct. 1926, 1936, 18 L.Ed.2d 1149 (1967) and footnotes omitted), which stated:

> On June 12, 1967, the Supreme Court of the United States in a trilogy of cases, *United States v. Wade, Gilbert v. California* and *Stovall v. Denno*, dealt with the constitutionality of police practices and procedures in obtaining eyewitness identifications. These decisions marked the Supreme Court's first major attempt to confront the "dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." The Court's primary concern was to evolve legal standards and remedies that would substantially reduce erroneous identification.

Katz & Reid, *Expert Testimony on the Fallibility of Eyewitness Identification*, 1 Crim.Just.J. 177, 177 (1977) describes:

> Many psychologists believe the testimony of an eyewitness to a crime may often be unreliable. This article addresses the question whether behavioral scientists should be permitted to testify at criminal trials to explain to the jury the inherent danger of relying on eyewitness identifications.
>
> After a discussion of the legal admissibility of this testimony, an analysis of the nature and scope of the problem is presented, followed by a discussion of specific topics upon which an expert in eyewitness identification may testify. In conclusion, this article presents some guidelines to assist the trial judge in his exercise of discretion on this matter.

O'Connor, *"That's the Man": A Sobering Study of Eyewitness Identification and the Polygraph*, 49 St.John's L.Rev. 1, 1–2 (1974) (footnote omitted) states:

> It is almost four o'clock in the morning, and, as he stands in the lighted doorway of the squad room at the 110th precinct, Manny Balestrero is tired—but, worse still, he is scared, more scared than he has ever been in his life. Things seem to be closing in around him. His interrogation since earlier that evening has not, by any standard, been brutal; no force has been used—just persistent, relentless, ceaseless questioning by two

*ables,* 36 J. Personality & Social Psychology 1546 (1978); R. Buckhout, *Psychology and Eyewitness Identification,* 1 Law and Psychology Review 75 (1975); T. Luce, *The Neglected Dimension in Eyewitness Identification,* 4 Criminal Defense 5 (1977); S. Portman, *Mistaken Eyewitness Identification: A Remedy,* 3 Criminal Defense 4 (1976); R. Buckhout, *Eyewitness Identification and Psychology in the Courtroom,* 1 Criminal Defense 5 (1977); E. Loftus, *Reconstructing Memory: The Incredible Eyewitness,* 8 Psychology Today 116 (Dec. 1974); and G. Allport & L. Postman, *The Psychology of Rumor* (1947). *See also* Walker & Monahan, *Social Frameworks: A New Use of Social Science in Law,* 73 Va.L.Rev. 559 (1987) and *How Did The Wrong Man Get Snared?,* The National Law Journal (March 7, 1988). One of the more validated sources in teaching orientation to be found is E. Loftus, B. Bell & K. Williams, *Powerful Eyewitness Testimony,* 24 Trial 64 (April 1988).

detectives who are so skeptically polite, so adamantly unbelieving!

\* \* \* \* \* \*

The drama moves swiftly to its bitter end. Manny again senses, rather than sees, movement in the darkened room. Then come the whispered words: "That's the man!" Manny's whole world collapses.

(After a mistrial and, in the interim, the real perpetrator was apprehended.)

"It is an article of faith within the legal profession that eyewitness testimony is unreliable." Pulaski, *Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection*, 26 Stan. L.Rev. 1097, 1097 (1974).

The unreliability of eyewitness identification evidence poses one of the most serious problems in the administration of criminal justice. Identifying the defendant as the wrongdoer presents an issue, and often the sole one for determination, in every criminal trial. Yet, commentators extensively have documented the frequency of wrongful convictions resulting from mistaken identifications and long have recognized the threat that such misidentification poses to the ideals of criminal justice. As Justice Felix Frankfurter once noted, "The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials."

Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan.L.Rev. 969, 969 (1977) (quoting F. Frankfurter, *supra*, at 30) (footnotes omitted). The variety and detail of just a few of the other articles on this subject are astounding.[25]

25. The major cause of injustice in the administration of the criminal law is not, as many believe, the use of confessions but the use of eyewitness identifications.

\* \* \* \* \* \*

Until recently, the judiciary had done little to correct the abuses of eyewitness identification.

Quinn, *supra* n. 23, 42 U.Colo.L.Rev. at 135 (footnotes omitted).

The vagaries of visual identification evidence have traditionally been of great concern to those involved in the administration of criminal law. It has been thought by many experts to present what is conceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished.

McGowan, *Constitutional Interpretation and Criminal Identification*, 12 Wm. & Mary L.Rev. 235, 238 (1970).

"All legal systems have made the mistake of suspecting and watching for voluntary errors in testimony, rather than for the involuntary ones. Yet it is comparatively rare in a civilized society for an innocent person to be put in peril of conviction by the lying testimony of the prosecution; the real danger is of mistaken evidence."

Grano, *Kirby, Biggers, and Ash: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent?*, 72 Mich.L.Rev. 717, 719 (1974) (quoting G. Williams, *The Proof of Guilt* 89 (3d ed. 1963)).

"Although eyewitness identification is a highly regarded form of evidence in criminal trials, its inaccuracy has not gone unnoticed." Comment,

*Expert Testimony on Eyewitness Perception*, 82 Dick.L.Rev. 465, 465 (1978).

"'[I]nnocent people will be imprisoned, and many of the guilty will remain free.'" Note, *Eyewitness Identification Testimony and the Need for Cautionary Jury Instructions in Criminal Cases*, 60 Wash.U.L.Q. 1387, 1387 (1983) (quoting Jonakait, *Reliable Identification: Could the Supreme Court Tell in Manson v. Brathwaite?*, 52 U.Colo.L.Rev. 511, 528 (1981)).

"Justice would less often miscarry if all who are to weigh evidence were more conscious of the treachery of human memory."

Throughout this century, experimental psychologists have demonstrated with increasing clarity that, due to normal deficiencies in the human memory process, eyewitness identification testimony is an inherently unreliable form of evidence. This inherent unreliability, in combination with the legal system's unwillingness to effectively safeguard against its disastrous effects, poses a serious threat to the fair and efficient administration of criminal justice in America.

Comment, *Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards*, 12 Am.J.Crim.L. 189, 189 (1984) (quoting H. Munsterberg, *supra* n. 24).

Eyewitness testimony plays a critical role in the American judicial system. Many cases are decided daily based substantially or entirely on the testimony of eyewitnesses. Since this testimony is produced by inherently fallible human systems of perception, memory and recall, there is a constant concern that it may not be as accurate as it seems. Recently many psychologists and legal commentators have suggested that psychologists should be permitted to testify as experts to inform jurors

In current literature, Fassett, *The Third Circuit's Unique Response to Expert Testimony on Eyewitness Perception: Is What You See What You Get?*, 19 Seton Hall L.Rev. 697, 722 (1989) provides a thoughtfully detailed and documented exposition and then concludes:

> The inherent unreliability of eyewitness identification evidence, combined with the dilution of constitutional protections designed to exclude unreliable identifications, necessitates the adoption of additional judicial safeguards where such evidence is both critical and disputed. The most effective such safeguard, expert identification testimony, should be admitted far more frequently than presently allowed by the majority *Amaral* [488 F.2d 1148] standard. Enunciated over fifteen years ago by the Ninth Circuit, that standard is inconsistent with the more liberal criteria of the Federal Rules of Evidence and has resulted in the near-blanket exclusion of such testimony.
>
> In *Downing*, the Third Circuit recognized the flaws of the *Amaral* standard and recommended more lenient admission of expert identification testimony. However, the tremendous discretion *Downing* afforded district courts, coupled with its open invitation to exclude such testimony in all cases except those based solely upon a single uncorroborated identification, will regrettably prevent any significant increase in its admission. Hence, criminal defendants who require expert testimony to attack unreliable identifications shall continue to face closed doors needlessly shut by a judiciary intent on limiting the scope and duration of trials. Given the dismantling of the constitutional protections developed twenty-two years ago to ensure the exclusion of unreliable identification evidence arising from unduly suggestive pretrial procedures, those closed doors will almost certainly and tragically facilitate the conviction of innocent defendants.

When invoking the reliability of the expert witness analysis in eyewitness identification, four concerns are found in review of the many cases and expansive literature:

1. The test for admissibility of expert testimony is F.R.E. 702, with application of either the *Frye* test, *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923), or a currently modernized standard.

2. There are generally agreed and determined practical validity concepts for eyewitness identification testimony.

3. Fairness is implicated in equality for availability of the expert witness to the defendant as to the prosecution.

4. The nature and the essential characteristics of the trial court exercised discretion presented by contentions of identification invalidity.

Judicial answers to the acknowledged problem have taken three directions. The first is to do nothing with the clearly un-

of scientific findings relevant to eyewitness testimony and the facts of the particular case. Comment, *Do the Eyes Have It? Psychological Testimony Regarding Eyewitness Accuracy*, 38 Baylor L.Rev. 169, 169 (1986) (footnote omitted).

> Of all the areas where the very issue of participation of expert witness in criminal trials is at issue, perhaps the most controversial at the present time is eyewitness identification. With increasing frequency experts have been testifying in this area. Whether such testimony should be admitted has, however, been within the discretion of the trial court. Almost all appellate courts that have ruled on the matter have upheld the trial court's exclusion of expert testimony introduced to discuss the effects of various factors on eyewitness performances, or on juror assessment of eyewitness identification.

> Recently, however, the supreme courts of Arizona in *State v. Chapple* [135 Ariz. 281, 660 P.2d 1208, 1224 (1983)] and California in *People v. McDonald* [37 Cal.3d 351, 375–76, 690 P.2d 709, 726–27, 208 Cal.Rptr. 236, 252–53 (1984)] have ruled that a trial judge committed reversible error in refusing to admit expert testimony on eyewitness identification. These are the first state courts to adopt this position. There are indications, however, that other jurisdictions may follow. And, it is important to keep in mind that many trial judges already admit this testimony in criminal trials.

Sanders, *Expert Witnesses in Eyewitness Facial Identification Cases*, XVII Tex.Tech.L.Rev. 1409, 1410–11 (1986) (footnotes omitted).

justified hope that either the jury will be smart enough to adequately discount identification testimony, or second, that the other evidence is sufficient so that the invalid testimony does not really matter. Alternatively, reliance on the power of cross-examination is also frequently given as a justification for the uncontrolled procedure as an adequate validation of eyewitness identification testimony. Since none of these explanations assure reliability of result for those who are innocent in a significant number of cases, the only remaining solace comes from the possibility that the guilty individual will confess or be otherwise uncovered, post-conviction processes will be remedial or that the normal justification is sufficient of a utilitarian society concept of a wrong-place, wrong-time—so what tragedy resolution. To one federal court, this latter precept was not acceptable where unreliable eyewitness identification was used. *Jackson*, 589 F.2d 108. The case was critiqued by the federal appellate court as "the rare case of a record almost entirely bare of credible untainted evidence of guilt" as founded on eyewitness identification. *Id.* at 108. See similar suggestive processes of identification in *United States v. Russell*, 532 F.2d 1063 (6th Cir.1976).[26]

The second and spreading effort to test contended prosecutorial identification reaches to education of the jury by special instructions. The most common application is the usage of some version of the *Telfaire* instruction which provides four factors a jury should consider when deciding how

much reliance eyewitness testimony might be given. *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972). *See* Note, *Eyewitness Identification Testimony and the Need for Cautionary Jury Instructions in Criminal Cases*, 60 Wash. U.L.Q. 1387 (1983). In *Hampton v. State*, 92 Wis.2d 450, 285 N.W.2d 868 (1979) (citing *Chapman v. State*, 69 Wis.2d 581, 230 N.W.2d 824 (1975) and *State v. Williamson*, 84 Wis.2d 370, 267 N.W.2d 337 (1978)), testimony of the expert witness was permitted, although restricted in scope, while the special instruction was denied. The special instruction approach has found broad usage, but unfortunately has been previously rejected by this court in a plain error context without any substantive consideration of its broad perspective. *Campbell v. State*, 589 P.2d 358 (Wyo.1979); *but see Thomas v. State*, 784 P.2d 237 (Wyo.1989), Urbigkit, J., specially concurring. *Cf. United States v. Hodges*, 515 F.2d 650 (7th Cir.1975); *United States v. Holley*, 502 F.2d 273 (4th Cir.1974); *State v. Wheaton*, 240 Kan. 345, 729 P.2d 1183 (1986); *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981); and *State v. Mastracchio*, 546 A.2d 165 (R.I.1988). The Tenth Circuit Court of Appeals adopted an intermediate position posited upon unavailable collaborative testimony. *United States v. McNeal*, 865 F.2d 1167 (10th Cir.), *cert. denied* 490 U.S. 1094, 109 S.Ct. 2439, 104 L.Ed.2d 995 (1989).

The third ameliorative approach addresses the jury by the use of expert witness testimony pursuant to W.R.E. 702.[27] The

---

**26.** A recommendation not found in any case, but probably justified in factual analysis, is that a polygraph, as it may be, is more reliable than eyewitness identification in many cases. Justice Frank O'Connor noted in O'Connor, *supra,* 49 St. John's L.Rev. at 30 (footnote omitted):

There remains unanswered the haunting inquiry of the nineteenth century student: "What would really prevent erroneous identification?" In the most perfect of worlds and with all the suggested guidelines adopted, perfected, implemented and in full force and effect, inequities, inequalities and injustices will continue to exist—at least in this life. The author argues from his experience in litigation as a judge that the polygraph may serve as a more adequate answer than what presently is done. His reasoning in regard to the polygraph for expert witness examination is singularly ap-

plicable also to the psychological evaluation and scientific evidence expert who analyzes behavioral facts and identification questions.

In *Jackson,* 589 F.2d at 111, the court observed in regard to a *Wade* hearing:

The state trial judge made no detailed findings either as to suggestiveness or as to reliability and evidenced a basic lack of familiarity with the appropriate legal standards.

**27.** The general concept rejecting the evidence from a scientific expert witness in a jurisdiction where the case does not demonstrate whether or nor the *Telfaire* instruction is used is most extensively stated in the denied availability posture as:

In holding that the trial court did not abuse its discretion in refusing to admit this expert testimony, we do not mean to suggest that we

decisional process used is significant, including both the propriety and advisability of a *Denno* hearing or motion in limine resolution in advance of trial.

As general principles for expert witness testimony, the separately definable considerations by the trial court include (a) competency and qualification of the witness, *see State v. Vineyard,* 497 S.W.2d 821 (Mo. App.1973) and *Windmere, Inc. v. International Ins. Co.,* 105 N.J. 373, 522 A.2d 405 (1987); (b) appropriateness of the subject for testimony under W.R.E. 702, *see People v. Cole,* 47 Cal.2d 99, 301 P.2d 854 (1956); *Windmere, Inc.,* 522 A.2d 405; *State v. Spry,* 87 S.D. 318, 207 N.W.2d 504 (1973), *overruled sub nom. State v. Buckingham,* 90 S.D. 198, 240 N.W.2d 84 (1976), *modified sub nom. State v. Hartman,* 256 N.W.2d 131 (S.D.1977) and Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half–Century Later,* 80 Colum.L.Rev. 1197 (1980) (as affording the three-test function); (c) creation of undue prejudice under W.R.E. 403, *see Foster v. State,* 508 So.2d 1111 (Miss.1987); and (d) probative value compared to prejudicial effect as a general power of exercised trial court discretion to deny a litigant his desired evidence, *see*

*Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052 (4th Cir.1986); *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973); and *Fensterer v. State,* 493 A.2d 959 (Del.Super.), *cert. granted and judgment vacated* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

The admissibility standard for expert testimony is somewhat differently phrased by the Sixth Circuit Court of Appeals in *United States v. Kozminski,* 821 F.2d 1186, 1194 (6th Cir.), *cert. granted* 484 U.S. 894, 108 S.Ct. 225, 98 L.Ed.2d 185 (1987), *judgment aff'd and remanded,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (emphasis in original) as a four-part test:

> For expert testimony to be admissible under Rule 702, a four-part test must be met: (1) a qualified expert; (2) testifying on a proper subject; (3) *in conformity to a generally accepted explanatory theory;* (4) the probative value of which outweighs any prejudicial effect.

It is noteworthy that a difference can be assessed between a test for *scientific evidence* compared with *expert testimony. Id.* at 1214, Guy, J., dissenting.

One of the more lucid reviews of the admissibility of expert testimony is found

---

think the broader issue of reliability of eyewitness identification testimony is unimportant. Rather, we simply believe that requiring trial courts to admit this sort of evidence is not the answer. There is no one answer to the problem, but there are a number of safeguards to prevent convictions of the innocent based on unreliable eyewitness identification. Prosecutors do not have to prosecute if they think the evidence is unreliable. Trial courts may suppress identification testimony if the identification procedures rendered the evidence unreliable. Effective cross-examination and persuasive argument by defense counsel are additional safeguards. Proper instruction of the jury on the factors in evaluating eyewitness identification testimony and on the state's burden of proving identification beyond a reasonable doubt are other safeguards. The requirement of jury unanimity is also a safeguard. Finally, this court has the power to grant relief if it is convinced that the evidence of a convicted defendant's guilt was legally insufficient.

*State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980). Unfortunately, the foregoing enumeration contemplates nothing different than what has historically occurred as insufficient to

counteract the recognized insufficiencies and irregularities of the eyewitness identification testimony. For a recent example, see *How Did the Wrong Man Get Snared?,* The National Law Journal, *supra* and *Memory on Trial. Witnesses of Crimes Are Being Challenged as Frequently Fallible,* The Wall Street Journal, March 2, 1988, at 1, col. 1, which states:

> The new research indicates that such publicized cases of eyewitnesses' fallibility "are just the tip of a much larger iceberg," says Stephen D. Penrod, a memory researcher at the University of Wisconsin in Madison who holds doctorates in both psychology and law. "The rate of mistaken identification is significantly higher than most people tend to believe," he says.
>
> \* \* \* \* \* \*
>
> Suggestions can also become memories, experiments by Prof. Loftus suggest. \* \* \*
>
> Hypnotists also can deliberately or inadvertently implant an unreal or false memory in a witness in a similar fashion, experiments have shown.
>
> Subtle suggestions by police can lead an eyewitness to err in picking a suspect out of a lineup, dozens of experiments indicate.

in statements of the New Jersey Supreme Court in *Windmere, Inc.* in regard to the particular topic of voice prints which was ultimately found inadmissible. That court recognized:

> There are generally three ways in which a proponent of expert testimony or scientific results can prove the required reliability in terms of its general acceptance within the professional community: (1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony.

*Windmere, Inc.,* 522 A.2d at 408.[28] That case applied a reasoned approach by factual analysis of each acceptability criteria.

The *Frye* test has been generally superseded by F.R.E. 702, and the more current recognition of science's relationship to the fact-finding search for truth in trial inquiry.[29] The psychological principles as psycho-legal fundamentals are enumerated to be derived from four factors involved in eyewitness identification quoted earlier in *Anderson,* 205 N.W.2d at 468 (with exhaustive bibliography).

The line of authority where trial denial resulted in reversal on appeal began in *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983) and *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984). These cases have presented the expanding philosophy that the expert witness testimony should be admissible when properly directed and adequately presented. A principal support for the eyewitness invalidity inquiry was provided in the Third Circuit Court of Appeals case of *United*

*States v. Downing,* 753 F.2d 1224, 1230–31 (3rd Cir.1985):

> [W]e find persuasive more recent cases in which courts have found that, under certain circumstances, this type of expert testimony can satisfy the helpfulness test of Rule 702. * * *
>
> * * * * * *
>
> We agree with the courts in *Chapple, Smith,* and *McDonald* that under certain circumstances expert testimony on the reliability of eyewitness identifications can assist the jury in reaching a correct decision and therefore may meet the helpfulness requirement of Rule 702.[30]

Retained discretional jurisdiction in making the probative versus prejudicial evaluation is further reflected in *United States v. Moore,* 786 F.2d 1308, *reh'g denied* 791 F.2d 928 (5th Cir.1986) and *State v. Via,* 146 Ariz. 108, 704 P.2d 238 (1985), *cert. denied* 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986). The more recent realistic and responsible analyses have generally concluded that the issue whether to reject requires an affirmative conclusion of trial prejudice. *See State v. Hamm,* 146 Wis.2d 130, 430 N.W.2d 584, 591 (1988). Perhaps the case most viably addressing eyewitness identification invalidity and the justification for relevant expert testimony comes from the Fifth Circuit Court of Appeals in *Dispensa v. Lynaugh,* 847 F.2d 211 (5th Cir.1988), as now addressed after release of the defendant from state penitentiary after serving four years on the fifteen year sentence.

Under present general standards which apply to discretion under W.R.E. 403 and

---

**28.** *Cf. State v. Williams,* 4 Ohio St.3d 53, 446 N.E.2d 444 (1983), where the evidence of the voice print was admissible as described to be "wretched results" by Professor Starrs in Starrs, *Frye v. United States Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702,* 115 F.R.D. 92, 100 (1987).

**29.** *United States v. Downing,* 753 F.2d 1224 (3rd Cir.1985); *State v. Williams,* 388 A.2d 500 (Me. 1978); *State v. Johnson,* 717 S.W.2d 298 (Tenn. Cr.App.1986); Giannelli, *supra,* 80 Colum.L.Rev. 1197. A current evaluation analysis of rules of admissibility concerning scientific evidence is

comprehensively presented in *Rules for Admissibility of Scientific Evidence,* 115 F.R.D. 79 (1987), as supplementing the earlier *Science and the Rules of Evidence,* 99 F.R.D. 187 (1983). *See also* Walker & Monahan, *supra* n. 24, 73 Va. L.Rev. 559.

**30.** *See also United States v. Smith,* 736 F.2d 1103 (6th Cir.), *cert. denied* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). Further support is found in *Skamarocius v. State,* 731 P.2d 63 (Alaska App.1987); *People v. Brooks,* 128 Misc.2d 608, 490 N.Y.S.2d 692 (1985); and *State v. Moon,* 45 Wash.App. 692, 726 P.2d 1263 (1986).

702, expert witnesses who evaluate the eyewitness identification clearly meet criteria of either the *Frye* test or the more modern approach of W.R.E. 702. Discretion in 1988 concept cannot properly be used to deny validity of knowledgeable testimony as long as the evidence is retained within proper bounds as not individualized to separately attest to the validity or invalidity of the critiqued eyewitness. It is also recognized that the discretion in exercise has a proper place under W.R.E. 403 or 706 to reject testimony which may be redundant, lacking benefit, unduly prejudicial, or otherwise excludable as would similar expert witness information on subjects such as speed, point of impact, occurrence of a sexual offense, or psychological explanation of a delayed report. *See State v. R.W.*, 200 N.J.Super. 560, 491 A.2d 1304, *cert. granted* 101 N.J. 206, 501 A.2d 891 (1985), *judgment aff'd and modified*, 104 N.J. 14, 514 A.2d 1287 (1986) (psychiatric analysis of testimonial capacity).

Clearly, the trial court is not required within the proper exercise of discretion to always permit this evidence in every case where eyewitness identification exists. Close analysis justifies the exclusion where the identification testimony is unquestionably valid, such as a case of personal acquaintanceship, significant occurrence contact, or other clear identification by an obviously competent and knowledgeable witness. Similarly, where identification is not important to conviction, exclusion is justified since the testimony serves no probative function. The Arizona courts recognized these discretionary constraints in the case of *State v. Poland*, 132 Ariz. 269, 645 P.2d 784 (1982). Utah has followed a similar path in *State v. Bruce*, 779 P.2d 646 (Utah 1989).

The evidence reaches relevance and admissability where identification is highly significant and, perhaps, reasonably questionable. In such a case, exclusion of the expert witness may factually constitute a directed verdict of conviction against the defendant. If we define discretion in real terms of judgmental decision and apply the principles emplaced in W.R.E. 702, answers in modern terms for expert witness testi-

mony on eyewitness identification validation assume a rational structure. "Where the key issue is the accused's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *Carter*, 522 So.2d at 1109.

The admissibility issues for use of the expert witness should be determined in advance of trial by *Denno* hearing or a motion in limine resolution. *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979). This is more rationally justified by planning, scheduling and expeditious trial proceedings. Also, since the cost of the attendance of the expert will usually fall upon the public, whether or not the witness testifies, savings are accommodated by advance decision in the *Denno* motion disposition. This process permits (a) determination of the expert status of the witness; (b) determination of the scope of the proposed testimony; and (c) application to the case as a discretional conclusion in consideration of the trial purpose and function. Function and purpose present discretional decision assessing whether there really is a viable issue of identification about which the scientific knowledge of the expert witness can aid the jury. 6 Ordover, Criminal Law Advocacy, at 6–1 (1988).

For the trial of Engberg (as was recognized in *Engberg I*), identification was central to prosecution and critical in defense. First to be questioned is the competency and qualification of the witness. Second is the appropriateness of the subject for expert witness testimony in a jury trial context. Third is the conformity of the testimony to the explanatory theory, and fourth is the eternal resolution in admissibility of weighing probative value versus prejudicial effect.

Dr. Elizabeth Loftus was clearly qualified by national exposure and experience and particularly so since she had testified in *Alberts v. State*, 745 P.2d 898 (Wyo. 1987). *See* E. Loftus & J. Doyle, *Eyewitness Testimony: Civil and Criminal* (1987). The next step in properly considered analysis is assessment of expert

testimony for admissibility validity. Clearly, this criteria was met and the proposed text enunciated within the offer of proof could not justify denial as validated with a witness of national reputation with an extensive history of courtroom forensic expert appearances. Her testimony came within the parameters of *Downing*, 753 F.2d 1224; *Chapple*, 660 P.2d 1208; and *McDonald*, 690 P.2d 709 as defined by the proper bounds of expert testimony under W.R.E. 702. Eyewitness identification legal jurisprudence has advanced too far since 1896 in *In re Bryant's Estate*, 35 A. 571, and even earlier studies, to now sustain denial of use of the expert criticism of impreciseness and invalidity.

Consequently, it is then in the fourth concept that the trial court should exercise discretion when presented the conflicting genesis for decision. For a proper exercise of discretion, see *State v. Cooper*, 708 S.W.2d 299 (Mo.App.1986), where the jury would have been bored with unconvincing evidence or insulted with an attack on their intelligence since no real issue of identification was presented. *Bruce*, 779 P.2d at 652. The test for use is a function of properly exercised discretion which should be essentially the same to address the *admissibility of any expert witness testimony*. Discretion is reasonableness when balancing probative function as a benefit and prejudice as a detriment. *Martin v. State*, 720 P.2d 894 (Wyo.1986).

The Supreme Court of Colorado has most recently spoken on this subject in *Campbell v. People*, 814 P.2d 1 (Colo.1991) in following *Downing*, 753 F.2d 1224 which is the pathway in justice and logic this court should also take. In other jurisdictions, the recent case law continues without remission from *State v. Galloway*, 275 N.W.2d 736 (Iowa 1979) through *McDonald* and *Chapple* to *People v. Sanders*, 51 Cal.3d 471, 273 Cal.Rptr. 537, 797 P.2d 561 (1990), *cert. denied* — U.S. —, 111 S.Ct. 2249, 114 L.Ed.2d 490 (1991) and then *Par-*

*ker v. State*, 568 So.2d 335, 339 (Ala.Cr. App.1990); *State v. Hall*, 244 Mont. 161, 797 P.2d 183 (1990); *Melson*, 556 A.2d 836 and *State v. Kinsey*, 797 P.2d 424 (Utah App.), *cert. denied* 800 P.2d 1105 (Utah 1990). See also Hoffheimer, *Requiring Jury Instructions on Eyewitness Identification Evidence at Federal Criminal Trials*, 80 J.Crim.L. & Criminology 585 (1989) and Comment, *Expert Testimony on Eyewitness Identification: The Constitution Says, "Let the Expert Speak"*, 56 Tenn. L.Rev. 735 (1989). Wyoming sadly fails to turn forward to modernization at this crossing in criminal law adjudication. Additionally well critiqued, we would find Loftus & Schneider, *"Behold With Strange Surprise": Judicial Reactions to Expert Testimony Concerning Eyewitness Reliability*, 56 UMKC L.Rev. 1 (1987).[31]

**G. The Failure of the Prosecutor to Inform Engberg and His Attorney That They Had the Principal Eyewitness Hypnotized to Enhance Her Memory and Subsequent Denial of a Post–Trial Hearing**

This appeal, unbelievably now first in post-conviction relief, combines four uncomfortable subjects for the majority to resolve in one harmless error resolution after the trial court denied a factual hearing to responsively consider following a full evidentiary presentation of what really happened. *In Engberg II, combined issues are presented of eyewitness identification, plus hypnosis, plus Brady nondisclosure, plus post-trial hearing denial. Here, neither defense counsel nor trial court knew until after the trial was completed that the principal witness had been subjected to hypnosis prior to any identification of Engberg.* Prosecutorial non-disclosure was prejudicial error. *United States v. Miller*, 411 F.2d 825 (2nd Cir. 1969); *People v. Schreiner*, 77 N.Y.2d 733, 570 N.Y.S.2d 464, 573 N.E.2d 552 (1991); *People v. Hughes*, 59 N.Y.2d 523, 466

---

**31.** While from the bounded level of our mind
Short views we take, nor see the lengths behind;
But more advanced, behold with strange surprise

New distant scenes of endless science rise!
Loftus & Schneider, *supra*, 56 UMKC L.Rev. at 1 (quoting Pope, Essay on Criticism (1711)).

N.Y.S.2d 255, 453 N.E.2d 484 (1983), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).

In post-conviction investigation, the successor appellate counsel discovered that hypnotism of the principal eyewitness had both been "attempted" and undisclosed to Engberg either before or during trial. In the post-conviction-relief proceeding, Engberg asked for an opportunity to have an evidentiary hearing to establish what had occurred in attempted hypnotism and why the activity was hidden from his counsel. After discovery, the trial court, in post-conviction decision denied any evidentiary hearing. The decision eliminated any proper examination by oral inquiry, leaving only the decedent's sister's denial by affidavit that she had actually succumbed when hypnotism was attempted on her by the police representative. *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984). *Cf. People v. Romero,* 745 P.2d 1003 (Colo.1987), *cert. denied* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988).

Both case law and academic writing considering the subject are again almost endless, including the right to defend case of *Rock,* 483 U.S. 44, 107 S.Ct. 2704. *See People v. Guerra,* 37 Cal.3d 385, 208 Cal. Rptr. 162, 690 P.2d 635 (1984); Note, *Rock v. Arkansas: Hypnosis and the Criminal Defendant's Right to Testify,* 41 Ark. L.Rev. 425 (1988); and Note, *Rock v. Arkansas: Hypnosis and the Prejudice Rule—Your Memories May Not Be Your Own,* 21 J. Marshall L.Rev. 409 (1988). *See also* Note, *Hypnosis and Criminal Defendants: Life in the Eighth Circuit and Beyond,* 53 Mo.L.Rev. 823 (1988).

An extensive list of comparable cases can be found in *Rock,* as well as the principal case of *People v. Shirley,* 641 P.2d 775 (Cal.), *republished* 31 Cal.3d 18, 181 Cal. Rptr. 243, 723 P.2d 1354, *cert. denied* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982). *See State v. Coe,* 101 Wash.2d 772, 684 P.2d 668 (1984); *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984); and *State v. Laureano,* 101 Wash.2d 745, 682 P.2d 889 (1984), where independent verification is required. *See also Little v. Ar-*

*montrout,* 835 F.2d 1240 (8th Cir.1987), *cert. denied* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). Also, in review, see Note, *Hypnosis and the Defendant's Right to Testify in a Criminal Case,* 1989 Utah L.Rev. 545 (1989).

A thoughtful analysis is provided by Comment, *Hypnotically Enhanced Testimony: Has it Lost its Charm?,* 15 S.Ill. U.L.J. 289, 293–95 (1991) (footnotes omitted):

The scientific consensus is that hypnosis does enhance recall. If this were the only factor to be considered, there would be no argument about its use. But the problems associated with hypnosis create the conflict. These problems lie in four major areas: suggestibility, confabulation, deliberate fabrication, and increased confidence.

Suggestibility is inherent in the hypnotic process. A hypnotic subject is intensely focused on the hypnotist and has an increased desire to please the hypnotist by complying with both implicit and explicit demands. Leading questions can imply the correct answer. However, the suggestions need not be verbal. The attitude, demeanor, and expectations of the hypnotist, coupled with tone of voice and body language, can convey suggestive messages to the subject. Most subjects will respond to these subtle hints and answer accordingly.

Often, the subject's desire to please will affect the truth of their statements. The subject may not be able to remember details which are being asked for by the hypnotist. The subject will then hallucinate or imagine the missing details. This pseudomemory will be remembered as being accurate. This fantasizing of information that seems plausible is called confabulation. The subject does not mean to lie, but the mind creates additional facts to make the story more logical.

The danger of someone deliberately lying while under hypnosis is minimal. The larger problem is that someone may pretend to be hypnotized and lie to enhance his version of the story. Only

someone who has a working knowledge of hypnotic techniques could adequately fake the results. However, experiments in the area have shown that even the best in the field have difficulty distinguishing between those who are faking and those who are not. Feigned hypnosis presents the same problems as when a defendant commits perjury. The hypnotist can attempt to determine the veracity of the statements in the same manner that a jury would decide whether a witness was lying. Generally, the incentive for a witness to lie is much less than that of the actual defendant.

The last area of concern is the increased confidence that a subject has after hypnosis. The details that are confabulated are often assimilated by the mind and the subject believes that they are real memories. The amount of confidence that one has regarding the recalled materials is based on responsiveness to hypnosis rather than the accuracy of the information. This misplaced confidence creates a more credible witness, who is harder to cross-examine. The difficulty in testing the witness, when combined with the other concerns, provides the basis for the opposition to the use of hypnosis. However, the fact that hypnosis reveals relevant evidence can not be rebutted.

In *State v. Tuttle*, 780 P.2d 1203, 1208 (Utah 1989), *cert. denied* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990), the Utah Supreme Court stated:

Over the course of the last twenty years or so, courts across the nation have taken different approaches to this issue at different times. Initially, the courts displayed a tendency to admit such evidence, accepting it as "scientific" and reliable. * * * However, after a period of time this trend was reversed as the results of carefully controlled scientific studies accumulated. The later decisions tended to exclude such evidence and to permit witnesses to testify only to their prehypnotic recall. * * *

This trend toward inadmissibility has gathered considerable momentum and now represents the undisputed direction of the law in this area. * * * Only a few recent decisions permit the admission of hypnotically enhanced testimony, even on a case-by-case basis.

*See Recent Developments in Utah Law*, 1991 Utah L.Rev. 119 (1991). *See also Bruce*, 779 P.2d 646. Additionally, see *Romero*, 745 P.2d 1003; *Stokes v. State*, 548 So.2d 188 (Fla.1989); *Iwakiri*, 682 P.2d 571; *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898, *reh'g denied* 40 Ohio St.3d 707, 534 N.E.2d 850 (1988); and, in particular, the procedural perilousness in trial usage, *People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989). The Illinois courts have even more recently spoken in *Tardi v. Henry*, 212 Ill.App.3d 1027, 157 Ill.Dec. 1, 571 N.E.2d 1020 (1991).

It is apparent that a close division has previously existed within this court on the usage of hypnotically induced testimony. *Haselhuhn v. State*, 727 P.2d 280 (Wyo. 1986), *cert. denied* 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987), Brown and Urbigkit, JJ., dissenting; *Pote v. State*, 695 P.2d 617 (Wyo.1985); *Gee v. State*, 662 P.2d 103 (Wyo.1983); *Chapman v. State*, 638 P.2d 1280 (Wyo.1982).[32] Without re-

32. Centuries of conjecture, research, quackery, and experiment have resulted in little empirical certainty about the phenomenon of hypnosis. Defying definition, hypnosis has been endorsed as a therapeutic technique for three decades. To date, however, the scientific community has not encouraged the use of hypnosis as a truth-inducing device. Because this skepticism lies at the heart of the legal debate surrounding the admissibility of hypnotically refreshed testimony, some understanding of the current state of scientific knowledge about hypnosis is required.

Typically, hypnosis sessions begin with a period known as induction. The hypnotist initially establishes some rapport with the subject by discussing the purpose of the session and by making certain that the subject freely wishes to proceed. Through a variety of methods, the subject is then asked to focus intensely on the hypnotist, to relax, and to try to visualize what the hypnotist is saying.

Once hypnotized, the subject generally becomes increasingly willing to suspend his or her critical judgment. Apparently, this results in a response criterion shift, which is a willingness to report details about events that are usually rejected as too unsure to relay. Unfortunately, this lax response criterion often

gard for the meandering of our precedent, we have a high degree of hypothetical question here since prior opportunity was not provided counsel to accurately develop by examination and investigation what really did happen. I would strongly advise bench and bar that a *Denno* hearing in advance of trial should be provided permitting the trial court to assess any proper infection by the hypnotically induced testimony. Comment, *supra*, 15 S.Ill.U.L.J. 289. The trial court may find that the witness was actually not hypnotized. The trial court might also find that her identification testimony, whether or not hypnotized, was not inflicted by hypnotic suggestion if it did occur. In the absence of any confinement of a potential testimony related to or affected by hypnosis, we write in this decision by assumption, absolution or ignorance.

The three-fold problem explicitly presented by this hypnosis issue is: (1) hypnosis of the principal witness was attempted; (2) prosecution then intentionally withheld the hypnosis activity from the defense pretrial; and (3) no post-trial hearing was provided for Engberg to rationally determine what actually happened. We only know factual-

ly as the "beyond a question of doubt" standard that hypnosis, which was never voluntarily revealed by either police or prosecution, was attempted on Kay Otto, who was the principal witness for eyewitness identification shortly after the robbery. About two years after the trial was concluded, the possibility of pretrial hypnotism of witnesses was first anticipated by astute appellate counsel and then confirmed by a private investigator. The issue within the present indeterminate factual record, in addition to substantive issues of hypnotically circumscribed testimony as particularly relating to eyewitness identification testimony, raises the question of prosecutorial non-disclosure.

Review of the record reflects an inordinate factual question as this court is faced, like counsel for Engberg, with "guessing what happened." This is truly adjudicating from ignorance. See *Cutbirth*, 751 P.2d 1257, Urbigkit, J., dissenting and *Story v. State*, 755 P.2d 228 (Wyo.1988), Urbigkit, J., specially concurring. Cf. *Frias v. State*, 722 P.2d 135 (Wyo.1986). An evidentiary comparison can be made with the evidence of what did occur in *Calhoun v. State*, 297

---

results in an increase in inaccurate as well as accurate recollections.

Distinct from, yet congruent with, the lowered response criterion is the hypnotized subject's increased suggestibility resulting from the attention he or she focuses on the hypnotist. Having suspended his or her critical judgment, the subject may be anxious to please the questioner by responding favorably to both the explicit and implicit suggestions made by the hypnotist or anyone else present at the session. This may lead the subject to confabulate, or fill gaps in his or her memory with plausible, but not necessarily accurate, data. It may also result in pseudomemory, which is a perceived recollection where there is no memory at all.

Additionally, the subject's preconceptions about the ability of hypnosis to induce recollections and the nature of the hypnotist's questions enhance the possibility of inaccurate recall. A subject may unconsciously alter his or her responses during hypnosis in accordance with any expectations he or she has prior to the session. There is also evidence that hypnotized subjects make more errors in responding to leading questions than non-hypnotized subjects.

Compounding these accuracy problems is a change in confidence subjects often experi-

ence after hypnosis as a result of their perceived increased recollection. This phenomenon becomes particularly significant in the context of a trial. A witness who testifies with self-assurance, even if misplaced, and in great detail, though inaccurate, is considerably more credible to a jury than his or her less confident and less descriptive counterpart. A witness whose confidence has been artificially increased is also less vulnerable to cross-examination. Thus, the risk inherent in admitting hypnotically refreshed testimony in a trial is an outcome based on unreliable information. This risk forms the basis for the legal debate as to whether hypnotically refreshed testimony ought to be admitted in criminal trials.

Note, *Fifth, Sixth, and Fourteenth Amendments—A Constitutional Paradigm For Determining the Admissibility of Hypnotically Refreshed Testimony*, 78 J.Crim.L. & Criminology 853, 854–57 (1988) (footnotes omitted). See similarly, Goleman, *New Studies on the Hypnotic State: Is it Real or Feigned?*, New York Times News Service, Wyoming State Tribune (Cheyenne, WY), April 5, 1987. The conclusion of this writer perceives susceptibility and suggestion, but much of the scientific community questions suggestion and susceptibility to what?

Md. 563, 468 A.2d 45 (1983), *cert. denied sub nom Ticknell v. Maryland*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846, *reh'g denied* 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984) (videotape, audio tape, independent expert witness). In stark contrast to the evidentiary opportunity not afforded Engberg, this case is not comparable to *Bundy v. State*, 455 So.2d 330, 343 (Fla.1984), *cert. denied* 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986), where "the circumstances of the hypnosis and the procedure used were fully disclosed to the jury and the defense had every opportunity to attack the credibility of [the witness] based on the fact that she had been hypnotized." *See also Bundy v. Dugger*, 850 F.2d 1402 (11th Cir.1988), *cert. denied* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); and *Johnston*, 529 N.E.2d at 903 n. 4.

We arrive in post-conviction process with present appellate counsel only first involved in a denied petition for rehearing after the original incomprehensibly inept appellate effort predictably failed. The post-conviction appellate counsel examined the trial transcript and argued in briefing:

78. The prosecutor's questioning was intentionally leading. It was designed to keep the witness from explaining that she had been hypnotized or at the very least that the State had attempted to hypnotize her. The prosecutor did not want a repeat of *State v. Gee*, where the witness disclosed while testifying at trial that she had been hypnotized. Here, the prosecution had successfully kept the Petitioner and his attorneys from discovering the State's use of hypnosis before trial, and it wanted to make it through trial without letting the defense catch on that the State was uncomfortable with Ms. Otto's testimony.

79. The State's actions were prosecutorial misconduct; hypnosis is exculpatory evidence which must be disclosed.

\* \* \* \* \* \*

109. On December 31, 1984, Martin McClain was appointed to represent Petitioner for purposes of pursuing available post-conviction relief.

110. On February 25, 1985, four days before the date this Petition was due, Mr. McClain learned that hypnosis was in fact involved, at least with regard to Kay Otto.

111. This information was obtained as a result of investigative work done on Mr. McClain's behalf and not because of a decision by the prosecution to comply with Petitioner's *Brady* request, or Disciplinary Rule 7–103(B), or the Wyoming Supreme Court's ruling in *Gee v. State*, 662 P.2d 103 (Wyo.1983).

112. Petitioner has not attached evidence of those matters which appear of record or those documents the State already should have. At this point in time, affidavits regarding the hypnosis are not available. Moreover, the State has more knowledge regarding this issue than Petitioner does. For these reasons, Petitioner has not attached any supporting evidence, and does not understand that this failure constitutes a waiver.

That post-conviction-relief petition, as filed March 4, 1985, more than two years after the sentencing date of December 20, 1982, was preceded by a motion of Martin J. McClain of the Public Defender's office, filed January 31, 1985, regarding a special investigator which exposed the newly discovered and extremely interesting information of hypnotism.[33] In accord with this

33. COMES NOW, Roy Lee Engberg, by and through his court-appointed attorney, Martin J. McClain, and requests an order authorizing Mr. McClain or an investigator on his behalf to contact Kay Otto and other eye-witnesses to the Buttrey's robbery, as well as police investigators, in order to ascertain whether hypnosis was used to enhance the witnesses' memories. For his reasons, Mr. McClain states the following:

1. On December 31, 1984, the Wyoming Supreme Court appointed Mr. McClain as Mr.

Engberg's attorney for purposes of pursuing any available post-conviction relief, and ordered that the resources of the State Public Defender's Office be made available to assist in Mr. McClain's representation of Mr. Engberg.

2. In the course of examining the trial transcript, Mr. McClain was struck by questions and answers during Ms. Otto's redirect examination. Ms. Otto indicated that the discrepancy in her testimony regarding the

resulting investigation, Engberg asked for an evidentiary hearing, *which was never provided by the trial court.* With petition amendment on attached affidavit, Engberg presented the following information developed by a special investigator:

5. On February 26, 1985, at approximately 2:20 P.M., I contacted Bill Claxton in Casper, Wyoming.

6. Mr. Claxton stated that he had attempted to hypnotize Kay Otto some time after the December 22, 1981, robbery of Ms. Otto and another Wells Fargo agent outside of a Buttreys Food store in Casper, Wyoming; however, he was unsure of the date.

7. Mr. Claxton said that no tape recording was made of his attempt to hypnotize Ms. Otto.

8. Subsequently, I checked with the Casper Police Department and was informed that the Department had made a verbal report to County Attorney Burton Guetz and as a result no written documentation of the hypnosis session exists. No records were available to pinpoint the date on which the hypnosis attempt had occurred.

The State responded, without justifying earlier non-disclosure, by three affidavits—a conclusory hearsay affidavit of an investigating officer, a second by the hypnotist, and the other by Ms. Otto. Denied to defense was the critically important right to test validity of those affidavits as tendered to contradict actual hypnosis by Engberg's clarification in cross-examination embodying his right of confrontation. With the record devoid of factual denial that the hypnotic effort was deliberately withheld from defense counsel prior to trial or thereafter, it was a clear *Brady* violation. *Brady*, 373 U.S. 83, 83 S.Ct. 1194; *Ex Parte Dickerson*, 517 So.2d 628 (Ala. 1987). In answer by general denial to the post-conviction-relief petition, the response given by the State was at best only half true where hypnosis had been *at least* attempted and was withheld as exculpatory information before, during and after trial.

After some sparring on the subject of hypnosis at a trial court hearing on May 9, 1985, the issue was comprehensively addressed in oral argument *without the requested evidentiary hearing* at the post-conviction-relief petition hearing held in August, 1985. *See Griffin v. State*, 749 P.2d 246 (Wyo.1988), Urbigkit, J., dissenting. Engberg's counsel again presented the subject in a motion for post-conviction-relief hearing:

Issue XII deals with the refusal to permit Petitioner to call an expert on eyewitness identification. Now, the particular witness involved was Elizabeth Loftus. Now, I do not disagree with the State. The decision on whether or not an expert can testify is an evidentiary ruling, and under the rules of evidence it is

---

length of time she had viewed the robber's face was caused by the fact that since the preliminary hearing, she counted the seconds she viewed the face and determined her initial estimate was in error. * * *

3. Mr. McClain also noted the sudden change in Robert Latham's recollection of the robber's identity which occurred at trial. * * *

4. Based on these oddities, Mr. McClain talked with Mr. Engberg's trial counsel, Wyatt Skaggs and Linda Miller, in order to ascertain whether they had received any information indicating that prosecution had hypnotically enhanced the eye-witnesses' memories.

5. Both trial counsel indicated they were never provided any information so indicating. However, Ms. Miller did indicate that she recalled in other cases in 1982, the Casper Police had used hypnosis to enhance a witness's memory.

6. Mr. McClain then checked the Wyoming Supreme Court's decision on the topic of hypnosis and discovered the case of *Gee v. State*, 662 P.2d 103 (Wyo.1983). * * * During the cross-examination of one witness, the defense counsel discovered that the witness had been hypnotized to enhance her memory. The Supreme Court affirmed because materials had been furnished to defense counsel prior to trial with a notation that the witness had been hypnotized. However, the Court noted the failure to disclose would have been error under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. Because of the testimony given in the present case and because of the similarities between it and *Gee*, there exists a suspicion that hypnosis may have been used here.

within the trial court's discretion. I don't dispute that at all.

However, I—it's my concern that, where the trial court abuses its discretion and denies the Defendant his ability to call a witness, then the constitutional right under the Sixth Amendment, the right to defend, is implicated.

It's my contention that there was an abuse of discretion in this case and, first, just on the basis of what occurred at trial, I would rely on the cases cited in my brief from Arizona, California, and, I believe, the Third Circuit. More recently, in the last two years, those courts have ruled that eyewitness identification is a field that the jury needs help with and an expert on eyewitness identification can provide the jury the help that is necessary to consider all the possibilities and to view the evidence properly, and it's my contention that, on the basis of those cases, there was an abuse of discretion here.

However, it's more complicated than that because it's complicated by Issue VII, the hypnosis issue. We have a situation where the witness—and the particular one we were focusing on was Kay Otto. There was an attempt to hypnotize her. The State wanted to hypnotize her because they were concerned about her in the first place. That adds more reason why we needed the expert, to help unravel this, and then, added to that, is the witness' inability to be hypnotized and what effect—how did that—how might that have affected the trauma that she was experiencing, would it have heightened it, would it have made her more concerned about helping the police capture somebody, etc.

And because of Issue VII and because of the failure to disclose the hypnosis aspect of this case, that affects Issue XII, and Issue XII should be viewed with Issue VII in mind. In light of the new information that we have under Issue VII, if there wasn't an abuse of discretion on Issue XII before, there certainly is now, and as a result Petitioner was denied his right to call a witness, which is part of his right to defend, under *Faretta vs. California.*

The State, in response, stated:

Concerning hypnosis in this case, I still don't feel that the Petitioner has come anywhere near making a factual showing that would require this Court to conduct an evidentiary hearing on this question. We have four affidavits in that regard, the same affidavits we had the last time we had a hearing before this Court. The defense has not come forward—or the Petitioner has not come forward with anything in addition to that, and I think at this time the Court has enough before it to decide that issue on the merits.

As concerns the burden of proof on hypnosis, we have cited to the Court *U.S. vs. Bagley,* and we would also call to the attention of the Court *Hopkinson 4,* which talks about this kind of newly discovered evidence in a Post–Conviction context, and in *Hopkinson 4,* the Court said that newly discovered evidence should be treated the same as a motion for a new trial, and if we're talking about impeachment evidence, that's for the defense to show it would likely result in acquittal, and I think the burden that concerns this issue and whether it's harmful or prejudicial is set forth in cases like *Bagley* and *Hopkinson 4.*

Without any evidentiary hearing as to what exactly happened and why, the trial court's decision in form and exact phraseology as filed by the State provided:

At ¶ L Consolidated Petition as Amended Engberg asserts that the State's failure to disclose the use of hypnosis denied him a fair trial. At ¶ P he asserts that leading questions were used to cover up such hypnosis. Under ¶ W he repeats ¶ L but includes an invocation of due process.

*Findings of Fact:*

41. The State has provided the Court with three affidavits made on personal knowledge and under oath by Kay Otto, James Cooper and William E. "Bill" Claxton. The affidavits of Otto, Cooper and Claxton reveal that Kay Otto met with

Bill Claxton, a hypnotist, but was never hypnotized.

42. Kay Otto's testimony was not hypnotically enhanced.

43. Petitioner claims that Kay Otto's trial testimony varied from her preliminary hearing testimony due to hypnosis. Yet, Kay Otto met with Bill Claxton long before the preliminary hearing. The preliminary hearing was on March 18, 1982. Kay Otto met with Bill Claxton on or about December 22, 1981, more than three months earlier. If Claxton influenced her, that influence would appear in the preliminary hearing testimony. The purported variances between Kay Otto's testimony at the preliminary hearing and at trial were all de minimis, natural and believable, and adequately explored on cross-examination and recross.

44. Petitioner's claim that the prosecution's redirect of Kay Otto employed leading questions to cover up the subject of hypnosis, is unconvincing. The form of the questions as well as the answers, were unobjected to at trial.

*Conclusions of Law:*

Hypnotically enhanced testimony is not for that reason alone inadmissible in Wyoming. *Chapman v. State,* Wyo., 638 P.2d 1280 (1982); *Gee v. State,* Wyo., 662 P.2d 103 (1983). And the testimony of a witness who may have been hypnotized is clearly admissible when the testimony is not hypnotically enhanced. *Pote v. State,* Wyo., 695 P.2d 617, 627 (1985). It follows that a witness who has never been under hypnosis, as Kay Otto, is not precluded from testifying, simply for having met with a hypnotist.

Strictly speaking, the use of hypnosis is not exculpatory evidence. It may in fact be quite the contrary. *Gee v. State, supra,* at 104. Our court has made the matter one of compulsory disclosure for the prosecution outside of *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963). *Gee* was decided more than a year after Roy Engberg was tried. *Chapman, supra,* was decided a month after Engberg's trial. Neither case applies as Kay Otto was never hyp-

notized and did no more than meet with a hypnotist. See *Pote v. State, supra; Bundy v. State,* Fla., 455 So.2d 330 (1984), *cert. denied* [476] U.S. [1109], 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986) (*Bundy I*).

If we assume that even the extremely limited role played by a hypnotist in this case must, for whatever reason, be disclosed to the defense, [Petitioner] still can take no solace. For such an unprecedented ruling should be applied prospectively only. See *Lemieux v. Superior Court of Arizona,* Ariz., [132 Ariz. 214] 644 P.2d 1300 (1982) (a civil case); and *State ex rel. Collins v. Superior Court,* Ariz., [132 Ariz. 180] 644 P.2d 1266 (1982) (a criminal case); *Bundy v. State,* Fla., 471 So.2d 9 (1985) (*Bundy II*).

Furthermore, if the ruling were applied to this case, we are still dealing with testimony unaffected by hypnosis under *Pote v. State, supra,* and any error is harmless. See also *Bundy II, supra,* [471 So.2d] at 19.

If the meeting of Kay Otto with the hypnotist is to be considered *Brady* material in the sense that it was impeachment evidence, see *Giglio v. United States,* 405 U.S. 150, 31 L.Ed.2d 104, 92 S.Ct. 763 (1972), then this case is controlled by *United States v. Bagley,* [473] U.S. [667], 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

In effect, Engberg is presented with a further constitutional right denial as a mutation derived from *Haselhuhn,* 727 P.2d 280, where inadequate time was allowed for that defendant to get an expert on the subject of hypnotism following hypnotic effort by a pseudo expert. As different here, the facts of the hypnotic activity were undisclosed pretrial which then precluded all trial cross-examination on the subject. Had the hypnotic sequence been revealed and had Engberg's witness on eyewitness examination been allowed to testify, the result would have been most interesting. See the more enlightened criteria found in *Coe,* 684 P.2d 668; *Martin,* 684 P.2d 651; and *Laureano,* 682 P.2d 889, where independent verification is required. *See also Johnston,* 529 N.E.2d at 905.

In due process aspects, this case is directly contrary to the current decision of the Eighth Circuit Court of Appeals in *Little*, 835 F.2d at 1243, where the federal court defined that "[w]hen the state brings criminal charges against an indigent defendant, it must take steps to insure that the accused has a meaningful chance to present his defense." As a basis that an expert on hypnosis is required to consider the validity and effect of hypnotic adjusted testimony, it was stated:

> Though studies have shown that hypnosis leads to an increase in a subject's recollections, both true and imagined memories may result. * * * Thus, some experts have concluded that while hypnosis is useful in investigation and establishing leads, it is less useful as a truth-dead. * * *

> Three major characteristics of hypnosis can lead to inaccurate memories. The first is confabulation, the process by which the subject fills in gaps in her memory to make her recall more coherent. Sometimes the added information is accurate, other times it is purely imagined. The subject cannot distinguish between the true and imagined memories. The second problem is suggestibility. The subject wishes to please the hypnotist, so she answers questions the way the hypnotist wants, not necessarily correctly. Suggestion by the hypnotist can be wholly unintended; he or she may suggest a response through tone of voice, demeanor, or body language. The third problem is memory-hardening. Hypnosis gives the subject great confidence in the memories reviewed. Because she now believes in the accuracy of her memory, regardless of its actual truth, the witness will be difficult to shake under cross-examination.

*Id.* at 1244 (footnote omitted). See the requirement for admissibility in *Johnston*, 529 N.E.2d 898.

I cannot accede to the extremist and unjustified posture adopted by this court generally on hypnosis, *Haselhuhn*, 727 P.2d 280; *Gee*, 662 P.2d 103 and *Chapman*, 638 P.2d 1280, but certainly even if that premise is accepted, this case still cannot be justified in logic or precedence. For a more realistic approach, see *Rock v. State*, 288 Ark. 566, 708 S.W.2d 78, *cert. granted* 479 U.S. 947, 107 S.Ct. 430, 93 L.Ed.2d 381 (1986), which was reversed for testimony of the defendant in *Rock*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).[34] The discredited position adopted by Wyoming finds little present comparable support in other jurisdictions.

In contrast to this disarray of conflicting and discredited theories, the basic rule we adopted in *Shirley*—that hypnotically induced testimony is inadmissible per se—continues to draw new adherents. * * *

* * * [A]nd all follow the spirit if not the letter of our decision on the principal issue at hand: they agree that the consensus of the scientific community continues to oppose the use of hypnosis to restore the memory of potential witnesses on the ground that it is inherently unreliable and impairs the defendant's right of confrontation, and all therefore hold hypnotically induced testimony inadmissible in their respective jurisdictions.

*Guerra*, 690 P.2d at 662–63 (footnotes omitted).

In an extended and detailed analysis in Note, *Fifth, Sixth, and Fourteenth Amendments—A Constitutional Paradigm for Determining the Admissibility of Hypnotically Refreshed Testimony*, 78 J.Crim.L. & Criminology 853, 857 n. 36 (1988), the author concisely reflected that "[a] comprehensive survey of the extensive legal literature devoted to the use of hypnosis in the criminal justice system would be onerous and of little help." The article's expansive analysis of differing approaches includes comment that twenty-one states uniformly reject hypnotic usage.[35]

---

**34.** *See also Guerra*, 690 P.2d 635; Note, *supra*, 41 Ark.L.Rev. 425; and Note, *supra*, 21 J. Marshall L.Rev. 409. Extensive listings of compara-

ble cases can be found in *Rock*, as well as the principal case of *Shirley*, 641 P.2d 775.

**35.** An argument as interestingly converse was presented in *Rault v. Butler*, 826 F.2d 299 (5th

*See also Tuttle,* 780 P.2d at 1208 where the Utah Court found denied introduction in twenty-five states and one federal circuit.

Although recognizing non-disclosure and denied factual hearing, the majority attacks the contention of Engberg in two campaigns. First, the majority denies any right to a post-conviction evidentiary hearing since it is now disclosed that there was an attempt to hypnotize the witness. This deliberately withheld information is then absolved by the bland statement that there is no reasonable probability that the jury's verdict would have been different had the use of hypnosis with respect to Kay Otto been disclosed. Nowhere, except in the mind's eye of the opinion writer, is there any compelling evidence upon which this supposition can be factually advanced.

Secondly, by stating "[t]he failure to disclose the use of hypnosis deprived Engberg of the opportunity to effectively cross-examine an important eyewitness; the jury was not privy to the use of hypnosis in weighing the credibility of Kay Otto", the majority recognizes that the impeachment evidence, like other exculpatory evidence, is within the *Brady* rule and, to avoid violation, must be disclosed if material. Consequently then, as the majority states, the federal standard found in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) is that the failure of the prosecution to disclose evidence found to be material requires reversal of a conviction. To initiate the escape from the compelling syllogism after proclaiming the status of federal law, the majority deduces that "[w]e need not determine whether the request should have been understood to cover use of hypnosis to enhance the testimony of the witness. If the evidence of hypnosis was material under the federal definition, disclosure was required." Then, to complete the escape, the majority concludes:

> The reasoning which explains that there was no prejudicial error under our state rule also applies to the claim under *Brady* and *Bagley.* This conclusion is

consistent with several federal cases which have found that the product of overwhelming evidence is that any evidence relating to hypnosis is not material and that no error occurred under the federal standards. * * * This analysis under the federal standard resulting in a conclusion that non-disclosed evidence of hypnosis was not material further persuades us that the failure to disclose the hypnotic session, in accordance with *Gee,* 662 P.2d 103, was harmless.

The majority postulates an interesting rule of materiality of witness hypnosis if denial for defendant's usage for impeachment is characterized to be only harmless. In first analysis, before those federal citations are reviewed, it is necessary to know what the majority defines to be harmless: identification by the principal witness; possible hypnotic affect on identification by the principal witness; non-disclosure of the hypnosis which singularly affected opportunity for cross-examination or just the action of prosecution in deliberately failing to provide information which may have been both exculpatory in substance and useful in cross-examination. Perhaps it is more than one, maybe even *all* of them.

Cited by majority are four federal cases, none of which support this strange rule or define the substance of the asserted harmless concept. *United States v. Risken,* 788 F.2d 1361 (8th Cir.), *cert. denied* 479 U.S. 923, 107 S.Ct. 329, 93 L.E.2d 302 (1986), was a witness tampering case with a prosecutorial witness on an undisclosed "pay" basis for testifying. The issue was credibility, not substantive hypnosis. Although I question the present validity of that case in current analysis, it does not even in text offer anything about materiality of principal witness hypnosis whether independent of the strength or weakness of the prosecutorial evidence. In *United States v. Ingraldi,* 793 F.2d 408 (1st Cir.1986), again not a hypnotized witness case, a delayed prosecutorial revelation of the witness's informer status was held harmless since

---

Cir.), *cert. denied* 483 U.S. 1042, 108 S.Ct. 14, 97 L.Ed.2d 803 (1987), where the convicted killer claimed error (rejected on appeal) in denial of

his right to be hypnotized in open court and then to testify under that state as *demonstrative evidence.*

available at trial. That case is the direct opposite of this case where information for cross-examination here was not available. *Bowen v. Maynard,* 799 F.2d 593 (10th Cir.), *cert. denied* 479 U.S. 962, 107 S.Ct. 458, 93 L.E.2d 404 (1986) was again a prosecutorial withheld information situation, not hypnosis, which could have been used for impeachment and in result required habeas corpus reversal of the state court conviction. The *Trujillo v. Sullivan,* 815 F.2d 597 (10th Cir.), *cert. denied* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987) consideration involved cumulative nature of the victim's propensity to violence and does not assist here in these circumstances of undisclosed hypnosis.

We cannot escape so lightly as the majority attempts from a very basic and pervasive *Brady* issue in a case so comprehensively infected with hypnosis, eyewitness examination and a presently inadequate record. In *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, the court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment * * *." In *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), the thought is further extended: "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence may have affected the outcome of the trial." In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), actually differing from the exculpatory evidence considered in *Brady* and *Agurs,* impeaching information withheld by the prosecutor from defense counsel was considered.

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, *Cf. Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

We are now provided a claim of denied access necessary to prepare the defense. *Ritchie,* 107 S.Ct. 989. Lacking knowledge of the existence of hypnosis, cross-examination of the principal witness on the subject of identification was severely confined. Clearly, her identification, as the court acknowledged in first appeal, was the principal source of conviction. Another problem is created which reaches the *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) concept. Not only would cause for the expert witness on eyewitness identification have been improved, but the witness could then have evaluated the affect of hypnosis on the principal witness of identification. This right for defense to know that hypnosis was involved had been specifically recognized by this court in *Gee. See also Tuttle,* 780 P.2d at 1208. The non-disclosed hypnosis reaches confrontation and the assistance of an expert witness in order to properly defend which are constitutional guarantees provided to the accused. *Rock,* 107 S.Ct. 2704 also teaches the concept of the right to present evidence as included within the Sixth Amendment guarantees.

The *Brady–Agurs– Bagley* non-disclosure occurrence is not without other recent federal and state cases defining the totality of inappropriateness of the majority decision. Non-disclosed evidence relating to validity of identification required habeas corpus reversal of the state conviction in *McDowell v. Dixon,* 858 F.2d 945 (4th Cir.1988), *cert. denied* 489 U.S. 1033, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989). Reversal came in *Carter v. Rafferty,* 826 F.2d 1299 (3rd Cir. 1987), *cert. denied* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988) upon non-disclosed adverse lie detector tests administered to an important prosecutorial witness. The prosecutorial hiding of the criminal record of a principal witness also invoked reversal in *Moore v. Kemp,* 809 F.2d 702 (11th Cir.), *cert. denied* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987) where the court cited in addition to *Brady, Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. People of the State of Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

For recognition of the remand requirement to "establish the trial facts," see *Haber v. Wainwright*, 756 F.2d 1520 (11th Cir.1985). The right to a hearing to determine facts is similarly recognized in *Stano v. Dugger*, 901 F.2d 898 (11th Cir.1990). *Stano* alleged prosecutorial suppression of collusion involving his own attorney resulting in a confession. A *Brady* issue was found which required a remand for hearing. In *Coleman v. Saffle*, 912 F.2d 1217 (10th Cir.), *cert. denied* —— U.S. ——, 111 S.Ct. 22, 111 L.Ed.2d 834 (1990), the court held that withheld information must be considered in the context of the whole picture. Surely the whole picture in *Engberg* includes hypnosis in conjunction with the cross-examination questions of the principal identification witness and the fact that defendant was denied his expert witness on identification.

*Brady–Bagley* issues are not confined to the federal courts. *See Johnston*, 529 N.E.2d 898 which also was a hypnosis case and involved documentation about a different place where the actual homicide had occurred and a different participant as the killer for information withheld from the accused. The court's confidence in the trial's outcome had been undermined. Pretrial withheld information about misidentification by a principal witness would also require a new trial as a matter of state law. *State v. Van Den Berg*, 164 Ariz. 192, 791 P.2d 1075 (1990); *State v. Moriwaki*, 71 Haw. 347, 791 P.2d 392 (1990); *Galloway*, 275 N.W.2d 736; *Welch v. State*, 566 So.2d 680 (Miss.1990).

Although this case presents a federal constitutional violation in the withheld information required for adequate defense, there is also a state constitutional interest presented under Wyo. Const. art. 1, § 6, due process of law, and Wyo. Const. art. 1, § 10, right of accused to defend. The Court of Appeals of New York provides a better standard founded in morality and fairness for prosecutorial non-disclosure which essentially retains the *Agurs* rule without the decimation inflicted by later cases, including specifically *Bagley*. The New York standard is predicated upon both "elemental fairness" to the defendant and upon concern that the prosecutor's office discharges official and professional obligations. That test is reasonable possibility to be applied to define materiality. *People v. Vilardi*, 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (1990). The New York court declined to abandon the broad concept of *Brady–Agurs* in favor of the lesser protection of *Bagley* and stated:

> We agree * * * that a showing of a "reasonable possibility" that the failure to disclose the exculpatory report contributed to the verdict remains the appropriate standard to measure materiality, where the prosecutor was made aware by a specific discovery request that defendant considered the material important to the defense. * * *
>
> Further, a backward-looking, outcome-oriented standard of review that gives dispositive weight to the strength of the People's case clearly provides diminished incentive for the prosecutor, in first responding to discovery requests, thoroughly to review files for exculpatory material, or to err on the side of disclosure where exculpatory value is debatable. Where the defense itself has provided specific notice of its interest in particular material, heightened rather than lessened prosecutorial care is appropriate.

*Vilardi*, 556 N.Y.S.2d at 523, 555 N.E.2d at 920. *See also* Note, *Specific Requests and the Prosecutorial Duty to Disclose Evidence: The Impact of United States v. Bagley*, 1986 Duke L.J. 892 (1986).

Unfortunately, there is a basic inconsistency and incongruity which is stark and unclothed. The difference should be compared to *People v. Hayes*, 49 Cal.3d 1260, 265 Cal.Rptr. 132, 783 P.2d 719 (1989), where eyewitness hypnosis required conviction reversal. For an identical result in similar factual situations, see *Stokes*, 548 So.2d 188 and *People v. Lee*, 434 Mich. 59, 450 N.W.2d 883, *cert. denied* —— U.S. ——, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

Even the Wyoming cases as a historical minority view do not provide support for the present decision from *Chapman*, 638 P.2d at 1285, where the court had before it

a posture of "adequate means to determine that which transpired" and opportunity for attack on credibility to explore suggestive role playing and general enhancement unreliability as well as incompetency of the alleged hypnotist. *See* Justice Brown's dissenting opinion in *Chapman*, 638 P.2d 1280.[36] Then, in *Gee*, 662 P.2d at 104, the court said:

> Implicit in the *Chapman v. State, supra,* holding is the requirement that the defendant be advised by the State of the fact that a witness had been previously hypnotized and that all statements and proceedings relative thereto be made available to the defendant on request. This requirement goes beyond those concerning discoverable materials for purposes of impeachment * * *.

This court retreated into the asylum of ignorance in *Haselhuhn* by denying opportunity when hypnotic effort was established to reasonably or even seasonably obtain an expert witness to counterpoint the power plant maintenance employee doubling as a hypnotist. Now regression is total since any "protection" so willingly asserted in *Gee*, 662 P.2d 103 and *Chapman*, 638 P.2d 1280 is denied with the hypnotic effect having been hidden until after trial. At a minimum, a full evidentiary hearing in conjunction with eyewitness expert analysis is required for any semblance of due process. *The unrealistic and logically misplaced conception is presented that the testimony of the sister of the decedent, who was present at the occurrence, is not material in conviction.* The thesis—that in assuming deletion of her testimony there would be no reasonable probability that the jury's verdict would have been different—is beyond the wildest imagination; the court need only look at the detailed discussions in *Little*, 835 F.2d 1240; *Guerra*, 690 P.2d 635; *Shirley*, 641 P.2d 775; and *Johnston*, 529 N.E.2d 898. See particularly in current review, *Tardi*, 157 Ill.Dec. 1, 571 N.E.2d 1020.

*Rock,* 107 S.Ct. 2704 is pertinent as founded on defendant's constitutional right to testify in order to countervail the opportunity of prosecution to use tainted evidence. Whatever observation is made, it is otherwise obvious that Wyoming is missing the modern trend.[37]

What happens when the black letter of the law confronts the black art of hypnosis? At this point, the question remains unresolved. While hypnosis seemingly represents a method for the discovery of truth, its potential unreliability signals that it may nonetheless provide an inappropriate basis for a verdict against a criminal defendant. Until there is conclusive evidence establishing the accuracy of hypnosis as a method of refreshing recollection, the use of hypnosis in a criminal trial must be cautiously approached and seriously questioned.

\* \* \* \* \* \*

* * * Until the trustworthiness of forensic hypnosis is established, the law must exercise caution, lest the system of justice also falls prey to the mesmerizing powers of the unconscious mind.

Comment, *The Use of Hypnosis in Criminal Trials: The Black Letter of the Black Art*, 21 Loy.L.A.L.Rev. 635, 705–06 (1988).

*Rock* itself provides an excellent review, since although premised on defendant's constitutional right to testify, the opinion recognizes the doubts about hypnotically enhanced testimony and discerns at least some opportunity for amelioration.

> Responses of individuals to hypnosis vary greatly. The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections. Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and

---

**36.** *See also Pote,* 695 P.2d 617, as affirmation that conviction was premised on the record, reports and information, which constituted adequate means to determine what happened.

**37.** Note, *Evidence—Admitting Hypnotically Refreshed Testimony—State v. Haislip,* 35 U.Kan. L.Rev. 219 (1986); Note, *supra* n. 8, 21 J. Marshall L.Rev. 409.

may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult. * * *

The inaccuracies the process introduces can be reduced, although perhaps not eliminated, by the use of procedural safeguards. One set of suggested guidelines calls for hypnosis to be performed only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation. * * *

The more traditional means of assessing accuracy of testimony also remain applicable in the case of a previously hypnotized defendant. Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence. Cross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions. Indeed, it is probably to a defendant's advantage to establish carefully the extent of his memory prior to hypnosis, in order to minimize the decrease in credibility the procedure might introduce. *Rock*, 107 S.Ct. at 2713–14 (footnotes omitted). *See also Bundy*, 850 F.2d 1402.

The critique of Justice Frankfurter in *Helvering v. Hallock*, 309 U.S. 106, 117, 60 S.Ct. 444, 84 L.Ed. 604 (1940), aptly characterizes the majority decision in this case: "Such an essay in linguistic refinement would still further embarrass existing intricacies. It might demonstrate verbal ingenuity, but it could hardly strengthen the rational foundations of law." The majority's rationalizations in a result-oriented decision derives effect from premise to conclusion without the utilization of intervening logic, fact or reason. The purpose for a requested hearing would have been to determine what actually happened and why

those facts were hidden from defense by the law enforcement agency and prosecution. How much more sanctified and believable all of this could now be had a diligent trial type examination with cross-examination and factual review been afforded to Engberg for present appellate review. In conclusion, I find the majority opinion as written is, in reality, a result searching in vain for a plausible reason. *See People v. Guerrero*, 44 Cal.3d 343, 243 Cal.Rptr. 688, 748 P.2d 1150 (1988).

On this issue alone, reversal of the post-conviction-relief petition denial is required.

## H. *Additional Guilt Phase Issues Raised by Engberg*

Engberg additionally leaves this court in this proceeding with a colloquy of evidentiary-procedural issues, most of which were raised at trial, none previously considered on initial appeal and all of which are now disregarded by the majority. In each case, Engberg's presentation is attacked by the attorney general's office as a constitutional forfeiture by procedural default defense. In overall evaluation, the disconsonance is presented that by ignoring presentation, the law student brief writers, as supervised however they may have been, were wiser in ignoring the issues than the experienced trial attorney or the present appellate counsel. I will avoid adding further disconsonance to this phalanx of issues except where present comment should provide assistance for future cases. *Bedford v. State*, 317 Md. 659, 566 A.2d 111 (1989).

Issues include evidence of guilt of the Casper homicide derived from obstreperousness at the Nevada arrest, subsequent refusal in the Nevada hospital to be photographed in a cap following hospitalization and surgery while still under medication, denied cross-examination of the photographer about his observations of the subject's physical condition and the use of an alias pre-homicide while living in Casper. Although evidence of attempted escape may be considered as a factor to establish guilt, 1 Wharton's Criminal Evidence § 214 (13th ed. 1972), the contention of "escape" as that consciousness of guilt must relate

to the offense charged. *See Bedford,* 566 A.2d 111, where evidence of walking away in the courthouse was admissible, but the evidence of possession of a sharpened wire was inadmissible and reversible error on introduction which caused reversal of the death penalty conviction.

An issue of validity of extradition was presented in denied constitutional rights upon transfer from Nevada back to Casper for this trial. Further significant question is presented about warrantless search and seizure of the Casper apartment where the incriminating evidence of one unspent cartridge in a vest was discovered. Excluding extradition and legality of search and seizure, the category of arguments present questions of determined relevancy. What do they prove about consciousness of guilt and to what degree are they simply prejudicial background information relating to the character of the defendant? As presented on this record, much of the "information" seems to provide no evidence of probability that Engberg committed this robbery/murder in Casper. This record is unconvincing about connective proof even as a matter of discretion of the court to supply validity of probativeness which exceeds the prejudicial effect of disassociative bad character evidence, which in itself provides no evidence to verify guilt in fact.

The test whether evidence is admissible is whether the evidence tends to prove the offense charged and whether it is relevant, i.e., whether it tends to make the question of guilt more or less probable. Evidence may be rejected as irrelevant and of little probable value if it is only remotely probative or would cause possible prejudice. The trial court has broad discretion in ruling on materiality and relevancy issues and its ruling will only be reversed upon abuse of discretion. *Martin,* 720 P.2d 894; *Hursh Agency, Inc. v. Wigwam Homes, Inc.,* 664 P.2d 27 (Wyo.1983); *Barnard v. Wendling,* 627 P.2d 603 (Wyo.1981); *People v. Castro,* 190 Ill.App.3d 227, 137 Ill. Dec. 717, 546 N.E.2d 662 (1989). W.R.E. 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to

the determination of the action more probable or less probable than it would be without the evidence.

Evidence which may tend to affect the jury's decision may not necessarily be admissible as factually relevant. *Velos v. State,* 752 P.2d 411 (Wyo.1988); *Shields v. Carnahan,* 744 P.2d 1115 (Wyo.1987); *Schmunk v. State,* 714 P.2d 724 (Wyo. 1986).

The weighing process envisioned by W.R.E. 401 for the determination of relevancy by the trial court within the concept of prejudice delineated by W.R.E. 403 is vested in the trial court's sound discretion. The preclusive question is how, if at all, does the proffered evidence tend to prove guilt and what extraneous injustice does it create? The central core of this case is opportunity, eyewitness identification and unexplained sudden wealth and accommodative departure from the scene of the murder along the route where evidence of the crime was later discovered. To the extent the basic items of proof are to be furnished by what may be perhaps extraneous evidence, the trial court is called to discretionally weigh relevance as a factor of probability with prejudice as a function of conviction by extraneousness. Probative facts and not bad character attribution is the historical touchstone and standard of this nation's criminal justice system and the substitution should not now be made to serve principally to convict by reputation for the expansion of penitentiary populations. Due process should be the guardian and not the victim of our system of criminal justice.

Consequently, I would reverse for retrial of guilt as well as penalty.

## VI.

## DEATH PENALTY ISSUE

Although I concur completely with the analysis and conclusion of Justice Cardine in present decision to reverse the death penalty, I write further in belief that some different subjects require address and some conclusion amplification.

### A. *The Death Penalty in "Modern" America*

Defined within the cognitive umbrella of the United States Supreme Court in *Gregg* and *Furman*, it may not be the provence of the state appellate court to question the pragmatic wisdom of the death penalty in our so-called modern society. Greenberg, *Capital Punishment as a System*, 91 Yale L.J. 908 (1982). Furthermore, under the United States Constitution and for this case, that decision has previously been rendered by the Wyoming Supreme Court under the Wyoming Constitution in *Hopkinson v. State*, 664 P.2d 43 (Wyo.), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983) and *Engberg I*. The volume of critical literature is overwhelming [38] with converse justification for litigative action based upon public opinion as almost completely limited in modern democracy to this nation. Levit, *Expediting Death: Repressive Tolerance and Post–Conviction Due Process Jurisprudence in Capital Cases*, 59 UMKC L.Rev. 55 (1990). *Cf.* Bigel, *Wil-*

---

**38.** But the outcome [of Furman] has been no more successful than that of the prior system of capital punishment. This failure has not resulted from lack of effort but rather from the impossibility of fashioning an acceptable method of administering capital punishment while maintaining the system of rights that our Constitution mandates.
Greenberg, *supra*, 91 Yale L.J. at 928.
 No theoretical penological justification for the death penalty supports the capital punishment system as it is now administered. Whatever view one takes of the deterrent capacity of the death penalty when it is the swift and certain result of criminal activity, the current, roller coaster system—though absolutely necessary to protect the innocent from execution, to safeguard basic constitutional rights, and to avoid racially motivated executions—makes swift and certain executions impossible. A hypothetical killer who calculates his chances of being executed before committing homicide must calculate that he or she is quite unlikely to be put to death.
*Id.* at 927. *See also* Amnesty International, United States of America: The Death Penalty (1987).
 The pattern is so simple it is stunning. Every Western industrial nation has stopped executing criminals, except the United States. The unanimity is quite recent.
F. Zimring & G. Hawkins, Capital Punishment and The American Agenda, at 3 (1986). Amsterdam, *supra*, 14 Human Rights 14; Mello, *supra*, 37 Am.U.L.Rev. 513; Landis & Goodstein, *When Is Justice Fair? An Integrated Approach to the Outcome Versus Procedure Debate*, 1986 Am. B.Found.Res.J. 675 (1986); Goldstein, *Application of Res Judicata Principles to Successive Federal Habeas Corpus Petitions in Capital Cases: The Search for an Equitable Approach*, 21 U.C. Davis L.Rev. 45 (1987); Dix, *Appellate Review of the Decision to Impose Death*, 68 Geo.L.J. 97 (1979); Geimer, *Death At Any Cost: A Critique of the Supreme Court's Recent Retreat From Its Death Penalty Standards*, 12 Fla.St.U.L.Rev. 737 (1985); Note, *Statistics and the Death Penalty: A Break With Tradition*, 21 Creighton L.Rev. 265 (1987); Note, *Tison v. Arizona: Justice O'Connor Creates a New Standard of Culpability for Capi-* *tal Crimes,* 21 Creighton L.Rev. 359 (1987); Letwin, *Impeaching Defendants With Their Prior Convictions: Reconsidering the Dangerous Propensities of Character Evidence After People v. Castro,* 18 U.C. Davis L.Rev. 681 (1985); Bedau, *Thinking of the Death Penalty as a Cruel and Unusual Punishment,* 18 U.C. Davis L.Rev. 873 (1985); Paduano & Smith, *Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty,* 18 Colum.Hum.Rts.L.Rev. 211 (1987); Scheidegger, *Capital Punishment in 1987: The Puzzle Nears Completion,* 15 W.St.U.L.Rev. 95 (1987); Havlena, *Abolishing the Death Penalty—Why? How? When?,* 15 W.St.U.L.Rev. 127 (1987); Comment, *Factual Innocence ... Who Pays the Price?,* 15 W.St.U.L.Rev. 319 (1987); Carter, *Maintaining Systemic Integrity in Capital Cases: The Use of Court–Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death,* 55 Tenn.L.Rev. 95 (1987); Paternoster & Kazyaka, *The Administration of the Death Penalty in South Carolina: Experiences Over the First Few Years,* 39 S.C.L.Rev. 245 (1988); Brennan, *Constitutional Adjudication and the Death Penalty: A View From the Court,* 100 Harv.L.Rev. 313 (1986); Poulos, *The Supreme Court, Capital Punishment and the Substantive Criminal Law: The Rise and Fall of Mandatory Capital Punishment,* 28 Ariz.L.Rev. 143 (1986); Project, *Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1985–1986,* 75 Geo.L.J. 713 (1987); Burt, *Disorder in the Court: The Death Penalty and the Constitution,* 85 Mich.L.Rev. 1741 (1987); Note, *CONSTITUTIONAL LAW—Is the Current Test of the Constitutionality of Capital Punishment Proper? Hopkinson v. State, 632 P.2d 79 (Wyo.1981),* XVII Land & Water L.Rev. 681 (1982); Dolinko, *Foreword: How to Criticize the Death Penalty,* 77 J.Crim.L. & Criminology 546 (1986); Allen, *Supreme Court Review. Foreword—Evidence, Inference, Rules, and Judgment in Constitutional Adjudication: The Intriguing Case of Walton v. Arizona,* 81 J.Crim.L. & Criminology 727 (1991); Wright, *Life Without Parole: The View From Death Row,* 27 Crim.L.Bull. 334 (1991). *See also* Book Review, *Serial Murder: An Elusive Phenomenon,* 81 J.Crim.L. & Criminology 1102 (1991).

liam H. Rehnquist on Capital Punishment, XVII Ohio N.U.L.Rev. 729 (1991).

Given the system and the apparent societal circumference articulated in controlling cases of the United States Supreme Court for federal law, it remains incumbent upon the state tribunal to honor the prerequisites of the state constitution. In attempting to define a fair, evenhanded and reasonably applied death penalty, see *Hopkinson*, 664 P.2d 43 and *Engberg I*, 686 P.2d 541, Rose, J., dissenting. My conviction against the entire process, issue analysis and decision in this case is examined as a result lacking either fairness, equal protection or any rational justification in simple criminal law for what occurred in this, the Engberg case.[39] The indeterminate future, definable once in accurate anticipation of total confusion by a law journal writer, is discernable in analysis by Professor Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard*, 64 N.C.L.Rev. 941 (1986). *See Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), but then consider *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). What really exists is best recognized by Bright, *Death by Lot-tery—Procedural Bar of Constitutional Claims in Capital Cases Due to Inadequate Representation of Indigent Defendants*, 92 W.Va.L.Rev. 679, 695 (1990), where the author concludes, following advocacy of continued federal review, that "[o]therwise, the death penalty will too often be punishment not for committing the worst crime, but for being assigned the worst lawyer." *See Death Penalty Litigation in the '90's-A Forum* (ABA 1990); I. Robbins, *Toward a More Just and Effective System of Review in State Death Penalty Cases* (ABA 1990); and Fogel, *A Fair Death: Arbitrariness, the Supreme Court and Capital Punishment, 1972–1989*, 16 New Eng.J.Crim. & Civ. Confinement 1 (1990). *Cf.* Arkin, *The Prisoner's Dilemma: Life in the Lower Federal Courts After Teague v. Lane*, 69 N.C.L.Rev. 371 (1991). *See also Project, The Death Penalty: Personal Perspectives*, 22 Loy.U.Chi. L.J. 1, 1 (1990), initially quoting Plato's *Apology of Socrates:* "But now it is time to go away, I to die and you to live. Which of us goes to a better thing is unclear to everyone except to the god." For additional analysis, see Ledewitz, *The Morality of Capital Punishment: An Exchange*, 29 Duq.L.Rev. 719 (1991) compared with Com-

---

**39.** For illustration of complexity, complication and frequent reversals, see *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *Franklin*, 487 U.S. 164, 108 S.Ct. 2320; *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Satterwhite*, 486 U.S. 249, 108 S.Ct. 1792; *Yates v. Aiken*, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988); and *Ross v. Oklahoma*, 484 U.S. 1054, 108 S.Ct. 1004, 98 L.Ed.2d 971 (1988). *See also Stout v. Oklahoma*, 486 U.S. 1050, 108 S.Ct. 2814, 100 L.Ed.2d 916 (1988), *remanded in light of Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Hayes v. Oklahoma*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988), case below, *Hayes v. State*, 738 P.2d 533 (Okl.Cr.1987), *remanded in light of Maynard*, 108 S.Ct. 1853; *Jones v. Maryland*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, (1988), case below, *Jones v. State*, 310 Md. 569, 530 A.2d 743 (1987), remanded in light of *Mills*, 108 S.Ct. 1860; *Woratzeck v. Ricketts*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988), cases below, *Woratzeck v. Ricketts*, 808 F.2d 1322 (9th Cir. 1986) and *Woratzeck v. Ricketts*, 820 F.2d 1450 (9th Cir.1987), remanded in light of *Maynard*, 108 S.Ct. 1853; *Lankford v. Idaho*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988), case below, *State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987), remanded in light of *Satterwhite*, 108 S.Ct. 1792; *Bennett v. Texas*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988), case below, *Bennett v. State*, 742 S.W.2d 664 (Tex.Cr.App.1987), remanded in light of *Satterwhite*, 108 S.Ct. 1792; *Jones v. Mississippi*, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988), cases below, *Jones v. State*, 461 So.2d 686 (Miss.1984) and *Jones v. State*, 517 So.2d 1295 (Miss.1987), vacated and remanded to the Supreme Court of Mississippi in light of *Thompson*, 108 S.Ct. 2687 and *Maynard*, 108 S.Ct. 1853; *Powell v. Texas*, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 926 (1988), *aff'd on remand* 767 S.W.2d 759 (Tex.Cr.App.), *rev'd* 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989), case below, *Powell v. State*, 742 S.W.2d 353 (Tex.Cr. App.1987), remanded in light of *Satterwhite*, 108 S.Ct. 1792; *Lloyd v. North Carolina*, 488 U.S. 807, 109 S.Ct. 38, 102 L.Ed.2d 18 (1988), case below, *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988), remanded in light of *Mills*, 108 S.Ct. 1860; and *Cook v. Texas*, 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988), case below, *Cook v. State*, 741 S.W.2d 928 (Tex.Cr.App.1987), remanded in light of *Satterwhite*, 108 S.Ct. 1792.

ment, *Barbarism in the Plastic Bubble: An Application of Existentialist Theory to Capital Punishment in the United States*, 1990 Det.C.L.Rev. 1011 (1990).

### B. Felony Murder as a Predicate for Capital Punishment

In the American justice system, constituting a disparate capital criminal adaptation, there are two paths to the death penalty. The first is the typical intent-driven premeditated killing. Note, *Should Courts Use Principles of Justification and Excuse to Impose Felony–Murder Liability?*, 19 Rutgers L.J. 451 (1988). The second is the dysfunctional category of felony murder where the malice or intent to kill is unnecessary to reach the death penalty plateau. *People v. Hamilton*, 46 Cal.3d 123, 249 Cal.Rptr. 320, 756 P.2d 1348 (1988), *cert. denied* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989); *King v. Com.*, 6 Va.App. 351, 368 S.E.2d 704 (1988). In the trial of Engberg, the prosecution started down both paths and then stepped back before jury submission to have the trial court instruct only on felony murder so that intent to kill was never considered by

the jury. *Cf. Price v. State*, 807 P.2d 909 (Wyo.1991). The dysfunction develops in result, since in most intentional death penalty cases, the factual events include both the intent and a corollary and separate non-homicide felony, while "pure" felony murder reaches a death penalty with only the felony and not the intent. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C.L.Rev. 1103 (1990).

Actually, in the vast majority of reported death penalty cases whether characterized as felony murder or intentional, the homicide was factually established as intentional. *Cf. Com. ex rel. Smith v. Myers*, 438 Pa. 218, 261 A.2d 550 (1970). An *Engberg* type felony murder when intent to kill is not established comes within a minority of the thousands of reported death penalty cases, but within a vast array of potential candidates if this kind of felony murder is to be indefinitely extended to its full potential. Death penalty vulnerability if every felony homicide creates the death-prone status could, nationwide, annually number, if including driving violations, *in excess of forty thousand per year.*[40] Non-vehicular

---

**40.** The relationship of the death penalty to felony murder was analyzed by the United States Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 789–92, 102 S.Ct. 3368, 3372–74, 73 L.Ed.2d 1140 (1982) (emphasis in original and footnotes omitted) and statistically considered:

Thirty-six state and federal jurisdictions presently authorize the death penalty. Of these, only eight jurisdictions authorize imposition of the death penalty solely for participation in a robbery in which another robber takes life. [As footnoted: California, Florida, Georgia, Mississippi, Nevada, South Carolina, Tennessee, and Wyoming] Of the remaining 28 jurisdictions, in 4 felony murder is not a capital crime. Eleven States require some culpable mental state with respect to the homicide as a prerequisite to conviction of a crime for which the death penalty is authorized. Of these 11 States, 8 make knowing, intentional, purposeful, or premeditated killing an element of capital murder. Three other States require proof of a culpable mental state short of intent, such as recklessness or extreme indifference to human life, before the death penalty may be imposed. In these 11 States, therefore, the actors in a felony murder are not subject to the death penalty without proof of their mental state, proof which was not required with respect to Enmund either under the trial court's instructions or

under the law announced by the Florida Supreme Court.

Four additional jurisdictions do not permit a defendant such as Enmund to be put to death. Of these, one State flatly prohibits capital punishment in cases where the defendant did not actually commit murder. Two jurisdictions preclude the death penalty in cases such as this one where the defendant "was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." [Quoting from Colo.Rev.Stat. § 16–11–103(5)(d) (1978) and 49 U.S.C. § 1473(c)(6)(D)] One other State limits the death penalty in felony murders to narrow circumstances not involved here.

Nine of the remaining States deal with the imposition of the death penalty for a vicarious felony murder in their capital sentencing statutes. In each of these States, a defendant may not be executed *solely* for participating in a felony in which a person was killed if the defendant did not actually cause the victim's death. For a defendant to be executed in these States, typically the statutory aggravating circumstances which are present must outweigh mitigating factors. To be sure, a vicarious felony murderer may be sentenced

homicides now number around twenty-three thousand per year. Casper Star–Tribune (Casper, WY), March 25, 1991. To provide the death penalty for this number annually would require about three and one-half executions every hour, day and night somewhere in this country. It could become the greatest growth industry in the country and particularly since the federal government wants to join in the killing campaign. *See* Finkel, *Capital Felony–Murder, Objective Indicia, and Community Sentiment,* 32 Ariz.L.Rev. 819 (1990). *See also* Comment, *The Cost of Killing Criminals,* 18 N.Ky.L.Rev. 61 (1990).

Realistically, only a small percentage of killings are not attended by some associative felony, whether involving financial gain or behavioral satisfaction. Excluding the vicarious thrill killer, perhaps the ego killers involving husband-wife-boyfriend, etc. stand as the only general exceptions to the included felony predominance in crime. Yet, in either of these exceptional circumstances, another felony offense may occur as often even a lesser included incident, such as breaking-and-entering, assault, fire arms violation, and so forth. The burden

of this analysis is to perceive that the felony murder death case as here presented is an incongruity in most cases, since only pursued to eliminate a prosecutorial burden of proving malice and intent by substitution of the conclusive presumption for the death penalty exposure from associative conduct. It is also apparent that the legislature recognized this problem by almost completely changing statutory provisions for imposition of the death penalty by passage of Wyo.Sess.Laws ch. 171 (1989).[41]

In application of the Wyoming Constitution and analysis of the realistic posture of the thousands of present death cases since *Furman,* I would deny death penalty exposure, unless in felony murder the killing was found by the jury to be intentional or at least achieve *Tison* compliance if the actor was not an accessory or co-actor. *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127, *reh'g denied* 482 U.S. 921, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987). In the present case, when the prosecution chose not to proceed to the jury with intent to kill, the State should have waived death penalty exposure for Engberg.[42] *See* Rosen, *supra,* 31 B.C.L.Rev. at 1169.

to death in these jurisdictions absent an intent to kill if sufficient aggravating circumstances are present. However, six of these nine States make it a statutory *mitigating* circumstance that the defendant was an accomplice in a capital felony committed by another person and his participation was relatively minor. By making minimal participation in a capital felony committed by another person a mitigating circumstance, these sentencing statutes reduce the likelihood that a person will be executed for vicarious felony murder. The remaining three jurisdictions exclude felony murder from their lists of aggravating circumstances that will support a death sentence. In each of these nine States, a nontriggerman guilty of felony murder cannot be sentenced to death for the felony murder absent aggravating circumstances above and beyond the felony murder itself.

Thus only a small minority of jurisdictions—eight—allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed. Even if the nine States are included where such a defendant could be executed for an unintended felony murder if sufficient aggravating circumstances are present to outweigh mitigating circumstances—which often include the defendant's minimal participation in the mur-

der—only about a third of American jurisdictions would ever permit a defendant who somehow participated in a robbery where a murder occurred to be sentenced to die. Moreover, of the eight States which have enacted new death penalty statutes since 1978, none authorize capital punishment in such circumstances.

**41.** The differentiated list in current Wyoming law provides other problems of a rationally confined number of death penalty prone homicides. In present Wyoming statute, W.S. 6–2–102, in considering the twelve item categories of aggravating circumstances, the only homicides not statutorily subject to death penalty would involve as a class "sane" victims older than seventeen and younger than sixty-five exclusive of police officers.

**42.** *Enmund,* 458 U.S. 782, 102 S.Ct. 3368; *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Note, *Felony Murder: Driving Away From the Death Penalty,* 12 Stetson L.Rev. 479 (1983); Comment, *Constitutional Law: The Eighth Amendment Requires a Determination of Actual Personal Intent for the Death Penalty to be Imposed on Non–Triggermen Felony Murders,* 35 U.Fla.L.Rev. 521 (1983); Note, *Redefining a Culpable Mental State for Non–Triggermen Facing the Death Penalty,* 33 Vill.L.Rev. 367 (1988).

The subject of felony murder as an American legal system phenomenon is not without criticism, analysis and comment. *See* 1 Model Penal Code & Commentaries, § 210.2 at 29 (1980), providing that felony homicide should only constitute death penalty murder if committed purposely, knowingly or recklessly under circumstances manifesting indifference to the value of human life; and Note, *A Reasoned Moral Response: Rethinking Texas's Capital Sentencing After Penry v. Lynaugh,* 69 Tex.L.Rev. 407 (1990). The further question, as earlier discussed by the majority death penalty opinion in conjunction with the doubling up factor, *State v. Davis,* 325 N.C. 607, 386 S.E.2d 418 (1989), *cert. denied* — U.S. ——, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990), is that the constituent felony by-passes intent to achieve felony murder and then proceeds automatically, as applied by single or dual aggravating factors, to the death penalty determination.

Thus, society can achieve a death penalty for an offense which otherwise may not have been more than a voluntary or involuntary homicide in committing a major felony. *Cf. DeShields v. State,* 534 A.2d 630 (Del.Super.1987), *cert. denied* 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 217 (1988), found by the appellate court to be an execution-type slaying of a helpless victim in cold blood. Consider also the predecessor cases of *Deputy v. State,* 500 A.2d 581 (Del.Super.1985), *cert. denied* 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987), where seventy-nine separate stab wounds in one victim and sixty-six in another were incompatible with accidental occurrence or unintended death as invoking a culpable mental state; *Whalen v. State,* 492 A.2d 552 (Del.Super.1985); *Flamer v. State,* 490 A.2d 104 (Del.Super.), *cert. denied* 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), *cert. denied* 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985); and *People v. King,* 109 Ill.2d 514, 94 Ill.Dec. 702, 488 N.E.2d 949, *cert. denied* 479 U.S. 872, 107 S.Ct. 249, 93 L.Ed.2d 173, *reh'g denied* 479 U.S. 956, 107 S.Ct. 449, 93 L.Ed.2d 396 (1986), where felony murderer acted intentionally or knowingly in killing. *See* 1 Model Penal Code & Commentaries, *supra,* § 210.6.

The basic thrust is demonstrated by Zimring & Hawkins, *Murder, The Model Code, and the Multiple Agendas of Reform,* 19 Rutgers L.J. 773, 783 (1988), where the authors believe that the model code mens rea doctrine is "the very feature that makes the felony-murder rule attractive to prosecutors * * *." Elimination of the requirement to prove intent improves and simplifies homicide proof for murder status. *Cf. People v. Land,* 169 Ill.App.3d 342, 119 Ill.Dec. 955, 523 N.E.2d 711 (1988) (intent in the underlying felony); and *Jones v. State,* 523 N.E.2d 750 (Ind.1988).

The felony murder rule, as in part embraced in the preclusive death penalty case law and discussion, has separately engendered substantial critique in law journals. As we find in Roth & Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads,* 70 Cornell L.Rev. 446, 446–48 (1985) (footnotes omitted and quoting 3 J. Stephen, A History of the Criminal Law of England 57, 65 (1883); *State v. Harrison,* 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977); Packer, *Criminal Code Revision,* 23 U. Toronto L.J. 1, 4 (1973); *People v. Aaron,* 409 Mich. 672, 689, 299 N.W.2d 304, 307 (1980); and Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law,* 88 Yale L.J. 1325, 1383 (1979)):

> Few legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule. Criticism of the rule constitutes a lexicon of everything that scholars and jurists can find wrong with a legal doctrine: it has been described as "astonishing" and "monstrous," an unsupportable "legal fiction," "an unsightly wart on the skin of the criminal law," and as an "anachronistic remnant" that has " 'no logical or practical basis for existence in modern law.' " Perhaps the most that can be said for the rule is that it provides commentators with an extreme example that makes it easy to illustrate the injustice of various legal propositions.

Despite the widespread criticism, the felony-murder rule persists in the vast majority of states. * * * The United

States thus remains virtually the only western country still recognizing a rule which makes it possible "that the most serious sanctions known to law might be imposed for accidental homicide."

That article examines two constitutional concepts as challenging the Eighth Amendment and Due Process: a presumptive device in criminal conviction (*Sandstrom* ), or a form of criminal strict liability (*Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854, *aff'd* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), *cert. denied* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979)), and in summary, states:

> The felony-murder rule arose from obscure historical origins and has developed haphazardly into a harsh and unjust legal doctrine. It is perhaps fitting, therefore, that two separate lines of constitutional doctrines, developing independently, have come together in such a way that it is impossible to conceptualize felony murder in a manner that does not run afoul of constitutional guarantees. Courts and commentators have exten-

sively documented the rule's weak policy justifications. This Article has demonstrated that the rule's infirmities have finally reached constitutional stature.

Roth & Sundby, *supra,* 70 Cornell L. Rev. at 492.[43]

The confusion of philosophy engendered by the relatively few death cases of the nature of Engberg where the felony engineers the felony murder and then aggravates the offense to a capital status, provides the question whether the homicide was intentional, inopportune or accidental. The type normally reflected as intended homicide is evidenced by numerous cases.[44] The same persuasion was once adopted by the California Supreme Court in *Carlos v. Superior Court of Los Angeles County,* 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1983), but with jurist changes following an election campaign in 1986, was reversed in *People v. Anderson,* 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987). As adopted for that state, intent to kill is not a necessary element of the felony murder special circumstance which only differentiates prosecutorial requirements from factual components.[45]

**43.** Articles which detail a large number of earlier writings include: Comment, *Washington's Second Degree Felony–Murder Rule and the Merger Doctrine: Time for Reconsideration,* 11 U.Puget Sound L.Rev. 311 (1988); Note, *Reckless Indifference as Intent to Kill: The Disproportionality of Punishment After Tison v. Arizona,* 20 Conn.L.Rev. 723 (1988); Note, *supra,* 19 Rutgers L.J. 451; Note, *Tison v. Arizona: A New Standard of Culpability for Accomplice Felony–Murder,* 39 Mercer L.Rev. 717 (1988); Note, *Overstepping Precedent? Tison v. Arizona Imposes the Death Penalty on Felony Murder Accomplices,* 66 N.C.L.Rev. 817 (1988); and Note, *The Constitutionality of Imposing Death on a Felony–Murder Accomplice,* 12 Nova L.J. 1299 (1988).

**44.** For example, see *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57, *cert. denied* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); *Gregg v. State,* 233 Ga. 117, 210 S.E.2d 659 (1974), *cert. granted* 423 U.S. 1082, 96 S.Ct. 1090, 47 L.Ed.2d 93, *aff'd* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *King,* 488 N.E.2d 949 (intent, knowledge, or strong probability of death); *Galloway,* 275 N.W.2d 736 (malice required for murder); *State v. Bates,* 495 So.2d 1262 (La.1986), *cert. denied* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d

826, *reh'g denied* 483 U.S. 1041, 108 S.Ct. 11, 97 L.Ed.2d 800 (1987); *State v. Anderson,* 409 A.2d 1290 (Me.1979); *State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706 (1986), *cert. denied* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); and *Com. v. Spallone,* 267 Pa.Super. 486, 406 A.2d 1146 (1979).

**45.** The realism of result is recognized in felony murder death cases in Note, *Disparity in Death Sentencing for Felony Murderers Created by Cabana v. Bullock,* 37 De Paul L.Rev. 289, 313–16 (1988), where the author, Mary von Mandel, accurately perceived:

> The *Bullock* decision is problematic in two ways. First, it allows sentencing procedures which do not afford felony murderers the same protection as deliberate murderers. Second, it weakens the traditional role of the jury in sentencing procedures.
>
> \* \* \* \* \* \*
>
> [The case result] combines fact finding with appellate review in the same proceeding for felony murderers. This creates a distinction between felony murderers and deliberate murderers. A deliberate murderer is assured complete consideration of aggravating and mitigating circumstances while a felony murderer is not.

The principal result of the intent rejection answer of *Tison* is that the available death penalty class is so numerically expanded that in result, it may lead to the total collapse of the Eighth Amendment limitation standard. Note, *Reckless Indifference as Intent to Kill: The Disproportionality of Punishment After Tison v. Arizona*, 20 Conn.L.Rev. 723 (1988). It is rationally anticipated that neither American society nor the judicial system at its worst can accommodate more than a limited number of death penalty executions and certainly not the number that will result from the intrusion of the non-intent felony murder upon the Eighth Amendment and Wyo. Const. art. 1, §§ 14 and 15.

Significantly increasing the class of death penalty exposed miscreants will serve either or both to accelerate total abolition or limitation to offenses that are intent-defined to be death penalty justified. Perhaps the content of deleted intent for death penalty can be extracted from Lipkin, *The Moral Good Theory of Punishment*, 40 U.Fla.L.Rev. 17 (1988). Harm happened, so punishment should be self-imposed by voluntary formulation. This could achieve a procedure so that if death is caused, another should die to balance the scales, and whether for retribution, deterrence, or rehabilitation, we need not inquire. If to be applied to motor vehicle usage, the standard could both serve to limit population increase and provide a new growth category of industry—executions.

For Engberg, I specially concur for reversal with a conclusion that felony constituents should not be recognized for aggravation circumstances in death penalty infliction unless intent to kill is proven. Engberg's prosecution failed to meet this standard. Specific and compelling authority is provided by the most recent case of *State v. Ortega*, —— N.M. ——, 817 P.2d 1196 (N.M.1991). Its decisive reasoning should now be adopted for Wyoming.

### C. *Present Wyoming Statute*

By the 1989 Wyoming legislature's comprehensive change of the Wyoming death penalty provisions, the weighing and burden of proof issues which are pervasive in this appeal no longer occur under the replacement provisions. A difficult instruction problem for capital penalty that existed in the old statute has been removed by the new text. Upon retrial, if Engberg is again prosecuted for capital murder, assessment of death penalty will be under the current statutes instead of the prior provisions which supplied the significant question of erroneous instructions addressed in the present appeal.

There are two particularly relevant Wyoming death penalty statutes. W.S. 6–2–101 states: [46]

(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping, ~~or by administering poison or causing the same to be done,~~ kills any human being is guilty of murder in the first degree.

(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law, *except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of sixteen (16) years.*

W.S. 6–2–101 (1991 Cum.Supp.) (1989 statute). W.S. 6–2–102 states:

(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph *(iii)* of this subsection:

(i) After hearing all the evidence, the jury shall deliberate and render a ~~recommendation of~~ sentence ~~to the judge,~~ based upon the following:

(A) Whether one (1) or more ~~sufficient~~ aggravating circumstances exist

---

**46.** The bold italicized portion of the text in the current statute signifies the additions made in the 1989 legislative session. The stricken portion indicates text that was deleted.

*beyond a reasonable doubt* as set forth in subsection (h) of this section;

(B) Whether, *by a preponderance of the evidence,* ~~sufficient~~ mitigating circumstances exist as set forth in subsection (j) of this section ~~which outweigh the aggravating circumstances found to exist~~; and

*(C) The mere number of aggravating or mitigating circumstances found shall have no independent significance.*

~~(C)~~ *(ii)* Based upon ~~these~~ *the* considerations *in paragraph (i) of this subsection, the jury shall unanimously determine* whether the defendant should be sentenced to death or life imprisonment. *The jury shall consider aggravating and mitigating circumstances unanimously found to exist, and each individual juror may also consider any mitigating circumstances found by that juror to exist.*

[See, however, *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).]

~~(ii)~~ *(iii)* In nonjury cases, the judge shall determine if any aggravating or mitigating circumstances exist and impose sentence within the limits prescribed by law, based upon the considerations enumerated in subparagraphs (A), (B) and (C) of paragraph (i) of this subsection.

(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. *In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.* The jury, if its verdict is a ~~recommendation~~ *sentence* of death, shall designate in writing signed by the foreman of the jury:

*(i)* The aggravating circumstance or circumstances which it *unanimously* found beyond a reasonable doubt. ~~In nonjury cases the judge shall make such designation. If the jury cannot,~~

~~within a reasonable time, agree on to punishment to be imposed, the judge shall impose a life sentence.~~;

*(ii) The mitigating circumstance or circumstances which it unanimously found by a preponderance of the evidence; and*

*(iii) The mitigating circumstance or circumstances which any individual juror found by a preponderance of the evidence.*

\*　　\*　　\*　　\*　　\*　　\*

(h) Aggravating circumstances are limited to the following:

(i) The murder was committed by a person ~~under sentence of imprisonment~~:

*(A) Confined in a jail or correctional facility;*

*(B) On parole or on probation for a felony;*

*(C) After escaping detention or incarceration; or*

*(D) Released on bail pending appeal of his conviction.*

\*　　\*　　\*　　\*　　\*　　\*

(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any ~~robbery, sexual assault, arson, burglary, kidnapping or~~ aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(vi) The murder was committed for *compensation, the collection of insurance benefits or other similar* pecuniary gain;

(vii) The murder was especially ~~heinous,~~ atrocious or cruel, *being unnecessarily torturous to the victim*;

(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney, ~~or for~~

mer county and prosecuting attorney, *defending attorney, peace officer, juror or witness, during or because of the exercise of his official duty;*

*(ix) The defendant knew or reasonably should have known the victim was less than seventeen (17) years of age or older than sixty-five (65) years of age;*

*(x) The defendant knew or reasonably should have known the victim was especially vulnerable due to significant mental or physical disability;*

*(xi) The defendant poses a substantial and continuing threat of future dangerousness or is likely to commit continued acts of criminal violence;*

*(xii) The defendant killed another human being purposely and with premeditated malice and while engaged in, or as an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary or kidnapping.*

(j) Mitigating circumstances shall include the following:

\* \* \* \* \* \*

(vii) The age of the defendant at the time of the crime;

*(viii) Any other fact or circumstance of the defendant's character or prior record or matter surrounding his offense which serves to mitigate his culpability.*

W.S. 6–2–102 (1991 Cum.Supp.) (1989 statute).

In the current Wyoming Criminal Code which was enacted in 1982 and 1983, a continuity provision was inserted to retain effectiveness of prior law for the determination of the existence of a criminal offense and to separately establish penalty assessment if less onerous in the new law. The saving clause, having first retained prior statutes to govern prosecutions for crimes occurring prior to the effective date of the act, then provided for penalty: "In a case pending on or after the effective date of this act, involving a crime committed prior to the effective date, if the penalty under this act for the crime is different from the penalty under prior law, the court shall impose the lesser sentence." W.S. 6–1–101(b) and (c). This application of the new code, if the changed penalty was favorable to the convicted person, was confirmed in *Attletweedt v. State,* 684 P.2d 812 (Wyo.1984).

Legislative enactment of Wyo.Sess.Laws ch. 171 (1989) relating to assessment of the death penalty following conviction of murder in the first degree now provides a more modern death penalty procedure. The new statute, in generally amending and re-enacting, included no reference to offenses committed prior to passage or for guilt determination thereafter except in Section 3: "This act is effective immediately upon completion of all acts necessary for a bill to become law as provided by Article 4, Section 8 of the Wyoming Constitution." Wyo.Sess.Laws ch. 171, § 3 (1989). Consequently, with approval March 6, 1989, the law became effective on passage. I conclude that the present law determines any future death penalty assessment procedure which would include a penalty retrial for Engberg.[47] *Jones v. State,* 771 P.2d 368

---

**47.** There are no ex post facto prohibitions invaded by application of the current enactment under either U.S. Const. art. I, § 10 or Wyo. Const. art. 1, § 35. This court has addressed those concerns in *Loomer v. State,* 768 P.2d 1042 (Wyo.1989). There we stated the ex post facto prohibitions turn on the issue of procedural or substantive detriment. " 'Any statute \* \* \* which makes more burdensome the punishment for a crime after its commission, \* \* \* is prohibited as ex post facto.' " *Id.* at 1049 (quoting *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, *reh'g denied* 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166

(1977)). While the line between procedure and substance wavers at times, *see Byrd v. Blue Ridge Rural Electric Cooperative,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953, *reh'g denied* 357 U.S. 933, 78 S.Ct. 1366, 2 L.Ed.2d 1375 (1958), a review of the new statute indicates the sentence of death is more difficult to impose than under the old W.S. 6–2–102. For instance, the new statute spells out an individual juror may consider *any* mitigating circumstance found by that juror to exist. Also, the new statute makes clear that the list of mitigating circumstances is illustrative only. Because W.S. 6–2–102 inures to the benefit of Engberg, ex post facto prohibi-

(Wyo.1989); *Reynoldson v. State*, 737 P.2d 1331 (Wyo.1987); *Miller v. State*, 732 P.2d 1054 (Wyo.1987); *Attletweedt*, 684 P.2d 812.

### D. *Weighing and Burden of Persuasion Conflicts Now Ameliorated by Present Law*

The shifting standards for assessing the death penalty in modern American jurisprudence can be explained by the deviousness of philosophic differences within the great case volumes and the narrowness of the precepts by which it is determined that the defendant is or is not to be executed. By current Wyoming statutory changes, there have been contentious problems removed including the weighing and burden of persuasion conflicts. *See Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *People v. Johnson*, 47 Cal.3d 1194, 255 Cal.Rptr. 569, 767 P.2d 1047 (1989), *cert. denied* 494 U.S. 1038, 110 S.Ct. 1501, 108 L.Ed.2d 636, *reh'g denied* — U.S. ——, 110 S.Ct. 2196, 109 L.Ed.2d 524 (1990); and *People v. Brown*, 40 Cal.3d 512, 230 Cal.Rptr. 834, 726 P.2d 516 (1985),

*cert. granted in part* 476 U.S. 1157, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986), *judgment rev'd* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Demonstrating this clash of problems in its jurisprudence, California, as one of the major participants in present death penalty litigation, is illustrated by the majority and dissenting opinions in *People v. Lang*, 49 Cal.3d 991, 264 Cal. Rptr. 386, 782 P.2d 627 (1989), *cert. denied* — U.S. ——, 111 S.Ct. 224, 112 L.Ed.2d 178 (1990) when compared to the unanimous decision published the same date of *People v. Hunter*, 49 Cal.3d 957, 264 Cal.Rptr. 367, 782 P.2d 608 (1989), *cert. denied* — U.S. ——, 111 S.Ct. 222, 112 L.Ed.2d 190 (1990). *See also State v. Deboue*, 552 So.2d 355 (La.1989), *cert. denied* — U.S. ——, 111 S.Ct. 215, 112 L.Ed.2d 174, *reh'g denied* — U.S. ——, 111 S.Ct. 541, 112 L.Ed.2d 550 (1990). The complexity is illustrated in the current appellate proceedings of *Stano v. Dugger*, 889 F.2d 962 (1989), *reh'g granted and opinion vacated* 897 F.2d 1067 (11th Cir. 1990).[48] Retrial application of the present Wyoming statute may avoid some of the

---

tions are not applicable here. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798); *cf. Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) and *United States v. Story*, 891 F.2d 988 (2nd Cir.1989).

The advantages to any death charged defendant for application of the provisions of the most current Wyoming statute are self-evident. The *Coleman v. McCormick*, 874 F.2d 1280 (9th Cir.), *cert. denied* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989) ex post facto determinant consequently does not apply where the amendatory provisions for death penalty assessment will not disfavor the accused. The retrospective application addressed in *Aden v. State*, 761 P.2d 88 (Wyo.1988) is not appropriate for present decision to follow the general rule for the procedure to assess death penalty now in effect for retrial as more rational and objective, *id.* at 90, and certainly thoughtfully composed by the legislature to address obvious concerns about the efficacy of the prior law.

For the purposes of W.S. 8–1–107, amendments to W.S. 6–2–102 for retrial do not affect a pending prosecution following prior reversal of conviction. We have applied the *Attletweedt* rule as exculpated from W.S. 6–1–101(c). *Dobbert*, 432 U.S. 282, 97 S.Ct. 2290. For amendatory purposes, the changes to the death penalty statute were procedural, *Matter of Boyd's Estate*, 606 P.2d 1243 (Wyo.1980), and affected the penalty. *Dobbert*, 432 U.S. 282, 97 S.Ct. 2290.

**48.** With the hundreds of new death penalty convictions each year and the small number of executions, the literature is constant and voluminous. In current analysis, Wells addresses the issue: "In the words of Justice Stevens, '[T]he Court has lost its way in a procedural maze of its own creation.' The only path leading out of this maze is by way of a return to the principles of *Furman.*" Wells, *Federal Habeas Corpus and the Death Penalty: A Need for a Return to the Principles of Furman*, 80 J.Crim.L. & Criminology 427, 490 (1989) (footnote omitted and quoting *Smith v. Murray*, 477 U.S. 527, 540, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (Stevens, J., dissenting)). *See* Acker & Walsh, *Challenging the Death Penalty Under State Constitutions*, 42 Vand.L.Rev. 1299 (1989); Note, *Successive Chances for Life: Kuhlmann v. Wilson, Federal Habeas Corpus, and the Capital Petitioner*, 64 N.Y.U.L.Rev. 455 (1989); and Note, *Reviving Mercy in the Structure of Capital Punishment*, 99 Yale L.J. 389 (1989). *See also* Goldberg, *The Death Penalty Revisited*, 16 Hastings Const.L.Q. 1 (1988); Lushing, *Capital Punishment: A Disputation*, 42 Ark.L.Rev. 105 (1989); Note, *Tison v. Arizona: A General Intent for Imposing Capital Punishment Upon an Accomplice Felony Murderer*, 20 U.Tol.L.Rev. 255 (1988); *Death Penalty, California Supreme Court Survey May 1988– July 1988*, 16 Pepperdine L.Rev. 451 (1989); Comment, *Capital Punishment*, 102 Harv.L.Rev. 1035 (1989); Welborn, *A New Effort to Reinstate*

*the Death Penalty in Michigan,* 1988 Det. C.L.Rev. 33 (1988); Note, *Preserving Integrity in Capital Sentencing: Booth v. Maryland,* 22 Creighton L.Rev. 333 (1988); Note, *Maynard v. Cartwright: How the Supreme Court Killed The Catchall Category in the Oklahoma Death Penalty,* 24 Tulsa L.J. 215 (1988); Note, *Oregon Joins Texas at the Constitutional Outpost: The Oregon Supreme Court Upholds the Death Penalty Statutes in State v. Wagner,* 25 Willamette L.Rev. 653 (1989); Gottlieb, *The Death Penalty in the Legislature: Some Thoughts About Money, Myth, and Morality,* 37 U.Kan.L.Rev. 443 (1989); Note, *State v. Coleman: The Felony Murder Rule and the Use of Presumptions to Fulfill Criminal Intent in Capital Cases,* XV Ohio N.U.L.Rev. 119 (1988); Barnard, *Death Penalty. The 1988 Survey of Florida Law,* 13 Nova L.Rev. 907 (1989); Note, *A Continuing Source of Aggravation: The Improper Consideration of Mitigating Factors in Death Penalty Sentencing,* 41 Hastings L.J. 409 (1990); Note, *supra,* 53 Mo.L.Rev. 823; Note, *Double Jeopardy and Resentencing in Bifurcated Criminal Proceedings: Bullington v. Missouri,* 1982 B.Y.U.L.Rev. 192 (1982); *Twelfth Annual Survey of Arkansas Law,* 12 U.Ark. Little Rock L.J. 115 (1989–90); McKay, *Arizona's Death Penalty: The Eighth Amendment and Exclusion of Mitigating Circumstances,* 20 Ariz.St.L.J. 779 (1988); and Uelmen, *Review of Death Penalty Judgments by the Supreme Courts of California: A Tale of Two Courts,* 23 Loy.L.A.L.Rev. 237 (1989). Additionally, for a most current review, see *Death Penalty Symposium,* 58 UMKC L.Rev. 517 (1990) and *Death Penalty Symposium,* 59 UMKC L.Rev. 1 (1990).

The recurrent problems encountered by the appellate courts in consideration of the burden of proof and weighing instructions for death penalty determination are excruciatingly illustrated by samples of current cases from illustrative jurisdictions:

Federal: *Perry v. Lockhart,* 871 F.2d 1384 (8th Cir.), *cert. denied* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989); *Martin,* 891 F.2d 807; *Newlon v. Armontrout,* 885 F.2d 1328 (8th Cir. 1989), *cert. denied* — U.S. —, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990); *Pulley,* 465 U.S. 37, 104 S.Ct. 871; *Williams v. Armontrout,* 891 F.2d 656 (1989), *reh'g* 912 F.2d 924 (8th Cir.1990), *cert. denied* — U.S. —, 111 S.Ct. 1092, 112 L.Ed.2d 1197 (1991); *Harris v. Pulley,* 885 F.2d 1354 (9th Cir.1988), *cert. denied* 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990); *Lusk v. Dugger,* 890 F.2d 332 (1989), *reh'g denied* 894 F.2d 414 (11th Cir.), *cert. denied* — U.S. —, 110 S.Ct. 3297, 111 L.Ed.2d 805, *reh'g denied* — U.S. —, 111 S.Ct. 10, 111 L.Ed.2d 825 (1990); *Delap v. Dugger,* 890 F.2d 285 (1989), *reh'g denied* 898 F.2d 160 (11th Cir.), *cert. denied* — U.S. —, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990); *Harris,* 874 F.2d 756; *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.), *cert. denied* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); *Coleman,* 874 F.2d 1280; *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988); *Clark v. Ricketts,* 886 F.2d 1152 (9th Cir.1989); *People v. Boyde,* 46 Cal.3d 212,

250 Cal.Rptr. 83, 758 P.2d 25 (1988), *cert. granted* 490 U.S. 1097, 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989), *aff'd* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316, *reh'g denied* — U.S. —, 110 S.Ct. 1961, 109 L.Ed.2d 322 (1990).

Alabama: *Hallford v. State,* 548 So.2d 526 (Ala.Cr.App.1988), *aff'd* 548 So.2d 547 (Ala.), *cert. denied* 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); *Hinton v. State,* 548 So.2d 547 (Ala.Cr.App.1988), *aff'd* 548 So.2d 562 (Ala.), *cert. denied* 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).

Arkansas: *Robertson v. State,* 298 Ark. 131, 765 S.W.2d 936, 940 (1989), Hickman, J. concurring; *Ruiz v. State,* 299 Ark. 144, 772 S.W.2d 297 (1989); *Wilson v. State,* 295 Ark. 682, 751 S.W.2d 734, *opinion modified* 295 Ark. 682, 752 S.W.2d 762 (1988).

California: *Lang,* 264 Cal.Rptr. 386, 782 P.2d 627; *People v. Sheldon,* 48 Cal.3d 935, 258 Cal. Rptr. 242, 771 P.2d 1330 (1989); *People v. Bell,* 49 Cal.3d 502, 262 Cal.Rptr. 1, 778 P.2d 129 (1989), *cert. denied* — U.S. —, 110 S.Ct. 2576, 109 L.Ed.2d 757 (1990); *In re Sixto,* 48 Cal.3d 1247, 259 Cal.Rptr. 491, 774 P.2d 164 (1989).

Connecticut: *State v. Breton,* 212 Conn. 258, 562 A.2d 1060 (1989).

Florida: *Bello v. State,* 547 So.2d 914 (Fla. 1989).

Idaho: *State v. Leavitt,* 116 Idaho 285, 775 P.2d 599, *cert. denied* 493 U.S. 923, 110 S.Ct. 290, 107 L.Ed.2d 270 (1989).

Illinois: *People v. Kokoraleis,* 132 Ill.2d 235, 138 Ill.Dec. 233, 547 N.E.2d 202 (1989), *cert. denied* — U.S. —, 110 S.Ct. 3296, 111 L.Ed.2d 804, *reh'g denied* — U.S. —, 111 S.Ct. 18, 111 L.Ed.2d 831 (1990); *People v. Kidd,* 129 Ill.2d 432, 136 Ill.Dec. 18, 544 N.E.2d 704 (1989).

Indiana: *Huffman v. State,* 543 N.E.2d 360 (Ind.1989), *cert. denied* — U.S. —, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990); *Minnick v. State,* 544 N.E.2d 471 (Ind.1989); *Games v. State,* 535 N.E.2d 530 (Ind.), *cert. denied* 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158, *reh'g denied* 493 U.S. 985, 110 S.Ct. 523, 107 L.Ed.2d 523 (1989); *Lowery v. State,* 547 N.E.2d 1046 (Ind.1989), *cert. denied* — U.S. —, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990); *Smith,* 547 N.E.2d 817.

Louisiana: *State v. Lindsey,* 543 So.2d 886 (La.1989), *cert. denied* — U.S. —, 110 S.Ct. 1796, 108 L.Ed.2d 798, *reh'g denied* — U.S. —, 110 S.Ct. 2579, 109 L.Ed.2d 761 (1990).

Mississippi: *Minnick v. State,* 551 So.2d 77 (Miss.1988), *cert. granted* — U.S. —, 110 S.Ct. 1921, 109 L.Ed.2d 285, *rev'd* — U.S. —, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Clemons v. State,* 535 So.2d 1354 (Miss.1988), *cert. granted in part* 491 U.S. 904, 109 S.Ct. 3184, 105 L.Ed.2d 693 (1989), *judgment vacated* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Williams v. State,* 544 So.2d 782 (Miss.1987); *West v. State,* 553 So.2d 8 (Miss.1989).

New Jersey: *State v. Gerald,* 113 N.J. 40, 549 A.2d 792 (1988); *State v. Hunt,* 115 N.J. 330, 558 A.2d 1259 (1989); *Davis,* 561 A.2d 1082; *State v. Pitts,* 116 N.J. 580, 562 A.2d 1320 (1989); *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987); *State v. Biegenwald,* 106 N.J. 13, 524 A.2d 130

major issues argued in complex detail by Engberg in this proceeding as his death penalty issues.[49] Althouse, *Essay. Standing, In Fluffy Slippers,* 77 Va.L.Rev. 1177 (1991).

### E. *Other Death Penalty Issues*

With some deference to Engberg's 212–page brief, some major and not so minor death penalty issues remain for this post-conviction-relief review. Upon retrial, if death penalty imposition is again undertaken, most of these peculiar *Engberg-Hopkinson* type of issues should disappear with a new trial and a changed statute. Only a brief mention will now be made of those issues to avoid further extension of this presently overlong writing.

1. The constitutionality under present concept and case law of the unanimity and

(1987); *State v. Biegenwald,* 110 N.J. 521, 542 A.2d 442 (1988); *State v. Biegenwald,* 126 N.J. 1, 594 A.2d 172 (1991).

New Mexico: *State v. Clark,* 108 N.M. 288, 772 P.2d 322, *cert. denied* 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271, *reh'g denied* 493 U.S. 998, 110 S.Ct. 555, 107 L.Ed.2d 551 (1989), *overruled sub nom. State v. Henderson,* 109 N.M. 655, 789 P.2d 603 (1990).

North Carolina: *State v. Artis,* 325 N.C. 278, 384 S.E.2d 470 (1989), *cert. granted and vacated* 494 U.S. 1023, 110 S.Ct. 1466, 108 L.Ed.2d 604 (1990); *State v. Huff,* 325 N.C. 1, 381 S.E.2d 635 (1989), *cert. granted and vacated* — U.S. —, 110 S.Ct. 3266, 111 L.Ed.2d 777 (1990).

Ohio: *State v. Dickerson,* 45 Ohio St.3d 206, 543 N.E.2d 1250, *reh'g denied* 46 Ohio St.3d 706, 545 N.E.2d 1285 (1989), *cert. denied* — U.S. —, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990); *State v. Cooey,* 46 Ohio St.3d 20, 544 N.E.2d 895, *reh'g denied* 46 Ohio St.3d 717, 546 N.E.2d 1335 (1989), *cert. denied* — U.S. —, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, *reh'g denied* 43 Ohio St.3d 712, 541 N.E.2d 78 (1989), *cert. denied* — U.S. —, 110 S.Ct. 3258, 111 L.Ed.2d 768, *reh'g denied* — U.S. —, 111 S.Ct. 16, 111 L.Ed.2d 830 (1990).

South Carolina: *State v. Smith,* 298 S.C. 482, 381 S.E.2d 724 (1989), *cert. denied* — U.S. —, 110 S.Ct. 1536, 108 L.Ed.2d 775, *reh'g denied* — U.S. —, 110 S.Ct. 2221, 109 L.Ed.2d 546 (1990).

Virginia: *Spencer v. Com.,* 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990).

The burden of this case law would have required reversal on Engberg's death penalty in any event. *People v. Young,* 814 P.2d 834 (Colo. 1991). *Cf.* Carter, *A Beyond a Reasonable Doubt Standard in Death Penalty Proceedings: A Neglected Element of Fairness,* 52, Ohio St.L.J. 195 (1991).

49. The Wyoming statutory changes assist this court in avoiding the criticism recognized by the critical scholars in death penalty case decisions described to be a failure to recognize the differentiated function of a court of appeals and a supreme court. The conflicting concepts as clearly delineated in the electoral change in California of 1986 is demonstrated in Uelmen, *supra* n. 48, 23 Loy.L.A.L.Rev. 237. In compar-

ing the predecessor Bird court with the successor Lucas court, Professor Uelmen stated:

> The thesis that will emerge is that, at least in reviewing death penalty judgments, two very different models of the appellate function are at work.
>
> The Lucas court approaches the review of death penalty cases very much like intermediate appellate courts approach the review of ordinary criminal cases. The process closely matches the process described in a classic study of criminal appeals in the California Court of Appeal for the First Appellate District as it operated in the mid–1970s: "The court approaches its work from a perspective that is noninterventionist, nonsupervisory, and conflict avoiding. Its decision process accentuates the value of finality and is strongly inclined toward affirmance." That study noted that a high rate of affirmance of criminal appeals reflected basic institutional norms and perspectives. Essentially, the justices approached their task with great deference to the trial judge:
>
> "As a result, the Court of Appeal seldom asks what the best or most appropriate answer to a legal issue would be; rather, it usually asks only whether the trial court's answer is within acceptable bounds. In addressing that latter question, the basic norms of appellate review collectively call for the Court of Appeal to defer to the judgment of the trial court if possible, and direct the Court of Appeal to resolve any doubts or ambiguities in the direction of affirmance."
>
> The basic norms of appellate review thus become norms of affirmance. These include the principle of abstention in issues not presented below, the substantial evidence rule, and the harmless error rule. The common effect of each of these norms, as described by Dr. Davies, "is to cut off inquiry and transform problematic issues into routine affirmances. Once these norms are internalized by intermediate appellate judges, the norms create a perceptual filter that makes the appeals themselves appear to be devoid of any significant issues."

*Id.* at 238–39 (footnotes omitted and citing Davies, *Affirmed: A Study of Criminal Appeals and Decision–Making Norms in a California Court of Appeal,* 1982 Am.B.Found.Res.J. 543, 592, 607, 612 (1982)).

mandatory weighing process provided in particularity by the prior statute. *McKoy*, 110 S.Ct. 1227; *Smith v. McCormick*, 914 F.2d 1153 (9th Cir.1990); *State v. Smith*, 328 N.C. 99, 400 S.E.2d 712 (1991); *State v. Jones*, 327 N.C. 439, 396 S.E.2d 309 (1990); *State v. Landrum*, 53 Ohio St.3d 107, 559 N.E.2d 710, *reh'g denied* 54 Ohio St.3d 710, 561 N.E.2d 945 (1990), *cert. denied* — U.S. ——, 111 S.Ct. 1092, 112 L.Ed.2d 1196 (1991); *State v. Stevens*, 311 Or. 119, 806 P.2d 92 (1991). *Cf. Parker v. Dugger*, — U.S. ——, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). See also the cases cited in n. 48, *supra* and Sundby, *The Lockett Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing*, 38 UCLA L.Rev. 1147 (1991).

2. Improper instruction of mitigation and aggravation which in any light were specifically in conflict as given relating to the burden of persuasion. *McKoy*, 110 S.Ct. 1227; *Mills*, 486 U.S. 367, 108 S.Ct. 1860; *Landrum*, 559 N.E.2d 710. Compare *People v. Bean*, 137 Ill.2d 65, 147 Ill.Dec. 891, 560 N.E.2d 258 (1990), *cert. denied* — U.S. ——, 111 S.Ct. 1338, 113 L.Ed.2d 270 (1991) with *State v. McDougald*, 120 N.J. 523, 577 A.2d 419 (1990); *State v. Sanderson*, 327 N.C. 397, 394 S.E.2d 803 (1990); and *State v. Wagner*, 309 Or. 5, 786 P.2d 93, *cert. denied* — U.S. ——, 111 S.Ct. 212, 112 L.Ed.2d 171 (1990). Perhaps two cases most interesting in touching questions about the prior and the present Wyoming statute and the way the jury was actually instructed in Engberg (both ways) are *People v. Tenneson*, 788 P.2d 786 (Colo.1990), addressing a prior Colorado statute, and the present statute declared to be unconstitutional in *People v. Young*, 814 P.2d 834 (Colo.1991).

3. Prosecutorial error in final argument minimizing the jury decisional responsibility and maximizing requirement as a matter of law to assess the death penalty and also expanding aggravative factors to include non-statutory elements. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

4. Improper documentation provided in death penalty trial session, including use of pure hearsay for prior conviction documentation. *See generally* Comment, *The Evidence for Death*, 78 Calif.L.Rev. 973 (1990).

## VII.

## CONCLUSION

Given the serious nature of the death penalty and the heightened reliability most courts have consistently required in death sentencing procedures, *People v. Davis*, 794 P.2d 159, 230 (Colo.1990), *cert. denied* — U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), Lohr, J., dissenting, I would find significant error in both guilt and penalty assessment which "sufficiently undermines the fairness and certainty of the death sentence returned in this case to require reversal." Although I would reverse the conviction of guilt for the clear trial errors defined within this record and dissent in that regard, I concur in reversal of the death penalty and agree that the case should be remanded for another trial on punishment if the prosecution elects to continue the litigation beyond the life sentence otherwise applied.

THOMAS, Justice, dissenting with respect to the reversal of the capital sentence, with whom BROWN, Chief Justice, Retired, joins.

Despite the sincere attempt of the American Bar Association over the years to establish as the slogan or motto of the legal community that we enjoy "[a] government of laws, and not of men * * *," (*Marbury v. Madison*, 1 Cranch 137, 163, 5 U.S. 137, 2 L.Ed. 60 (1803)), and without regard to the support of the bench and the bar for that concept, the precise converse must be accepted as true in Wyoming the instant this decision is filed. I have searched, in vain, for something different in this case with respect to the validity of the capital sentence imposed in *Engberg v. State*, 686 P.2d 541 (Wyo.1984), *cert. denied* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984). Nothing has changed about the case. The only discernible difference is that there are two new members on this court who apparently would espouse the views of the dissent in the first *Engberg* case and one

member of the court who earlier had voted with the majority but has now had a change of heart.

Why then do I claim that Wyoming enjoys a government of men, not laws? First, because the majority opinion on the issue of capital punishment reaches out to capture a question that is not part of the *Engberg* case for the purpose of overruling the most recent affirmance of the sentence to death by this court in the Mark Hopkinson case. *Hopkinson v. State*, 798 P.2d 1186 (Wyo.1990). Second, because the disposition of the sentence to death in the majority opinion on that issue is made in complete disregard of the doctrine of *res judicata.* Third, I cannot overlook the fact that one of the justices, who has assiduously recused himself from every case or matter involving Hopkinson since joining the court (I understand because of some contact with one of the parties while the justice still was in private practice), now joins a majority opinion that has no effect in this case but effectively overrules the prior decision of this court in *Hopkinson,* 798 P.2d 1186. After eschewing the front entrance to the Hopkinson case, it now seems that the justice is willing, even if unwittingly, to enter through the Engberg portal.

There are those who advocate the repeal of capital punishment statutes. If the judicial department is so philosophically opposed to capital punishment that it will find a reason in every case to set the death sentence aside, there may be merit in the repeal of the capital punishment statute. When that occurs, however, there is some justification for the suggestion that we indeed have an imperial judiciary that insists upon imposing its philosophy as to that question without regard for the majority will apparently articulated by a valid legislative adoption of capital punishment. As a member of the minority of the court on this question, I cannot change that result, but I can call attention to the event and its implications and, on behalf of the citizens, protest the resolution.

It is necessary to quote at length from the majority opinion on the issue of the death sentence to avoid taking the matter out of context. The majority opinion first quotes from an amendment to the Wyoming capital murder statute that was adopted some *seven years* after Engberg killed Vernon Rogers and some *four years* after his sentence to death became final after full appellate review. Then the majority says:

"The change reflects the United States Supreme Court's decision in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), a decision made while this petition was still pending before this court. In *Mills,* the Court held that the trial court in a death sentence case must clearly instruct the jury that each individual juror may consider any mitigating circumstance he or she finds to exist in making a sentencing determination regardless of whether the jury unanimously found that mitigating circumstance to exist. 486 U.S. at 377–80, 108 S.Ct. at 1867–68. Reversal is required unless a 'substantial possibility' that this occurred can be ruled out.

"The sentencing phase instructions in this case required that the jury find an aggravating circumstance beyond a reasonable doubt and mitigating circumstance by a preponderance of evidence. The instruction for weighing the factors against each other did not indicate whether the mitigating factors must be found unanimously. Another instruction told the jury that it must unanimously agree on a verdict of death, and if it is unable to do so, the court will impose a sentence of life. The verdict form gave the jury two choices. The jury could either find the mitigating circumstances outweighed the aggravating circumstances and sentence Engberg to life, or that the mitigating circumstances did not outweigh the aggravating circumstances and sentence him to death. Nowhere in the instructions or verdict form was the jury told that the mitigating circumstances need not be found unanimously by the jury but that the mitigating circumstances may be found by individual jurors and weighed by them individually in deciding the life or death question.

*"Because W.S. 6–2–102 (1991 Cum. Supp.) will govern retrial of the sentencing phase of this case, we need not decide whether to extend the Mills decision to Engberg in a retroactive manner. See Sawyer v. Smith, — U.S. —, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); Flores v. State, 572 P.2d 746 (Wyo.1977). Nevertheless, it is important to remember that our law has always been 'that matters which convict require unanimity, and failure to convict can result from the vote of one juror and that aggravating and mitigating circumstances should be dealt with in the same way.' Hopkinson v. State, 798 P.2d 1186, 1190 (Wyo.1990) (Cardine, J., dissenting). The right to a unanimous verdict is beyond dispute. Taylor v. State, 612 P.2d 851, 853 (Wyo.1980); see Wyo.Const. Art. I, § 9. It is essential that Engberg be accorded the proper instructions on finding and considering mitigating circumstances in a retrial of the penalty phase of his felony murder conviction."* Majority opinion on the issues affecting imposition of the capital sentence, at 11 (emphasis added).

I must respectfully remind the majority that the Wyoming law is not settled by what is articulated in a dissenting opinion in *Hopkinson*, 798 P.2d 1186, or any other case or matter. On that issue, the majority opinion in *Hopkinson*, 798 P.2d at 1187, states:

"6. The Petitioner's earnest arguments that error occurred in the second penalty trial because of the instructions to the jury relating to mitigating circumstances in the light of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), fail of persuasion because the record in this case would not have justified reversal based upon the legal principle articulated in those cases, the cases are distinguishable and, under the circumstances, the court is not required to, nor would it be appropriate, to ap-

ply those cases retrospectively. The issue of the instructions relating to mitigating circumstances has been before this court, *Hopkinson v. State*, 664 P.2d 43 (Wyo.1983), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983), and the United States District Court, *Hopkinson v. Shillinger*, 645 F.Supp. 374 (D.Wyo.1986), *reh. denied* 648 F.Supp. 141 (D.Wyo.1986), and the instructions were approved."

While one must grudgingly admire the assiduity and tenacity of the majority in the effort to eliminate capital punishment in Wyoming, attempting to do that by articulating dictum in a case in which, by the majority's own admission, "we need not decide" the issue and relying upon a dissenting opinion, the quotation from which is itself taken out of context, for the authority to justify the dictum falls short of my perception of intellectual honesty.

The only possible purpose for this aspect of the majority opinion is to furnish support to the federal court, in which the Hopkinson case is pending on a petition for post conviction relief, to set aside the sentence to death in the Hopkinson case. That effort would have the effect of eliminating the death sentence in the only two remaining cases in Wyoming in which it was imposed by the jury. Already, there is evidence of the fact that prosecutors are not seeking the death penalty in cases in which a sentence to death well might be appropriate because they do not believe that the judiciary will permit the execution. I rest my case on this aspect of the evidence that Wyoming now enjoys a government of men, not laws.

I turn to my second concern about the resolution of this case. One of the most revered doctrines in our jurisprudence is that of *res judicata*. Those matters that have been adjudicated between the same parties are accorded finality. Nothing could be more clear than the fact that these identical issues were before this court in the prior case and decided contrary to this decision. Were this not the same case, but a different one, the doctrine of *stare deci-*

*sis* would suggest the same result. As Justice Cardine said:

> "Perhaps only a Cassandra will be heard to mourn the neglected rule of *stare decisis*, but it is a sad day indeed when our declarations within the same case are subject to judicial revision. If we are unwilling to take seriously what we write, how can we expect others to take us seriously?" *Jones v. State*, 798 P.2d 1206, 1208 (Wyo.1990), Cardine, J., dissenting.

With respect to the death sentence in this case, we have done the very thing that was so vigorously protested in *Jones*.

Furthermore, the majority has reached that result in a way that is particularly troublesome. Instead of applying settled law in the same case under either doctrine, *res judicata* or *stare decisis*, the majority has selected a rule adopted by judges in other places who have no commitment to serving the people of the State of Wyoming and has preferred that rule over the one previously adopted by Wyoming justices on this Court. This is done despite the fact that the decision of the Court was scrutinized by the United States Supreme Court for error under the Constitution of the United States and then not subjected to federal review. What we have then is an adaptation of a rule under another state constitution, adopted by judges in the different state, that has been imported to be substituted for solid Wyoming law. Is there any question that I must protest this result by dissenting from the majority opinion on the validity of the death sentence?

Perhaps the real justification for the majority position is best captured in the following:

> "Few of us have directly faced the awesome task of deciding whether a fellow human being should, three days hence, be killed by execution. I face that immediate decision, alone for the first time, as another of life's sobering experiences by which we find out more about who we are and how we feel about life and death, our relationships with others, power, justice, and the law. The legislative branch has decided as a matter of policy that the penalty for first degree murder in the State of Wyoming should be death. Statutes have been enacted specifying death by lethal injection as punishment. *I am convinced now that this is an unwise policy.*
>
> \* \* \* \* \* \*
>
> " \* \* \* To arrive at a rational decision, our focus ought to be on the death penalty itself. Every person who ever walked or will ever walk on the face of this earth is unique. There will never be another like that person. Life is precious. It is a gift that is so unique and wonderful that no mortal man should cheapen it by taking it from another. It has been said that killing begets killing. The more we kill, the more conditioned we become to killing until we are so conditioned that no one cares anymore. Someday every court in our land will recognize punishment by killing as cruel and unusual, but today we are not prepared to accept what someday will come to pass." *Hopkinson*, 798 P.2d at 1188 and 1192, Cardine, J., dissenting (emphasis added).

These are noble words. Would they had been uttered to memorialize a torture victim, a family literally blown apart, or an innocent victim of an armed robbery rather than in support of convicted, cold-blooded killers. The court should not lose the fact that when he killed Vernon Rogers, Engberg was an escapee from the Missouri Department of Corrections minimum security facility, where he was serving a life sentence for murder in the first degree after the killing of a night watchman in connection with an armed robbery. I submit that noble words do not justify the result here and, instead of seizing upon justification from other jurisdictions, the rule of *res judicata* should control, and the capital sentence should be affirmed. I regret that the drafter of the majority opinion on the sentencing phase feels that there has been unfair and personal criticism in this dissenting opinion. I do, indeed, endeavor to be attentive to the feelings of my brothers on the court. On the other hand, there are situations in which candor is es-

sential. I perceive this as one of those situations.

There is no justification for the drafter of the majority opinion to accept criticism as personal. A majority opinion is the product of a collegiate court and, when circulated for consideration by the other members of the court, or, at least, when filed, it no longer retains any proprietary aspect so far as the drafter is concerned. It becomes an institutional product that is owned only by the court. The opinion is the product of an institution that has no personality, but instead is a corporate identity. Certainly, this institutional identity encompasses one of the difficulties in serving on an appellate and collegiate court. The effort to articulate a committee decision in a way that is acceptable to all members of the committee is difficult and stressful.

Turning then to the reference to omitted material from the dissent in *Hopkinson* the full text of that material reads:

"Few of us have directly faced the awesome task of deciding whether a fellow human being should, three days hence, be killed by execution. I face that immediate decision, alone for the first time, as another of life's sobering experiences by which we find out more about who we are and how we feel about life and death, our relationships with others, power, justice, and the law. The legislative branch has decided as a matter of policy that the penalty for first degree murder in the State of Wyoming should be death. Statutes have been enacted specifying death by lethal injection as punishment. I am convinced now that this is an unwise policy. I am convinced also that, at this time in our history, these statutes are constitutional and, therefore, the law. I have taken an oath to support, obey and defend the constitution and will honor that oath. So, on to the law." *Hopkinson*, 798 P.2d at 1188.

I was aware of the full text when this dissenting opinion was prepared initially. I also am aware that, in becoming attuned to what we colloquially call the "bottom line," the citizens in our society, indeed, pay attention to what we do as well as what we say.

Mature reflection demands acceptance of the proposition that, in many instances, actions speak more voluminously and more eloquently than any words that can be used to describe them. Consequently, I opted to omit the complete quotation from *Hopkinson* because the next to the last sentence seems to me to have a hollow ring in light of the impact of this decision upon the death penalty in Wyoming. Lip service to the constitutionality of the death penalty has no meaning so long as this court will reach and stretch to find technical justification for avoiding its implementation. In my view, that reaching and stretching is present here and, to the extent that the court now redecides the *Hopkinson* case, it is present there.

I add to what has been said the proposition that it is clear that at least one member of the court's majority now has read the dissenting opinion. There can be no question that the revisiting of *Hopkinson* to decide it in a different way is indeed intentional and not accidental. I would like to offer a solution to the abrogation of the capital sentencing statute in Wyoming but, as the saying goes, "When you have the votes, vote!" The majority have the votes; they have voted; and capital punishment is abolished in the State of Wyoming. That result is not required by the law, but instead it is reached as a choice of policy, a policy that is contrary to the one chosen by the legislature.

An affirmance of the capital sentence can clearly be justified by proper reasoning and authority. In most situations, Engberg's sixteenth issue, the impropriety of invoking as aggravating circumstances the commission of the murder by Engberg for pecuniary gain and while engaged in the commission of the robbery, after relying on the robbery to invoke the first degree murder statute, would be controlled by the doctrine of *res judicata* and the concept of waiver. Engberg's argument that his sentence was determined in a manner which violates the Eighth and Fourteenth Amendments to the Constitution of the United

States is a combination of an argument rejected by this court on his direct appeal, together with an issue which he did not raise, but which was addressed by a dissenting justice in *Engberg*, 686 P.2d 541. Engberg was encouraged to raise that issue in his petition for rehearing, and the court's order denying the petition stated:

"This case came on before the court upon the Petition for Rehearing filed herein by the appellant, Roy Lee Engberg, and the court, having carefully considered the Petition for Rehearing and being fully advised, finds that the petition does not encompass any question or matter necessary to correct a decision which has been overlooked by the court; *seeks to present a point for the first time in the case* ; does not demonstrate a reasonable probability that the court arrived at an erroneous conclusion; and that the Petition for Rehearing should be denied; and it therefore is \* \* \*." *Engberg*, 686 P.2d at 563 (emphasis added).

I am persuaded that cause exists to avoid procedural waiver because of recent cases dealing with this issue. *State ex rel. Hopkinson v. District Court, Teton County*, 696 P.2d 54 (Wyo.1985), *cert. denied* 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985). *See also Perry v. Lockhart*, 656 F.Supp. 46, 48 (E.D.Ark.1986) ("the 'novelty' of the pecuniary gain argument at the time of Perry's trial was sufficient to provide 'cause' for his failure to raise this question"); *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

Subsequent to the decision of the court in *Engberg*, a division developed in the federal courts on the question of whether an element of the underlying felony could be used as an aggravating circumstance without infringing upon the Eighth Amendment to the Constitution of the United States. *See Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *Wilson v. Butler*, 813 F.2d 664 (5th Cir.1987), *cert. denied* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021, *reh'g denied* 485 U.S. 1015, 108 S.Ct. 1491, 99 L.Ed.2d 719 (1988), following *Welcome v. Blackburn*, 793 F.2d

672 (5th Cir.1986), *cert. denied* 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 825, *reh'g denied* 483 U.S. 1012, 107 S.Ct. 3245, 97 L.Ed.2d 750 (1987). In addition, several decisions in the highest courts of the states, most notably the recent decision by the Supreme Court of North Carolina in *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), *appeal after remand* 325 N.C. 125, 381 S.E.2d 681 (1989), *cert. granted and judgment vacated* —— U.S. ——, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990), *on remand* 327 N.C. 480, 397 S.E.2d 233 (1990), *on remand* 328 N.C. 288, 401 S.E.2d 632 (1991), have held that it is improper to submit statutorily overlapping aggravating circumstances to a jury in the sentencing phase of a capital case. We relied upon the rationale of the Supreme Court of North Carolina found in *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), in deciding *Engberg*, 686 P.2d 541, specifically rejecting the view of the Supreme Court of Florida. Since the Supreme Court of North Carolina now has ruled in a definitive way contrary to the holding which we adopted previously, I would address the merits of Engberg's sixteenth issue only to determine whether our prior conclusion should be changed or modified.

A constitutionally satisfactory procedure for imposing the death penalty requires assurance that the jury has made a specific determination that capital punishment is appropriate on the basis of the character of the individual defendant and the circumstances of that particular crime. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127, *reh'g denied* 482 U.S. 921, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The legislature's selection of aggravating circumstances has been accepted by the United States Supreme Court as properly limiting the jury's discretion if they circumscribe the class of persons upon whom capital punishment may be imposed. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh'g denied* 429 U.S. 875, 97 S.Ct. 197, 50

L.Ed.2d 158 (1976). *See Hopkinson*, 632 P.2d 79.

"* * * [A] jury's discretion to impose the death sentence must be 'suitably directed and limited so as to minimize the risk of wholly, arbitrary and capricious action.' *Gregg v. Georgia*, 428 U.S. 153, 189 [96 S.Ct. 2909, 2932, 49 L.Ed.2d 859] (1976) (joint opinion of Stewart, Powell and Stevens, JJ.); * * *." *Booth*, 482 U.S. at 502, 107 S.Ct. at 2532.

The provisions of the Constitution of the United States do not prohibit a state from imposing capital punishment on an individual defendant on the basis of a single aggravating circumstance, so long as the circumstance is not unconstitutionally vague.[1] Even though an aggravating circumstance may meet the constitutional standard under this test, if the circumstance is so construed that it is vague as applied, the imposition of capital punishment will be set aside.

"Thus the validity of the petitioner's death sentences turns on whether, in light of the facts and circumstances of the murders that he was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase 'outrageously or wantonly vile, horrible or inhuman in that [they] involved * * * depravity of mind * * *.' We conclude that the answer must be no. The petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 [(1977)], it 'is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason, rather than caprice or emotion.'

"That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 U.S. 420, 432–33, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *cert. denied* 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180, *reh'g denied* 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982) (footnotes omitted).

The requisite narrowing also may be accomplished by defining the elements of the crime. The Supreme Court of the United States said in *Jurek v. Texas*, 428 U.S. 262, 270–71, 96 S.Ct. 2950, 2955–56, 49 L.Ed.2d 929 (1976), *reh'g denied* 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976):

"While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose. See *McGautha v. California*, 402 U.S. 183, 206 n. 16, 91 S.Ct. 1454, 1466 n. 16, 28 L.Ed.2d 711 (1971); Model Penal Code § 201.6, Comment 3, pp. 71–72 (Tent. Draft No. 9, 1959). In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their statutory

---

1. If the aggravating circumstance is so vague as to permit a jury to impose capital punishment in a "wanton and freakish" manner, it will not pass constitutional muster. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh'g denied* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

"* * * [A] system 'could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur.' 428 U.S. at 195, n. 46, 96 S.Ct. at 2935, n. 46. To avoid this constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible from the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742.

aggravating circumstances. For example, the Texas statute requires the jury at the guilt determining stage to consider whether the crime was committed in the course of a particular felony, whether it was committed for hire, or whether the defendant was an inmate of a penal institution at the time of its commission. Cf. *Gregg v. Georgia,* 428 U.S. at 165–166, n. 9, 96 S.Ct. at 2921 n. 9; *Proffitt v. Florida,* 428 U.S. [242] at 248–249, n. 6, 96 S.Ct. [2960] at 2965, n. 6 [49 L.Ed.2d 913 (1976)]. Thus, in essence, the Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option—even potentially—for a smaller class of murders in Texas. Otherwise, the statutes are similar. Each requires the sentencing authority to focus on the particularized nature of the crime."

In achieving this narrowing, however, the state may not remove the jury's discretion as to whether capital punishment should be imposed by a mandatory infliction of capital punishment even in narrowly circumscribed situations. *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987).[2]

My further reflection upon the rulings of the Supreme Court of the United States persuades me that an element of the underlying felony may be considered as an aggravating circumstance in a capital case. I conclude that the United States Court of Appeals for the Fifth Circuit adequately captured the justification for our position in *Welcome,* 793 F.2d 672, relied upon in *Wilson,* 813 F.2d 664, in which it said:

"Louisiana's inclusion as an element of the crime of first degree murder of the

aggravating circumstance of committing multiple murders in a single consecutive course of conduct serves to cull out of the class of all murders, a small group which the State makes eligible for the death penalty. But finding that circumstance present in the course of determining guilt does not fix punishment. It only serves to permissibly advance the sentencing jury to the stage of weighing mitigating as well as aggravating circumstances in order to make an individualized determination of life or death based on the character of the individual and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2743-44, 77 L.Ed.2d 235 (1983). The finding of this aggravating circumstance as a part of the guilt determination process does not finally control the imposition of the death penalty. Such a finding only permits the death penalty to be considered." *Welcome,* 793 F.2d at 677.

The utilization of an aggravating circumstance, although it duplicates an element of the felony upon which the conviction of first degree murder was premised, does not fail to "genuinely narrow the class of persons eligible for the death penalty." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. This was the criticism levied by the United States Court of Appeals for the Eighth Circuit in *Collins,* 754 F.2d 258, and I conclude that the stance there taken is fallacious.

Statutory aggravating circumstances are invoked to circumscribe those instances in which capital punishment may be imposed after the defendant has been found guilty of a capital offense. If the jury finds, beyond a reasonable doubt, that one of the legislatively defined aggravating circumstances has been established, it may impose capital punishment on the basis of all the evidence without transgressing the Constitution of the United States. *Zant; Barclay v. Florida,* 463 U.S. 939, 103 S.Ct.

---

**2.** In *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), the Supreme Court noted that the Nevada statute permitted imposition of capital punishment upon the finding of a single aggravating circumstance and that circumstance was an element of the underlying

felony. Even though the constitutionality of that statutory approach was not directly addressed, it is obvious that the Supreme Court was aware of the sequential evaluation of the same circumstance.

3418, 77 L.Ed.2d 1134, *reh'g denied* 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983).

"Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important *at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.*" *Zant*, 462 U.S. at 878–79, 103 S.Ct. at 2743–44 (citations and footnotes omitted; emphasis added).

Since a single aggravating circumstance can be used to narrowly define the offense and be construed as constitutional, or, alternatively, the same circumstance may be characterized as an aggravating circumstance to be considered by the jury in connection with all evidence bearing on the "character of the individual and the circumstances of the crime," I cannot be persuaded that an element of the underlying felony cannot be considered as an aggravating circumstance in the sentencing stage. In the form of statute that Wyoming has adopted, the definition of the crime serves a narrowing function with respect to those instances in which capital punishment may be imposed. Even though the same information is invoked as an aggravating circumstance following conviction, at that stage of the trial, it simply serves to further narrow the instances in which capital punishment may be and should be imposed. There is no justification for a contention that this sequential consideration simply results in arbitrary imposition.

In determining whether capital punishment should be imposed, the Eighth Amendment to the Constitution of the United States demands that the evidence against the defendant focus on his character and the circumstances of the crime. *Booth*, 482 U.S. 496, 107 S.Ct. 2529; *Zant*; *Barclay*. There is nothing in these interpretations of the constitution that justifies a rule that relevant evidence should be excluded from the jury's consideration in the sentencing phase simply because that evidence also established the defendant's guilt of the crime. Rather than assuring arbitrary action, the utilization of this evidence serves to avoid the possibility of capricious action.

The constitution does not require a state to limit the evidence presented against a defendant in the sentencing portion of a capital case, but it may choose to do so. *Zant*. In Wyoming, the legislature made a choice. It limited the evidence which may be presented and considered against a defendant to that which is relevant to one of the statutorily defined aggravating circumstances, even though it permitted any relevant mitigating evidence whether or not it is probative of one of the statutorily defined mitigating circumstances. Section 6–2–102(d), W.S.1977 (June 1983 Repl.); *Hopkinson*, 632 P.2d 79. In performing this function, the jury is doing exactly that which the Supreme Court has indicated must be done. It is the classic sentencing function of imposing "[a]n individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879, 103 S.Ct. at 2744.[3]

Engberg's argument, based upon the rule in the Fifth Circuit, would be more persuasive if the duty of the jury at the sentencing stage was simply to count the number of aggravating circumstances against the number of any mitigating circumstances. We explained in *Engberg*, 686 P.2d 541, however, that the sentencing stage analysis in Wyoming is qualitative not quantitative, and we approved the in-

---

**3.** We note that our statute permits the sentencing hearing to be conducted before a new jury impaneled for that purpose if good cause exists. If the same jury did not serve at the sentencing stage, it would be essential that the information regarding the crime be submitted as an aggravating circumstance in order for the jury to adequately perform the sentencing function.

struction of the trial court which explained to the jury how that process should be accomplished. In considering the evidence as to the underlying felony at the guilt stage, the jury is concerned only with whether certain facts have been proved beyond a reasonable doubt. When that same information is presented at the sentencing stage, however, the legislature has given the jury additional discretion that it may use to deny capital punishment. At this point in the trial, the jury must focus not upon whether facts have been proved, but upon the qualitative evaluation of those facts in the light of other aggravating and mitigating circumstances. The inevitable result is to narrow further the instances in which capital punishment will be the sentence.

Finally, the position of the Fifth Circuit simply fails to acknowledge the significance of mandatory appellate review. We explained in *Hopkinson:*

"A sentence of death is subject to automatic review by this court. We must consider, not only the errors enumerated by way of appeal, but also whether the sentence was the product of an arbitrary factor, the evidence supports the findings of the trier of fact, and the sentence is excessive or disproportionate when compared with similar cases. In addition to affirming or reversing the underlying conviction, we may affirm the sentence of death, set aside the sentence and impose a sentence of life imprisonment, or remand for resentencing by the trial judge." *Hopkinson,* 632 P.2d at 153.

It is our duty to determine that a capital sentence was not imposed in an arbitrary and discriminatory manner. The United States Supreme Court has recognized meaningful appellate review as a strong factor in determining whether a capital punishment statute adopted by a state is constitutional. *E.g. Barclay,* 463 U.S. 939, 103 S.Ct. 3418; *Godfrey,* 446 U.S. 420, 100 S.Ct. 1759; *Zant.*

I also would conclude to abide by our decision in *Engberg,* 686 P.2d 541, with respect to the claim that it was error to allow the jury to consider both aggravating circumstances: (1) that the murder was committed during the course of a robbery and (2) that it was committed for pecuniary gain. Again, I recognize that the Supreme Court of North Carolina has changed positions from *Oliver,* 274 S.E.2d 183, to *Quesinberry,* 354 S.E.2d 446. Again, the utilization of both aggravating circumstances would be more troublesome if the Engberg jury was performing a quantitative analysis. Because the jury in this state must invoke a qualitative rather than a quantitative analysis of the aggravating factors, the significance of any overlap of the factors is diminished substantially. Furthermore, as the dissenting justice noted in *Quesinberry,* the act of robbery involves the consideration of the *actus reus* while the pecuniary gain circumstances considers the *mens rea* of the defendant. Perhaps the overlap is more imagined than real. In accord with the individualized determination requirement by the Supreme Court of the United States, *Zant,* 462 U.S. 862, 103 S.Ct. 2733, I note that the act of the robbery focuses on a circumstance of the crime, whereas the reason for the robbery, that it was committed for pecuniary gain, focuses on the character of the defendant. The evidence relating to the circumstances may overlap, but the considerations are separate and meaningful.

I cannot share the confidence of the majority that "Engberg will now, on remand, be given a lawful sentencing hearing at which a jury can correctly consider life or death upon proper instructions on the law and, if appropriate, impose the death penalty." Majority opinion on the issues affecting imposition of the capital sentence, at 13. It may be that the majority intended to invoke the language of § 6–2–103(e)(iii), W.S.1977 (Cum.Supp.1991), which provides that this court may "[s]et the sentence aside and remand the case for resentencing." The last sentence of the opinion, however, provides only "case remanded for proceedings consistent with this opinion." In my view the likelihood of a new sentencing hearing is not high. The case is ten years old, and I think the prosecutor must be possessed of unusual tenacity and perseverance to pursue the capital sentence.

The state secured a conviction and the imposition of a capital sentence in 1982, and the conviction and sentence were affirmed by this court in 1984. A petition for a writ of certiorari was denied by the Supreme Court of the United States. While the capital sentence was affirmed under the applicable rules, it now is set aside because in the interim someone in another place decided to modify Wyoming's rules. How is the prosecutor to understand, with any degree of confidence, that if another capital sentence is imposed, someone somewhere will *not decide to change the rules while the new sentence is subject to review?* The prosecutive effort would be frustrated again, as it is now. For me it is doubtful that Engberg will again face a capital sentence, and the humanitarian philosophy of the majority will be vindicated.

I would affirm both the conviction of first degree murder and the imposition of the sentence to death. The death sentence was arrived at in a lawful and rational manner, and it should be affirmed.